No.   22-_____

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
*Plaintiff–Respondent*,


AND


VINCENT JACKSON,
*Plaintiff-Intervenor–Respondent*,


VS.


DOLGENCORP, LLC,
*Defendant–Petitioner*.

---

On Appeal from the United States District Court
for the Northern District of Alabama
No. 2:17-cv-01649-MHH

---

## PETITION FOR PERMISSION TO FILE INTERLOCUTORY APPEAL

---

Stanley E. Graham
Frederick L. Conrad III
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37027
615.244.6380 phone | 615.244.6804 fax

*Counsel for Dolgencorp, LLC*

C

## CERTIFICATE OF INTERESTED PARTIES

Defendant–Petitioner, in accordance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1 & -2, hereby states that the following persons and entities may have an interest in the outcome of this appeal:

1.   **Dolgencorp, LLC**, Defendant–Petitioner;

2.   **Graham, Stanley E.**, Counsel for Defendant–Petitioner Dolgencorp, LLC;

3.   **Conrad III, Frederick L.**, Counsel for Defendant–Petitioner Dolgencorp, LLC;

4.   **Waller**, **Lansden**, **Dortch & Davis**, **LLP**, Counsel for Defendant–Petitioner Dolgencorp, LLC;

5.   **Haikala, Hon. Madeline Hughes**, U.S. District Judge;

6.   **Equal Employment Opportunity Commission**, Plaintiff–Respondent;

7.   **Rucker, Marsha L.**, Counsel for Plaintiff–Respondent;

8.   **Miller, Gerald L.**, Counsel for Plaintiff–Respondent;

9.   **Pearson, Gina Elaine**, Counsel for Plaintiff–Respondent;

10.  **Franklin, Alysia Desiree**, Counsel for Plaintiff–Respondent;

11.  **Lee, James, L.**, Counsel for Plaintiff–Respondent;

12.  **Jackson, Vincent**, Plaintiff-Intervenor–Respondent;

13.  **Scott, David W.**, Counsel for Plaintiff-Intervenor–Respondent;

14.  **Perkins, Byron R.**, Counsel for Plaintiff-Intervenor–Respondent;

15.    Plaintiff–Respondent has identified the following twenty-five individuals as "aggrieved parties" on whose behalf it is seeking to recover damages under the ADA:

| | | | |
|---|---|---|---|
| 1) | **Alexander, Jackson** | 14) | **Jackson, Marvin** |
| 2) | **Allen, Glenn** | 15) | **Jackson, Vincent** |
| 3) | **Allen, Jonathan** | 16) | **James, Demetrius** |
| 4) | **Carey, Carlos** | 17) | **Johnson, Gregory** |
| 5) | **Copeland, Willie** | 18) | **Johnson, Leodis** |
| 6) | **Crumpton, Roderiguez** | 19) | **Larry, Kinisha** |
| 7) | **Fielder, Eric** | 20) | **May, Darnell** |
| 8) | **Fischer-Ross, Brian** | 21) | **McConnico, Lorenzo** |
| 9) | **Flowers, David** | 22) | **Orenthal, Jordan** |
| 10) | **Greene, John** | 23) | **Ransom, Herman** |
| 11) | **Hall, Kevin** | 24) | **Snead, Anthony** |
| 12) | **Henderson, Bryan** | 25) | **Tate, Percy** |
| 13) | **Jackson, Antonio** | | |

16.    Plaintiff–Respondent has identified the following four hundred and ninety-seven individuals as "aggrieved parties" on whose behalf it is seeking to recover damages under GINA:

| | | | |
|---|---|---|---|
| 1) | **Abbott, Brian** | 2) | **Abernathy, Fredrick** |

| | | | |
|---|---|---|---|
| 3) | Abrams, Latisha | 23) | Bennett, Christopher |
| 4) | Acoff, Deantwaun | 24) | Bennett, Edward |
| 5) | Adams, Jeremy | 25) | Berryhill II, Keffie |
| 6) | Adams, Tommie | 26) | Bevelle, Patrick |
| 7) | Alexander, Earnest | 27) | Blakely, Glenn |
| 8) | Alexander, LaSheena | 28) | Bluester, Justin |
| 9) | Allen, Christopher | 29) | Body, Keyun |
| 10) | Allen, Tracy | 30) | Bonner, Rodriquez |
| 11) | Alvis, Nicholas | 31) | Boone, Carter |
| 12) | Argo, Michael | 32) | Borden, Turkesa |
| 13) | Austin, Montrel | 33) | Boyd, Tomika |
| 14) | Bandy, Demarco | 34) | Boyd, Tykneshia |
| 15) | Banks, Corey | 35) | Brantley, Johnny |
| 16) | Banks-Page, Darryl | 36) | Brasher, Steven |
| 17) | Barker, Jasper | 37) | Breeding, Cordell |
| 18) | Barker, Rondrez | 38) | Bridges III, Joe |
| 19) | Bartlett, David | 39) | Britton, Corey |
| 20) | Beasley, Jake | 40) | Broaden, Quarnisha |
| 21) | Beatty, Matthew | 41) | Brooks, Delois |
| 22) | Beckwood, Tori | 42) | Brooks, Tomecca |

43) Brown, Alexsis

44) Brown, Curtis G.

45) Brown, Joshua

46) Brown, Kenjarious

47) Brown, Rakeem

48) Brown, Vittorio

49) Bryant, Corey

50) Buchannan, Brandy

51) Burch, Brandon

52) Bwoma, Andrew

53) Byron, Gabrielle

54) Caldwell, Antonio

55) Caldwell, Errish

56) Calhoun, Floyd

57) Campbell, Christopher

58) Campbell, Travis

59) Cannon, Randol

60) Carey, Carlos

61) Carmichael, Terrence

62) Carney, Jason

63) Carpenter, Tracy

64) Carwell, Juan

65) Catlin, Dedrick

66) Cauthens, Marcus

67) Chambers, Eddie

68) Chandler, Jefferson

69) Chapman, George

70) Chatmon, Ryan

71) Christian, Nicholas

72) Clayton, Robert

73) Cochran, Cornelius

74) Coleman, Marcus

75) Collier, Ronderas

76) Collins, Willie

77) Combs, Antonio

78) Conor, Wesley

79) Cook, Christopher

80) Cooks, Johon

81) Coon, Angela

82) Cotton, Cameco

83)  Cottonham, Pertika

84)  Cousins, Brian

85)  Cox, Markeith

86)  Craig, Nikia

87)  Crockett, Feodore L Jr.

88)  Crumpton, Roderiquez

89)  Cruz, Pablo

90)  Cunningham, Nicholas

91)  Cunningham, Nicholas

92)  Curry, Courtney

93)  Curry, Twila

94)  Cutchens, Daniel

95)  Dalton, Eric

96)  Davis II, John C.

97)  Davis, Anterious

98)  Davis, Anthony

99)  Davis, Derrick

100)  Davis, Dewan Epps

101)  Davis, Franswa

102)  Davis, George

103)  Davis, Koydarrius

104)  Davis, Marcus

105)  Davis, Tyrone

106)  Dawson, Ashley

107)  Dawson, Clifton

108)  Dean, Clarence

109)  Dejarnette, Vernita

110)  Denson, Khadidra

111)  Desormeaux, Travis

112)  Dial, Mateo

113)  Doss, Treveon

114)  Dover, Kenneth

115)  Dowdell, Erica

116)  Dowdell, Robert

117)  Doyle, Michael

118)  Duncan, Morgan

119)  Dunn, Johnny

120)  Dunn, Jonathon L

121)  Dunn, Samuel

122)  Dunsmore, Caroline

123) Dunson, Litara

124) Dussett, Ryan

125) Eatman, Marcus

126) Eatman, Ronald

127) Echols, Walter

128) Ensminger, Lexis

129) Fancher, Tyrus

130) Fann, Montez

131) Farr, Orville

132) Farris, Joshua

133) Faulkner, John

134) Felder, Jerold

135) Felder, Kwame

136) Fergunson, Pierre

137) Ferrell, Frances

138) Fielder, Eric

139) Fields, Eric

140) Fields, Jacob

141) Fields, James

142) Finley, Brandon

143) Ford Jr., Robert

144) Ford, Justin

145) Foster, Durrelle

146) Foster, Erik

147) Foster, Lucious

148) Franks, Xavier

149) Freeman, Siddell

150) French, Richard

151) Gaddis, Ricky

152) Gadson, Betty

153) Gaines, Alphonzo

154) Gaines, Carl

155) Gaines, Demarko

156) Gann, Justin

157) Garner, Terrance

158) Garrett, Heather

159) Garrett, Stephen

160) Gaspard, Travel

161) Gaston, Kordarius

162) George, Brandon

163) Givens, Benjamin

164) Godfrey, Sharryl

165) Golston, James

166) Gooden Jr., Cecil

167) Gooden, Dandre

168) Gooden, Jeremy

169) Gordon, Debbie

170) Grant, Jatoria

171) Gray, Jacquez

172) Gray, Penny

173) Green, Alana

174) Green, Johnny E.

175) Greene, John

176) Greer, Lowell

177) Griffie, Michael

178) Griffin Jr., Lee M

179) Grimes, Maria

180) Griswold, Alexis

181) Gurley, Bernie

182) Hackworth, Dareon

183) Hagro, Jeffrey

184) Hall, Andrew

185) Hall, Kevin

186) Hall, Willie

187) Hamilton, Tamela

188) Hannah, Amanda

189) Hannah, Justin

190) Hardy, Keyondric

191) Harris III, Conrad

192) Harris Jr., Derrick

193) Harris, Jason

194) Harris, Richard

195) Hawkins, Christian

196) Hawkins, Erskine

197) Hefler, Dawn

198) Henderson, Bryan

199) Henderson, Phillip

200) Hicks, Beaunca

201) Hicks, Joshua

202) Hill, Alfreda

203) Hill, Anthony

204) Hill, Ceandra

205) Hill, Shawn

206) Hobson, Ladarius

207) Hodge, Lesley

208) Hollings, Jeremy

209) Holloway, Zack

210) Holmes, Alphonza

211) Holt, Darian

212) Horne, Montrez

213) Hoskins, Carla

214) Howard, Jeffrey

215) Hubbard, Reginald

216) Hubbard, Virnise

217) Hudson, Dedrick

218) Hullett, Billy

219) Isbell, Michael

220) Ivory, Dezman

221) Jackson, Clarence

222) Jackson, Cornelius

223) Jackson, Curtis

224) Jackson, Demetrius

225) Jackson, Kelvin

226) Jackson, Marvin

227) Jackson, Ratez

228) Jackson, Tony

229) Jackson, Vincent

230) January, Laderrin

231) Jemison, Napoleon

232) Jemison, Roderick

233) Johnson Jr., Jimmie

234) Johnson, Brandon

235) Johnson, Bryan

236) Johnson, Christopher

237) Johnson, Daniel

238) Johnson, Gregory

239) Johnson, Jemarcus

240) Johnson, Leodis

241) Johnson, Malcolm

242) Johnston, Norman

243) Jones IV, Parnell

244) Jones, Anthony

245) Jones, Deangelo

246) Jones, Malcolm

247) Jordan, Joel

248) Jordan, Michael

249) Jordan, Orenthal

250) Jordan, Terry

251) Jordan, William

252) Karrh, Johnnie

253) Keith Jr., Charles

254) Kennedy II, Walter

255) Kennedy, Jonathan

256) Kidd, Aaron

257) King Jr., Stanley

258) King, Demetrius

259) King, Dennis

260) Kirkland, Jerandy

261) Kitchens, Eric

262) Knight, Anthony

263) Knowles, Steven

264) Knox, Trendelyn

265) Kornegay, George

266) Kreutz, Darius

267) Larry, Kinisha

268) Lawson, Kelli

269) Layton, Leandre

270) Lee, Kitoryia

271) Lemsky, Mark

272) Leonard, Quinton

273) Leonard, Traedrein

274) Lett, Houston

275) Lewis, Jason

276) Lewis, Ladarius

277) Lewis, Xavier

278) Linton, Armond

279) Little, Gregory

280) Little, Jason

281) Lloyd, Jessica

282) Long, Gregory

283)  Loyd, Frederick

284)  Lucas, Ricco

285)  Lutin, Nicholas

286)  Mack, Gary

287)  Maddox, Julia

288)  Maddox, Justin

289)  Maden, Brandon

290)  Majernik, Dawn

291)  Marbury, Desmond

292)  Mason, Keith

293)  Maybell, Demarquis

294)  Mays, Maurice

295)  McClew, Justin

296)  McClinton, Demetruis

297)  McConnico, Demetrius

298)  McConnico, Lorenzo

299)  McCray, Crystal

300)  McCray, Michael

301)  McFarland, Joseph

302)  Mcghee, Caleb

303)  Mcghee, David

304)  Mcghee, Quedarius

305)  Mcghee, Stevie

306)  McGinnis, Maricus

307)  McIntyre, Cedric

308)  McKinney, Audrey

309)  McMullen, Michael

310)  McNeal, Issac

311)  McNeil, Brian

312)  Mcwhorter, Lawrence

313)  Means, Ricky

314)  Means, Sharminer

315)  Meany, David

316)  Miller, Johnny

317)  Miller, Joseph

318)  Mitchell Jr., Norman

319)  Mitchell, Briaunna

320)  Mobley, Kenneth

321)  Montgomery, Santez

322)  Moore III, William

| | |
|---|---|
| 323) Moore, Alonzo | 343) Palmer, Marlon |
| 324) Moore, Athony | 344) Paradise, Duntai |
| 325) Moore, Clarence | 345) Parham, Khayriyyah |
| 326) Moore, Jerold | 346) Parker, Louis |
| 327) Moore, Kederius | 347) Parker, Nicholas |
| 328) Moore, Shirley | 348) Parker, Taimon |
| 329) Morris, Demetrius | 349) Parsons, Noah |
| 330) Motley, Rickley | 350) Patrick, Justin |
| 331) Muhammad, Rashad | 351) Patterson, Antoan |
| 332) Murrell, Justin | 352) Patterson, Michael |
| 333) Muse, Tony | 353) Pavino, Christina |
| 334) Nash, Diante | 354) Payne, Jonathan |
| 335) Nene, Ian K | 355) Peterson, Courtney |
| 336) Nevels, Bryan | 356) Pettway, Keon |
| 337) Nichols, Andrew | 357) Phillips, Andrew |
| 338) Odom, John | 358) Pickering, David |
| 339) Ogden, Ronnie | 359) Pike, Christopher |
| 340) Oliver, Darrion | 360) Polanco-Torrez, Jorge |
| 341) O'Neill, Timothy | 361) Powell, Carlos |
| 342) Owens, Denzel | 362) Powell, Ronnie |

363)  Price, Daniel

364)  Pruitt, Adrian

365)  Ragland, Tommy

366)  Rahman, Idris

367)  Randolph, Denetrius

368)  Ray, Anthony John

369)  Reese Jr., Morris

370)  Reese, Timothy

371)  Rencher, Devon

372)  Requena, William

373)  Richardson, Pasha

374)  Richardson, Tristan

375)  Riddle, Quinton

376)  Riggins, Kurikas

377)  Riley, Lane

378)  Robertson, John

379)  Robinson, Jeremy

380)  Robinson, LaShanta

381)  Robinson, Marcus

382)  Robinson, Nicholas

383)  Rodgers, Quentin

384)  Rodgers, Wilnesha

385)  Rothenberger, Anthony

386)  Roubdioux, Larry

387)  Ruffin, Alicia

388)  Ruffin, Tomeka

389)  Russell Jr., Earnest

390)  Rutledge, Trenton

391)  Sampson, Truman

392)  Sanders, Lafayette

393)  Sanders, Terrod

394)  Sanford, Scotty

395)  Scott, William

396)  Servant, Reginald

397)  Shack, Melvin

398)  Shackleford Jr., John

399)  Shepard, Tyrone

400)  Simmons, Mauricia

401)  Simpson, Jared

402)  Sims Jr., David

403) Sims, Stephanie

404) Skinner, Richard

405) Smith, Deondre

406) Smith, Joshua

407) Smith, Lloyd

408) Smitherman, Alexsandria

409) Smoot, Dajuan

410) Snead, Anthony

411) Spain, Yashika

412) Sparks, Tonya

413) Stanford, Dock

414) Stanford, Karl

415) Steele, Willie

416) Sumpter III, Eddie

417) Swift, Carlon

418) Tartt, Jervan

419) Tate, Percy

420) Taylor, Christopher

421) Taylor, Matthew

422) Taylor, Rachelli

423) Taylor, Shaniqua

424) Taylor, Ymicheal

425) Thigpen, Victor

426) Thomas, Arthur

427) Thomas, James

428) Thomas, Ladarius

429) Thomas, Mikul

430) Thomas, Roland

431) Tindle, Ebony

432) Tolliver, Kenyatta

433) Townes, Justin

434) Tucker, Dasheen

435) Turner, Jeremy

436) Turner, John

437) Underwood, Bridarius

438) Underwood, Tamika

439) Vinziant, Stephen

440) Waldrop, Joshua

441) Walker III, Neal

442) Walker, Derek

443)  Walker, Shanika

444)  Walker, Steven

445)  Wallace, Matthew

446)  Wallace, Miles

447)  Waller III, Judson

448)  Walls, Mister

449)  Walton Jr., Sammie

450)  Walton, Bryant

451)  Wardlow, William

452)  Ware, Corey

453)  Ware, James

454)  Ware, Keyonte

455)  Washington Jr., Dion

456)  Washington, Juan

457)  Washington, Taalib

458)  Waters, Desmond

459)  Watkins, Jeremy

460)  Weatherspoon, Robert

461)  Webb, Maurice

462)  Webb, Stephan

463)  Weeks, Michael

464)  Welch Jr., James

465)  Welch, Ledarius

466)  Wheeler, Clifton

467)  Wheeler, Renay

468)  Whitaker, Walter

469)  White, Marcus

470)  White, Philip

471)  Whitehorn, Christopher

472)  Whitley, Nicholas

473)  Wiley Jr., Anthony

474)  Williams III, James

475)  Williams Jr., Ernest

476)  Williams Jr., Israel

477)  Williams, Adrian

478)  Williams, Ashton

479)  Williams, Cameron

480)  Williams, Jeffrey

481)  Willis, Brooklyn

482)  Wilson, Desi

483)  **Wilson, Herman**

484)  **Wilson, LeWayne**

485)  **Wilson, Marice**

486)  **Wilson, Robert**

487)  **Wilson, Yusaf**

488)  **Witherspoon, Laquita**

489)  **Woods Jr., Rodragus**

490)  **Woods, Londriquez**

491)  **Wormely, Michael**

492)  **Wrench, Noel**

493)  **Wright, Deshaundrea**

494)  **Wright, Richard**

495)  **Young, Ian**

496)  **Young, Marcus**

497)  **Zeigler III, Leo**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The undersigned attorneys of record for Defendant–Petitioner Dolgencorp, LLC hereby certify, pursuant to Eleventh Circuit Local Rules 26.1-1 through 26.1-3, that:

1.      Dolgencorp, LLC is a limited liability company under the laws of the State of Kentucky.

2.      Dolgencorp, LLC is a wholly-owned subsidiary of Dollar General Corporation.

3.      Dollar General Corporation is a publicly traded Tennessee corporation with its principal place of business in Tennessee.

4.      No publicly held corporation owns ten percent (10%) or more of stock in Dollar General Corporation.

# I.  INTRODUCTION

The Americans with Disabilities Act (the "ADA") has long given employers the right to condition job offers on pre-employment physical examinations assessing a candidate's physical qualification for the job.  The District Court's Memorandum Opinion in this case has turned the statute on its head and effectively prohibits such examinations regardless of whether they have any adverse effect on individuals with disabilities and regardless of whether the employer's had any discriminatory intent in utilizing them.  Its decision runs counter to decisions from the Supreme Court, this Circuit, and numerous other circuit and district courts as well as the language of the statute itself.  If not corrected quickly on immediate appeal, the parties in this case would be required to engage in additional discovery, motion practice, and a trial on a legally invalid ADA claim brought by the EEOC on behalf of more than two dozen individuals.  An immediate appeal would further mitigate the risk of copycat claims being asserted in reliance on the District Court's incorrect reasoning.  Accordingly, Petitioner Dolgencorp, LLC ("Dollar General") requests that the Court grant this Petition and take up the issue presented on interlocutory appeal.

Dollar General lawfully required post-offer pre-employment physical examinations between 2013 and 2017 for General Warehouse Worker ("GWW") candidates at its Bessemer, Alabama distribution center (the "Bessemer DC").

Respondents—Plaintiff Equal Employment Opportunity Commission (the "EEOC") and Plaintiff-Intervenor Vincent Jackson—later sued Dollar General claiming, *inter alia*, that these examinations applied unlawful "qualification standards" that had the effect of screening out GWW candidates on the basis of disability in violation of 42 U.S.C. § 12112(b)(6).  Respondents have specifically challenged the components of the physical exam that considered blood pressure readings, peripheral vision and depth perception, and blood sugar levels, and alleged they constituted "qualification standards" that "screened out or tended to screen out" individuals with disabilities.  The EEOC brought the action in a representative capacity, identifying twenty-five individuals, including Mr. Jackson, as "aggrieved parties."

Despite relying on a disparate impact theory that the physical examination applied qualifications standards that had the ***effect*** of discriminating against candidates based on disability, at summary judgment Respondents offered no statistical evidence that the challenged standards actually "screened out or tended to screen out" individuals with disabilities. This type of statistical evidence, however, is required in order to withstand summary judgment on what is necessarily a disparate ***impact*** claim. In contrast, Dollar General presented undisputed statistical evidence that application of the allegedly unlawful

qualification standards ***did not*** screen out or tend to screen out individuals with disabilities.

In its Memorandum Opinion granting in part and denying in part cross motions for summary judgment, the United States District Court for the Northern District of Alabama found that Respondents had not offered statistical evidence to establish that the pre-employment physical examination had a disparate impact on individuals with disabilities and that such evidence was required for a disparate impact claim to survive summary judgment. *See* Memorandum Opinion, Case No. 2:17-cv-01649, DE No. 131 at 9–11, 19–20 (attached as Exhibit A). Rather than dismissing Respondent's Section 12112(b)(6) claim outright as it should have, however, the District Court found that consideration of candidates' blood pressure and vision constituted direct evidence of disparate ***treatment*** discrimination for which statistical evidence was unnecessary. *Id.* at 10–23. Dollar General subsequently filed a motion for permission to appeal the District Court's Order, and on January 3, 2023, the District Court certified the following question for interlocutory appeal:

> Should ADA claims regarding qualification standards that screen out or tend to screen out individuals with disabilities under 42 U.S.C. § 12112(b)(6) be analyzed exclusively as disparate impact claims or may plaintiffs establish screening claims by making an adequate showing of disparate treatment?

*See* Order, Case No. 2:17-cv-01649, DE No. 154 at 8 (attached as Exhibit B).[1]

The District Court's holding is in conflict with decisions from the Supreme Court, this Circuit, at least four other Circuit Courts, and dozens of District Courts inside and outside this Circuit that have either suggested or explicitly found that ADA "screen out" claims brought under 42 U.S.C. § 12112(b)(6) may only proceed under a disparate impact theory. Although the Eleventh Circuit has not directly decided this precise issue, it suggested in an unpublished 2015 decision that Section 12112(b)(6) claims are limited to a disparate impact theory only. In that case, the Court analyzed a Section 12112(b)(6) claim exclusively under a disparate impact theory and affirmed summary judgment for the defendant because the plaintiff had failed to provide any statistical evidence of the tendency of a policy to screen out individuals with a disability. *Smith v. Miami-Dade Cty.*, 621 F. App'x 955, 961–62 (11th Cir. 2015). The United States Supreme Court's decision in *Raytheon v. Hernandez* further indicates that Section 12112(b)(6) sounds in disparate impact, not disparate treatment, with the Court quoting that section's language concerning "qualification standards, employment tests, or other

---

[1] Dollar General also moved for permission to appeal the District Court's Order with respect to a question of first impression under the Genetic Information Nondisclosure Act ("GINA"), specifically whether an "acquisition of genetic information" claim under GINA supports a claim for compensatory and punitive damages under 42 U.S.C. § 1981a when there is no allegation of any intent to discriminate based on genetic information. The District Court declined to certify this question to the Eleventh Circuit. *See* Exhibit B at 8.

selection criteria that screen out or tend to screen out an individual with a disability" as the basis for asserting disparate impact claims under the ADA. 540 U.S. 44, 52–53 (2003).

The vast majority of Circuit Courts and District Courts to have addressed the issue have likewise held—often citing *Raytheon*—or implied that a Section 12112(b)(6) claim may only be established through a disparate impact theory. *See e.g.*, *Lopez v. Pacific Maritime Assoc.*, 657 F.3d 762, 766–67 (9th Cir. 2011) (holding that a plaintiff waived his disparate-impact ADA claim by not citing Section 12112(b)(6) in his opening brief); *Fulbright v. Union Pac. R.R. Co.*, 2022 U.S. Dist. LEXIS 37383, *9 (N.D. Tex. Mar. 2, 2022) ("Plaintiff may not bring his section 12112(b)(6) screening claim under a disparate-treatment theory of discrimination and is limited to doing so only under a theory of disparate impact."); *see also Meza v. Union Pac. R.R. Co.*, 2022 U.S. Dist. LEXIS 164208, *7–9 (D. Neb. Sep. 12, 2022) ("[S]everal courts hold that § 12112(b)(6) applies only to disparate-impact claims . . . and the[se] cases [] are persuasive.") (collecting cases).

Not only is the District Court's opinion permitting the Respondents' Section 12112(b)(6) claims to proceed under a disparate treatment theory counter to the overwhelming weight of case law throughout the country, it is also counter to a plain reading of the statute itself. Section 12112(b)(6) is limited by its terms to

a claim challenging "qualification standards . . . that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities . . . ." Such effects-based language makes clear that, regardless of the reason for the challenged standard, there is no violation of Section 12112(b)(6) if application of that standard did not "screen out or tend to screen out" the disabled in practice. Such a showing could only be made with statistical evidence that a challenged qualification standard adversely impacted disabled candidates by actually screening them from further consideration. It would be nonsensical to allow such a claim to also be viewed as a disparate treatment theory alleging a discriminatory state of mind when the undisputed statistical evidence is that *the allegedly unlawful standards did not screen out or tend to screen out individuals with a disability.*

Whether Section 12112(b)(6) recognizes a claim for disparate treatment, and not just disparate impact, is a pure question of law that Dollar General submits warrants immediate review by the Eleventh Circuit. There is substantial legal authority in this Circuit and elsewhere that an ADA challenge to qualification standards must be analyzed as a disparate impact claim requiring statistical evidence and that Section 12112(b)(6) does not extend to disparate treatment claims of intentional discrimination. The answer to the question presented would also materially advance the termination of this litigation by avoiding the need for

further discovery, additional dispositive motions practice, a trial, and an inevitable appeal on the same pure question of law for which immediate review is now sought.  For these reasons, Dollar General respectfully requests that the Court grant its petition for interlocutory appeal.

## II. QUESTION FOR REVIEW ON INTERLOCUTORY APPEAL

Should ADA claims regarding qualification standards that screen out or tend to screen out individuals with disabilities under 42 U.S.C. § 12112(b)(6) be analyzed exclusively as disparate impact claims or may plaintiffs establish screening claims by making an adequate showing of disparate treatment?

### III. FACTUAL AND PROCEDURAL BACKGROUND

In order to supply its retail locations, Dollar General operates large distribution centers in multiple locations where product is received, checked in, unloaded, stored, and shipped to its stores. Exhibit A at 4. One such distribution center is the Bessemer DC. *Id.* Product is moved throughout the Bessemer DC by GWWs, primarily through the operation of heavy machinery that GWWs must be able to operate safely and effectively throughout the busy facility. *Id.* at 4, 31.

Between December 2013 and September 2017, GWW job applicants at the Bessemer DC went through a multi-step selection process that included a written application, job interview, background check, and an offer of employment conditioned on successful completion of a drug screen and a pre-employment physical examination at a third party medical center. *Id.* at 4–5. During the pre-employment physical examinations, candidates would fill out an intake form[2] and the medical center's staff would then take the candidate's vitals and perform a vision test, a urinalysis, a hearing evaluation, and a physical examination. *Id.* at 7. The medical center would then fax a form to Dollar General indicating whether the candidate was qualified, not qualified, or was referred to a primary medical doctor for further evaluation (listed as "Refer to PMD"). *Id.* at 7–8.

---

[2] The basis for the GINA acquisition claim in this case is that the intake form included the yes or no question: "Have your grandparents, parents, or children had significant medical problems?" Exhibit A at 5. There is no allegation or evidence that the answer to this question had any effect on a candidate's ultimate rating or that Dollar General ever had any knowledge of the answers.

Only 1 out of the 627 candidates who underwent an examination received a final rating of "Not Qualified" for any reason other than failing a drug screen or refusing to complete the pre-employment physical examination. *See* Memorandum in Support of Summary Judgment, Case No. 2:17-cv-01649, DE No. 110 at 9–10 (attached as Exhibit C). Further, of those candidates initially rated "Refer to PMD" because of a blood pressure, blood sugar, or vision measurement, 100% of those who returned to the clinic after that referral and completed the examination were subsequently rated as "Qualified." *Id.*

The EEOC's Complaint avers that Dollar General's pre-employment examination process violated Section 12112(b)(6) of the ADA by using qualification standards that allegedly screened out or tended to screen out individuals with disabilities. *See* Complaint, Case No. 2:17-cv-01649, DE No. 1 (attached as Exhibit D). There is no allegation that Dollar General designed or utilized qualification standards with any deliberate intent to discriminate against individuals with disabilities, but rather that such standards adversely affected the twenty-five "aggrieved parties" on whose behalf it has brought suit. *See generally* Exhibit D. That group consists of that subset of candidates who received ratings of "Not Qualified" or "Refer to PMD" after they had tested for high blood pressure or

low visual acuity during the pre-employment physical examination.[3] *Id.*; Exhibit A at 8.

The parties filed cross motions for summary judgment as to liability after the District Court bifurcated the case and reserved additional discovery as to damages and any specific issues related to individual aggrieved parties until after resolution of the motions. On July 26, 2022, the District Court granted in part and denied in part Dollar General's motion and granted the EEOC's motion for partial summary judgment as to liability on its GINA claim. Exhibit A. In reaching this result, the Court held that the EEOC's ADA "screen out" claim under 42 U.S.C. § 12112(b)(6) survived summary judgment despite the absence of statistical evidence that the pre-employment physical examinations actually screened out or tended to screen out individuals with disabilities, and that the claim could be brought instead under a disparate treatment theory. *Id.* at 10–23. Specifically, the Court found that although there was no showing that individuals with disabilities were screened out or tended to be screened out—nor was there any showing of an intent to discriminate by anyone at Dollar General or the medical clinic conducting the examinations—using a pre-employment physical examination that considered blood pressure and visual acuity was, on its own, direct evidence of discriminatory

---

[3] The Complaint also alleged ADA claims on behalf of individuals with abnormal blood sugar readings, but the District Court properly found that having an abnormal blood sugar level was not a disability and dismissed the ADA claims brought by Respondents on behalf of those individuals. *See* Exhibit A at 23 n.10.

intent that supported a disparate treatment claim under Section 12112(b)(6). *Id.* at 17–23.

On August 25, 2022, Dollar General filed a Motion for Certification of an Interlocutory Appeal and requested the Court stay the remaining discovery issues and pretrial deadlines. *See* Motion for Certification and Memorandum in Support, Case No. 2:17-cv-01649, DE Nos. 134 and 135 (attached as Exhibits E and F). The Motion requested certification of two questions: (1) whether a GINA claim for the "acquisition of genetic information" under 42 U.S.C. § 2000ff-1(b) is a claim for "intentional unlawful discrimination" within the meaning of 42 U.S.C. § 1981a for which compensatory and punitive damages are available; and (2) whether a "screen out" claim brought under 42 U.S.C. § 12112(b)(6) can be brought only as a disparate impact claim requiring statistical evidence. Exhibits E and F.

On January 3, 2023, the District Court granted the Motion in part and certified an interlocutory appeal limited to "whether ADA claims regarding qualification standards that screen out or tend to screen out individuals with disabilities under 42 U.S.C. § 12112(b)(6) [are] analyzed exclusively as disparate impact claims or may plaintiffs establish screening claims by making an adequate showing of disparate treatment." Exhibit B. The Court held that an interlocutory appeal was warranted because there are "substantial grounds for difference of opinion" on the issue, "determination of this issue would not require the Eleventh

Circuit Court of Appeals to delve into the factual record in this case," and "[r]esolution of the ADA issue in favor of Dollar General likely will substantially reduce the scope of this litigation on remand." *Id.* at 7–8.

## IV. REASONS FOR GRANTING PETITION TO APPEAL

This Court in its discretion may permit an appeal to be taken from an order certified for interlocutory appeal under 28 U.S.C. § 1292(b) on "(1) pure questions of law (2) which are controlling of at least a substantial part of the case, (3) and which are specified by the district court in its order, (4) and about which there are substantial grounds for difference of opinion, (5) and whose resolution may well substantially reduce the amount of litigation necessary on remand." *McFarlin v. Conseco Servs.*, 381 F.3d 1251, 1264 (11th Cir. 2004); *see* 28 U.S.C. § 1292(b). To be suitable for immediate appeal, "[t]he legal question must be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law. And the answer to that question must substantially reduce the amount of litigation left in the case." *McFarlin*, 381 F.3d at 1259. These elements are all present in the question presented here. Accordingly, the Court should exercise its discretion and accept the request for interlocutory appeal.

### A. The issue specified by the District Court involves a pure question of law that controls a substantial part of the case.

The sole question certified by the District Court and expressly specified in its Order is whether ADA claims challenging qualification standards that allegedly screen out or tend to screen out individuals with disabilities under 42 U.S.C. § 12112(b)(6) must be analyzed exclusively as disparate impact claims. Exhibit B

14

at 8.  This question concerns the interpretation of a federal statute, specifically the applicable standard and required evidence for a particular type of claim under the ADA.  Answering that question does not require any detailed review of the factual record.  It is also a controlling question that if answered in the affirmative would dispose of the putative ADA claims of 25 "aggrieved parties."  Moreover, the answer to whether claims brought under Section 12112(b)(6) must be analyzed exclusively as disparate impact claims would clarify the applicable theories of liability available to all present and future plaintiffs in the Eleventh Circuit who seek to bring "screen out" claims under that provision of the ADA.

This Court and its sister circuits have repeatedly held that similar questions concerning the available theories of liability for a specific claim is a pure and controlling question of law suitable for interlocutory appeal.  *See, e.g.*, *Peace Church Risk Retention Grp. v. Johnson Controls Fire Prot. LP*, 49 F.4th 866, 869 (3d Cir. 2022) (noting the Court granted interlocutory appeal on the question of plaintiff's novel theory of liability); *In re Jones*, 2021 U.S. App. LEXIS 1571, *2 (6th Cir. Jan. 20, 2021) ("[W]hether the ADA and RA permit recovery against a municipality based on a theory of *respondeat superior* liability—involves a controlling question of law . . . ."); *Love v. Delta Air Lines*, 310 F.3d 1347, 1351 (11th Cir. 2002) (granting § 1292(b) review of whether the Air Carrier Access Act of 1986 creates a private right of action).  In fact, in *Adams v. Fla. Power Corp.*,

this Court granted interlocutory appeal on the question of "whether a disparate impact theory of liability is available to plaintiffs suing for age discrimination under the Age Discrimination in Employment Act of 1967 ('ADEA')," which this Court explained "presents a controlling issue of law."  255 F.3d 1322, 1323 (11th Cir. 2001).  The Court should also grant interlocutory appeal here on the materially similar question of whether a disparate treatment theory of liability is available under 42 U.S.C. § 12112(b)(6).

### B.    There exists substantial grounds for difference of opinion on the issue.

As the District Court discussed in its Memorandum certifying this interlocutory appeal, there is a difference of opinion among courts as to what theory of liability may be applicable to a "screen out" claim under Section 12112(b)(6).  Exhibit B at 5–8.  While there is no dispute among courts, or the parties, that Section 12112(b)(6) claims may be pursued under a disparate *impact* theory, there remains an open and disputed question over whether such "screen out" claims may also be established under a disparate *treatment* theory.  This divergent case law demonstrates the existence of substantial grounds for difference of opinion.  *See McFarlin*, 381 F.3d at 1258; *see also Ala. Aircraft Indus. v. Boeing Co.*, 2019 U.S. Dist. LEXIS 242335, *18–19 (N.D. Ala. Mar. 18, 2019) ("Substantial ground for difference of opinion exists when a legal issue is (1)

difficult and of first impression, (2) the district courts of the controlling circuit are split as to the issue, or (3) the circuits are split on the issue.").

The difference of opinion on this issue exists both between the various circuit courts and among district courts within the Eleventh Circuit. To date, no circuit court appears to have squarely addressed the question presented in detail, and there is inconsistency in those decisions that have tangentially addressed it. Some circuits have appeared to indicate that Section 12112(b)(6) claims must be analyzed under a disparate impact theory while at least one circuit has indicated a disparate treatment theory may also be applicable. *Compare Lopez*, 657 F.3d at 766–67 (holding that a plaintiff waived his disparate impact ADA claim by not citing Section 12112(b)(6) in his opening brief) *and Boersig v. Union Electric Co.*, 219 F.3d 816, 822 (8th Cir. 2000) (stating that Section 12112(b)(6) "invoke[es] a disparate impact theory of ADA liability") *with EEOC v. Kronos Inc.*, 694 F.3d 351, 357 (3d Cir. 2012) (noting in dicta that "screen out" tests "may be impermissible under both disparate treatment and disparate impact theories").

Although neither the Supreme Court nor this Circuit has explicitly ruled on the issue, prior decisions from both courts support Dollar General's position that Section 12112(b)(6) only recognizes disparate impact claims. For example, in *Smith v. Miami-Dade County*, this Circuit affirmed summary judgment for the defendant on the plaintiff's Section 12112(b)(6) claim because the plaintiff had

failed to provide any statistical evidence of the tendency of the challenged policy to screen out individuals with a disability. 621 F. App'x at 961–62. The Circuit analyzed the Section 12112(b)(6) claim exclusively under a disparate impact theory, which requires a showing of statistical evidence. *Id.* The Circuit also dismissed the plaintiff's putative disparate treatment claim because it was based on the application of the challenged qualification standards, which the Circuit held "failed to allege claims of disparate treatment." *Id.* at 959. Thus, although this Circuit did not explicitly state that Section 12112(b)(6) claims may only be brought under a disparate impact theory, such a position is strongly implied by the Circuit's analysis in *Smith*.

Similarly, in *Raytheon v. Hernandez*, the Supreme Court also indicated that Section 12112(b)(6) is limited to claims of disparate impact. 540 U.S. 44, 52–53 (2003); *see also* Exhibit A at 14 ("Dicta in *Raytheon* undergirds the argument that § 12112(b)(6) pertains only to disparate impact claims."). In that decision, the Supreme Court focused on the distinction between a disparate-treatment theory's ***intent***-centric nature versus the ***effect***-centric nature of a disparate-impact theory. *Id.* The Court explained that disparate treatment claims are limited to those circumstances where the claim "depends on whether the protected trait . . . actually motivated the employer's decision" while disparate impact claims focus on whether a policy "in fact fall[s] more harshly on one group than another

[regardless] of the employer's subjective intent to discriminate that [would be] required in a disparate-treatment case." *Id.* (internal quotations omitted). Critically, in discussing how different subsections of the ADA recognize disparate treatment claims while others permit disparate impact claims, the Supreme Court cited Section 12112(b)(6)'s *effects*-based language as the basis for an ADA disparate impact claim. In so doing, the Court categorized Section 12112(b)(6) as a claim arising under a disparate *impact* theory of liability. *Id.* at 53; *see also Meza v. Union Pac. R.R. Co.*, 2022 U.S. Dist. LEXIS 164208, *8 (D. Neb. Sep. 12, 2022) ("the U.S. Supreme Court's holding in *Raytheon*, [] 'puts § 12112(b)(6) squarely into the disparate-impact category'") (quoting *EEOC v. BNSF Ry. Co.*, 2016 U.S. Dist. LEXIS 2557, *15–16 (W.D. Wash. Jan. 8, 2016) *aff'd in part*, 902 F.3d 916 (9th Cir. 2018); *Fulbright v. Union Pac. R.R. Co.*, 2022 U.S. Dist. LEXIS 37383, *9 (N.D. Tex. Mar. 2, 2022) ("The Supreme Court appears to have also positioned section 12112(b)(6) exclusively in the disparate-impact category, although it has not definitively held as much.").

The lack of a definitive ruling from the Supreme Court or this Circuit on this question has led to divergent case law among district courts within the Circuit. For example, prior to the District Court's contrary decision in this case, two other district courts in the Eleventh Circuit had issued opinions indicating that qualification standards claims brought under Section 12112(b)(6) are exclusively

analyzed as disparate impact claims. *See Monaco v. City of Jacksonville*, 51 F. Supp. 3d 1251, 1268 (M.D. Fla. 2014) (dismissing a Section 12112(b)(6) claim "[b]ecause Plaintiffs are proceeding solely under a theory of disparate treatment" and Section 12112(b)(6) "relies on a theory of disparate impact discrimination") *and Allmond v. Akal Sec., Inc.*, 2007 U.S. Dist. LEXIS 72713, *14–17 (M.D. Ga. Sep. 28, 2007) (holding that "[c]laims brought pursuant to § 12112(b)(6) are treated as disparate impact claims" for which it is inappropriate to apply the traditional *McDonnell Douglas* framework used for disparate treatment claims). Those decision are now at odds with the ruling from the District Court in this case. *Compare Monaco* and *Allmond* supra *with* Exhibit A at 19 ("[T]he Court rejects Dollar General's contention that § 12112(b)(6) pertains only to disparate impact claims and that a plaintiff may prove a discrimination claim under § 12112(b)(6) only by offering comprehensive statistical evidence.").

Accordingly, there is confusion and divergent case law on the issue among circuit courts and district courts within the Eleventh Circuit, and these differing opinions among courts on the issue makes the question certified by the District Court appropriate for interlocutory appeal under 28 U.S.C. § 1292(b).

## C. An immediate appeal would substantially reduce the amount of litigation necessary on remand.

If the Court confirms that a Section 12112(b)(6) claim can only be established under a disparate impact theory, the ADA claims brought on behalf of

twenty-five aggrieved parties should be dismissed in their entirety. This results from the fact that Respondents have not offered—and, as shown by Dollar General's statistical evidence, could not offer—any statistical evidence that the challenged standards screened out or tended to screen out individuals with disabilities. Such evidence is indispensable to the success of a disparate impact theory of liability. *See Smith*, 621 F. App'x at 961 ("[T]o establish a *prima facie* case of disparate impact, a plaintiff must provide comparative evidence showing that a policy has a disparate impact on the disabled.").

Dismissal of Respondents' Section 12112(b)(6) claim would eliminate the need to conduct substantial remaining discovery concerning the alleged disabilities, damages, and specific factual circumstances of twenty-five "aggrieved parties" on whose behalf the EEOC is alleging disability discrimination. It would also avoid the need for trial altogether on those claims. What would remain is an analytically distinct claim that Petitioner violated GINA when candidates were asked about family health history as part of the pre-employment examination process. Accordingly, a substantial amount of trial time, trial preparation, cost, and expense would be eliminated, and significant judicial resources would be preserved if the ADA question presented is accepted for immediate appeal, thereby materially advancing the ultimate termination of the litigation.

## V. CONCLUSION AND RELIEF REQUESTED

Whether claims brought under § 12112(b)(6) of the ADA must be analyzed exclusively under a disparate impact theory is a controlling issue of law and substantial grounds for difference of opinion exist regarding the correctness of the District Court's decision on this question. An immediate appeal resolving that question now, rather than after further discovery and a trial, would materially advance the ultimate termination of the litigation. For these reasons, Petitioner Doller General requests the Court grant its petition to appeal the single narrow issue presented.

s/ Stanley E. Graham
Stanley E. Graham, Esq.
Frederick L. Conrad III, Esq.
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
stan.graham@wallerlaw.com
trip.conrad@wallerlaw.com

*Counsel for Dolgencorp, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this motion complies with Fed. R. App. P. 27 & 32. This motion has been prepared using Equity Text A, which is a proportionally spaced face that includes serifs, in 14-point type. This motion contains 4,520 words according to Microsoft Word, excluding the cover page, Certificate of Interested Parties, Corporate Disclosure Statement, signature block, Certificate of Compliance, and Certificate of Service.

s/ Stanley E. Graham
Stanley E. Graham, Esq.
WALLER LANSDEN DORTCH & DAVIS, LLP

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2023, a copy of this motion is being filed electronically. Notice of this filing will be sent via electronic mail and by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

**Marsha L. Rucker, Esq.**
**Gerald L. Miller, Esq.**
**Gina Pearson, Esq.**
**James L. Lee, Esq.**
**Alysia Deiree Franklin, Esq.**
Equal Employment Opportunity Commission
1130 22nd Street South
Suite 2000
Birmingham, AL 35205
marsha.rucker@eeoc.gov
gerald.miller@eeoc.gov
gina.pearson@eeoc.gov
james.lee@eeoc.gov
alysia.franklin@eeoc.gov

**David W. Scott, Esq.**
D.W. Scott Law LLC
P.O. Box 11734
Birmingham, AL 35202
david@dwscottlaw.com

**Byron R. Perkins, Esq.**
Perkins Law
The Civic Center Medical Forum Bldg.
950 22nd Street N., Suite 550
Birmingham, AL 35203
bperkins@perkins-law.com

I certify that four stamped paper copies of this petition shall be placed in the mail for delivery to the Clerk's Office under Fed. R. App. P. 5(c).

s/ Stanley E. Graham
Stanley E. Graham, Esq.
WALLER LANSDEN DORTCH & DAVIS, LLP

24

# Exhibit A

FILED

2022 Jul-26  PM 02:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | } } } | |
| Plaintiff, | } } | |
| and | } } | |
| VINCENT JACKSON, | } } | Case No.: 2:17-cv-01649-MHH |
| Plaintiff-Intervenor, | } } | |
| v. | } } | |
| DOLGENCORP, LLC, | } } | |
| Defendant. | } | |

## <u>MEMORANDUM OPINION</u>

In this case, the Equal Employment Opportunity Commission, on behalf of unsuccessful Dollar General job applicants, challenges Dollar General's hiring practices. Vincent Jackson, one of the unsuccessful job applicants, challenges Dollar General's hiring practices individually, (Docs. 1, 41). The EEOC and Mr. Jackson contend that Dollar General violated the Americans with Disabilities Act and the Genetic Information Nondiscrimination Act because, when hiring general warehouse workers for its Bessemer, Alabama facility, the company used a post-offer medical examination that screened out some applicants based on actual or

perceived disabilities.  Third-party Middle Creek Medical Center conducted the medical exams for Dollar General.[1]

The EEOC and Dollar General have filed cross motions for summary judgment on the employees' GINA claim.[2]  Dollar General has filed a motion for summary judgment on the plaintiffs' ADA claims.  This opinion resolves these pending motions.  The opinion begins with a discussion of the standard that a district court uses to evaluate motions for summary judgment.  Then, consistent with the summary judgment standard, the Court identifies the evidence that the parties have

---

[1] Mr. Jackson's complaint, (Doc. 41), is nearly identical to the EEOC's complaint, (Doc. 1).  In their complaints, in addition to their GINA claims, the EEOC and Mr. Jackson bring three ADA claims:  a claim under 42 U.S.C. § 12112(a); a claim under 42 U.S.C. § 12112(b)(6); and a claim under 42 U.S.C. § 12112(d)(3).  Mr. Jackson's claims and the EEOC's claims rest on identical factual allegations.  Therefore, the Court analyzes Mr. Jackson's claims and the EEOC's claims together and cites to the EEOC complaint when discussing the plaintiffs' allegations.

Plaintiffs may plead multiple ADA claims, but to pursue those claims simultaneously, the plaintiffs must allege a distinct factual basis for each clam.  *Jean-Pierre v. Naples Cmty. Hosp., Inc.*, 817 Fed. Appx. 822, 828 (11th Cir. 2020).  Where plaintiffs' ADA claims under various statutory provisions rest on identical factual allegations, the alternative claims are duplicative and do not require separate analysis on a motion for summary judgment.  *Jean-Pierre*, 817 Fed. Appx. at 828.

The plaintiffs brought their § 12112(d)(3) claim under a separate count, (Doc. 1, pp. 8-9; Doc. 41, pp. 8-9), but no plaintiff alleges a distinct factual basis for this claim.  Rather, the plaintiffs reiterate their uniform factual allegations, noting that Dollar General "used the results of its post-offer medical examinations to screen out qualified individuals with disabilities using criteria that are neither job-related nor consistent with business necessity." (Doc. 1, p. 9, ¶ 29; Doc. 41, p. 9, ¶ 29).  The quoted language is copied directly from § 12112(b)(6).  Thus, the Court regards the plaintiffs' § 12112(d)(3) claim as duplicative of the plaintiffs' § 12112(b)(6) claim.

Accordingly, the Court analyzes two ADA claims:  the plaintiffs' § 12112(b)(6) claim on behalf of the entire "ADA class" and the plaintiffs' § 12112(a) claim on behalf of Mr. Jackson.  The Court will address whether the § 12112(a) claim was properly pleaded later in the opinion.

[2] Mr. Jackson has not moved for summary judgment on his GINA claim separately.

submitted. Finally, the Court evaluates the evidence under the governing legal standards, considering first the ADA claims and then the GINA claim.

## I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When considering a summary judgment motion, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences from that evidence in favor of the non-moving party. *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a

matter of law on the facts that are not disputed.  The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Alabama Municipal Ins. Corp. v. Scottsdale Ins. Co.*, 297 F. Supp. 3d 1248, 1252 (N.D. Ala. 2017) (quoting *Southern Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014)).  "Cross motions for summary judgment may be probative of the nonexistence of a factual dispute.  Indeed, when both parties proceed on the same legal theory and rely on the same material facts the court is signaled that the case is ripe for summary judgment." *Shook v. U.S.*, 713 F.2d 662, 665 (11th Cir. 1983) (internal citation omitted).

## II.

Dollar General, a national discount retailer, operates a distribution center in Bessemer, Alabama.  (Doc. 103-2, pp. 22-23, tpp. 21-22).  The Dollar General distribution center receives retail products, stores them, and distributes the products to the company's retail locations.  Warehouse workers manage the product traffic at the Bessemer facility.  (Doc. 103-2, pp. 56-64, tpp. 55-63).

To hire employees for its Bessemer distribution center, Dollar General uses a multi-step process.  When an individual applies for a job as a Dollar General general warehouse worker, she must submit an online application.  (Doc. 103-2, p. 41, tp. 40).  Dollar General's HR department interviews applicants, either in person or by phone.  (Doc. 103-2, p. 41, tp. 40).  Applicants who pass the first interview then

interview on-site at the distribution center with a warehouse supervisor.  (Doc. 103-2, pp. 41-42, tpp. 40-41).  Following the on-site interview, some applicants receive a job offer contingent on a pre-employment background check, physical examination, and drug test.  (Doc. 103-2, p. 47, tp. 46).  Applicants receiving a contingent job offer from the Bessemer facility must visit Middle Creek Medical Center for a physical examination and drug test.  (Doc. 103-2, p. 47, tp. 46).

Middle Creek Medical Center is an urgent care center.  (Doc. 104-19, p. 23, tp. 22).  In addition to treating "episodic medical conditions," Middle Creek offers "pre-employment physicals, drug screens, and hearing tests."  (Doc. 104-19, pp. 23, 24, tpp. 22, 23).  In 2011, Middle Creek verbally agreed to provide pre-employment medical services for Dollar General.  (Doc. 104-19, pp. 25-26, tpp. 24-25).  In January of 2012, Middle Creek began performing pre-employment medical examinations for Dollar General.  (Doc. 104-19, p. 43, tp. 42).

At the beginning of a physical examination, a job candidate must complete a "Physical Encounter Questionnaire" designed by Dollar General.  (Doc. 104-19, p. 59, tp. 58).  The questionnaire includes a series of "yes" or "no" questions.  (Doc. 104-19, p. 316).  The questions are divided into several categories, one of which is "Medical History."  (Doc. 104-19, p. 316).  For a period of time, the "Medical History" section contained the following question:  "Have your grandparents, parents, or children had significant medical problems?" (Doc. 104-19, p. 316).  After

job candidates completed the questionnaire, Middle Creek staff question candidates about the candidates' family medical history.  (*See e.g.*, Doc. 102-9, p. 8; Doc. 105-1, p. 61, tp. 59).[3]  On August 22, 2014, Dollar General sent Middle Creek an updated questionnaire without the question about family medical history.  (Doc. 102-7, p. 8).[4]

---

[3] According to Brittney Busbee, a medical professional at Medical Creek, Dollar General job candidates were asked follow-up questions about their family history only if they indicated on the questionnaire that their grandparents, parents, or children had significant medical problems.  (Doc. 105-1, pp. 61-62, tpp. 59-60).

[4] The updated questionnaire was attached to an email from Rick Sumner, Director of Insurance and Safety at Dollar General.  The email states:

Dear Carla [Busbee],

Thank you for administering Dollar General's post offer, pre-employment physical evaluation.  Please ensure that you are using the updated attached documents and forms when administering the evaluation.  I have also attached a document that generally outlines the process for the evaluation.  As you are aware, the Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by the law.  Genetic information as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductions services.  To help ensure continued compliance with this law, when relaying the results of the evaluation, you should not provide Dollar General with any genetic information about the candidate.  You should only inform Dollar General (on the form provided) whether the candidate is qualified, not qualified or referred to his or her PMD.  Please do not provide any other information to Dollar General.  Please ensure these new documents are implemented immediately.

Please do not hesitate to contact me with questions or concerns about this information.

Regards,

In addition to collecting information in writing about candidates' medical history, Middle Creek staff take the candidate's vitals and perform a vision test, a urinalysis, a hearing evaluation, and a physical examination "including [a] hernia check for males." (Doc. 104-19, p. 362). Middle Creek uses a form labeled "Dollar General Physical Requirements" which lists the following benchmarks for a "qualified" rating:

NOT Qualified if [blood pressure] > 160/100

Vision must be 20/50 or better

If color blind, [employee] still passes

MUST pass peripheral vision screen

(Doc. 104-19, p. 362).[5] The form instructs Middle Creek staff to fax to Dollar General the final page of the questionnaire, indicating whether the candidate was

---

Rick Sumner

(Doc. 102-7, p. 2).

[5] The parties dispute whether Dollar General or Middle Creek set these requirements, especially the benchmarks for vision and blood pressure. Nick Orefice, Dollar General's HR Generalist, opined during his deposition that these requirements were likely created at Dollar General's "corporate level." (Doc. 103-1, pp. 64-65, tpp. 63-64). Carla Busbee, Middle Creek's 30(b)(6) representative, also indicated that these requirements came from Dollar General. (Doc. 104-19, pp. 74, 101, 103, tpp. 73, 100, 102). Elizabeth Deslattes, a nurse practitioner at Middle Creek, suggested that Middle Creek may have come up with the requirements. (Doc. 104-1, pp. 96-97, tpp. 95-96). Similarly, Rick Sumner stated he thinks Middle Creek developed the checklist and that it was not provided by Dollar General. (Doc. 104-21, p. 154, tp. 153).

This fact is relevant only to the plaintiffs' ADA claims, not their GINA claim. And for purposes of the ADA claims, because only Dollar General moves for summary judgment, the Court views this evidence in the light most favorable to the non-movants, the EEOC and Mr. Jackson. Thus,

qualified, not qualified, or referred to a primary medical doctor for further evaluation. (Doc. 104-19, p. 362). Middle Creek complies. (Doc. 104-1, p. 71, tp. 70; Doc. 103-2, pp. 28-29, tpp. 27-28).

"Qualified" means that the person was "medically capable of performing the job." (Doc. 104-1, pp. 106-07, tpp. 105-06). "Referred to PMD" sometimes means that the person was not qualified to do the job; it also may mean that Middle Creek felt it needed more information before making a final determination. (Doc. 104-1, p. 107, tp. 106). According to Elizabeth Deslattes, a nurse practitioner at Middle Creek, rating a candidate "not qualified" "didn't necessarily mean they weren't physically able to do the job." (Doc. 104-1, p. 107, tp. 106).

The job applicants represented by the EEOC, including Mr. Jackson, received ratings of either "not qualified" or "referred to PMD." None of the applicants became an employee of Dollar General. Mr. Jackson was rated "not qualified" after failing the vision test. (Doc. 102-9, p. 11). According to Dollar General, Mr. Jackson refused to complete the physical examination after being informed that he failed the vision test. (Doc. 102-9, p. 11). Mr. Jackson testified that he wanted to finish the examination. (Doc. 105-8, p. 266, tp. 265). The Court accepts Mr.

---

for purposes of this opinion, the Court assumes that Dollar General provided these requirements to Middle Creek.

Jackson's version of the facts for purposes of Dollar General's summary judgment motion.

## III.

### *ADA "Screen Out" Claim*

The EEOC and Mr. Jackson assert that the pre-employment medical examination that Middle Creek conducted on behalf of Dollar General screened out the 24 job applicants the EEOC represents in this case in violation of the ADA. The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in job application procedures" or hiring or "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The statute identifies seven categories of conduct that constitute discrimination. 42 U.S.C. § 12112(b). Here, the EEOC brings its "screen out" claim under subsection (b)(6). Section 12112(b)(6) prohibits an employer from discriminating against a qualified individual on the basis of disability by:

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b)(6). Dollar General contends that the Court must evaluate a § 12112(b)(6) claim as a disparate impact claim and that a plaintiff must offer

comparative statistical evidence to prove a disparate impact claim, something neither

the EEOC nor Mr. Jackson has done.  (Doc. 110, pp. 14-18).

Employment discrimination claims typically fall into two buckets:  disparate

treatment claims and disparate impact claims.  *Raytheon Co. v. Hernandez*, 540 U.S.

44, 52 (2003).  As its name suggests, in a disparate treatment case, a plaintiff must

establish that his employer "simply treats some people less favorably than others"

because of a protected characteristic, here a disability.  *Raytheon*, 540 U.S. at 52.

The "because of" requirement speaks to the employer's intent to discriminate against

a job applicant or an employee based on a protected trait.  *Raytheon*, 540 U.S. at 52.

In contrast, disparate impact claims examine the way in which employment policies

and practices disproportionately *effect* certain job applicants or employees:

> disparate-impact claims "involve employment practices that are
> facially neutral in their treatment of different groups but that in fact fall
> more harshly on one group than another and cannot be justified by
> business necessity." *Teamsters, supra*, at 335–336, n. 15, 97 S.Ct.
> 1843. Under a disparate-impact theory of discrimination, "a facially
> neutral employment practice may be deemed [illegally discriminatory]
> without evidence of the employer's subjective intent to discriminate
> that is required in a 'disparate-treatment' case."

*Raytheon*, 540 U.S. at 52-53 (quoting *Teamsters v. United States*, 431 U.S. 324, 335-

36 n.15 (1977) & *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645-46 (1989)).

"Because 'the factual issues, and therefore the character of the evidence presented,

differ when the plaintiff claims that a facially neutral employment policy has a

discriminatory impact on protected classes,' *Texas Dept. of Community Affairs v.*

*Burdine*, 450 U.S. 248, 252, n. 5, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), courts must be careful to distinguish between" disparate treatment claims and disparate impact claims. *Raytheon*, 540 U.S. at 53.

In *Raytheon*, the plaintiff, Mr. Hernandez, pleaded only a disparate treatment claim in his complaint. *Raytheon*, 540 U.S. at 49. At summary judgment, Mr. Hernandez began to weave disparate impact concepts into his opposition to Raytheon's dispositive motion. *Raytheon*, 540 U.S. at 49. The Court of Appeals held that the district court properly selected the *McDonnell Douglas* burden-shifting framework to evaluate Mr. Hernandez's ADA claim because Mr. Hernandez pleaded only a disparate treatment claim; the Court of Appeals found that Mr. Hernandez waited too long to attempt to pursue a disparate impact claim. *Raytheon*, 540 U.S. at 49. At the first stage of the burden-shifting framework, the Court of Appeals concluded that Mr. Hernandez established a prima facie case of discrimination. *Raytheon*, 540 U.S. at 49-50. At the second stage, the stage at which Raytheon merely had to identify, not prove, a facially legitimate reason for its employment decision, the Court of Appeals mistakenly evaluated the merits of the rehire policy that Mr. Hernandez challenged. *Raytheon*, 540 U.S. at 51-52.[6] Raytheon's rehire

_____

[6] In *Raytheon*, the Supreme Court outlined the *McDonnell Douglas* framework as follows:

> The Court in *McDonnell Douglas* set forth a burden-shifting scheme for discriminatory-treatment cases. Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment

policy, neutral on its face, was "by definition, a legitimate, nondiscriminatory reason under the ADA" for Raytheon to refuse to rehire Mr. Hernandez. *Raytheon*, 540 U.S. at 51-52. The Court of Appeals criticized the policy under the ADA because the policy operated to exclude from rehire recovered addicts. The Supreme Court rejected the Court of Appeals' analysis and explained that at stage two, the impact of the policy on addicts was irrelevant. The Supreme Court held that at stage two, the Court of Appeals should have deemed Raytheon's facially-neutral rehire policy a non-discriminatory reason for the company's hiring decision and proceeded to stage three to examine Mr. Hernandez's evidence of discriminatory intent. *Raytheon*, 540 U.S. at 51-52. The Supreme Court noted that by considering the impact of Raytheon's rehire policy on addicts at stage two, "the Court of Appeals erred by conflating the analytical framework for disparate-impact and disparate-treatment claims." *Raytheon*, 540 U.S. at 51.

Mindful of the Supreme Court's instruction that courts must be careful to distinguish between disparate treatment claims and disparate impact claims, *Raytheon*, 540 U.S. at 53, we turn to the EEOC's allegations against Dollar General

---

action. 411 U.S., at 802, 93 S.Ct. 1817. If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual.

*Raytheon*, 540 U.S. at 49 n.3.

to identify the ADA claims at issue in this case.  The EEOC alleges that Dollar General:

> discriminated against Jackson, a qualified individual with a disability, and a class of qualified individuals with disabilities, when it failed to hire Jackson and the [ADA class] for general warehouse positions because of disability, perceived disability and/or record of disability. [Dollar General] further discriminated against Jackson and the class when it used post-offer medical examinations to screen out individuals with disabilities by means of exclusionary criteria that were neither job-related nor consistent with business necessity.

(Doc. 1, pp. 1-2; *see also* Doc. 41, pp. 1-2).  The first sentence identifies a disparate treatment claim concerning Dollar General's decision not to hire Mr. Jackson because of his alleged actual or perceived disability.[7]  The second sentence concerns a screen out claim.  The "ADA Class" for the screen out claim consists of Mr. Jackson and 23 other individuals who Middle Creek, on Dollar General's behalf, screened out in the hiring process based on vision, blood pressure, or blood sugar. (Doc. 1, p. 7, ¶¶ 25(b)-(f)).  As mentioned, the EEOC asserts the disparate treatment

---

[7] *See Raytheon*, 540 U.S. at 53 (explaining "that respondent's case was limited to a disparate-treatment theory, that the company refused to rehire respondent because it regarded respondent as being disabled and/or because of respondent's record of a disability").

The EEOC mentions an "ADA class" in its description of its disparate treatment claim, but the EEOC provides factual allegations to support a disparate treatment claim only for Mr. Jackson.  In the parties' Rule 26 report, the EEOC characterizes its class claim as a medical screening claim. (Doc. 37, p. 2).  The Court regards the EEOC's disparate treatment claim as only an individual claim for Mr. Jackson.  Mr. Jackson asserts an individual disparate treatment claim in his complaint.  (Doc. 41, pp. 5-8, ¶¶ 22-24).

claim and the screen out claims pursuant to 42 U.S.C. §§ 12112(a) and (b)(6).  (Doc. 1, pp. 5, 7, ¶¶ 22, 25).

Some courts have held that § 12112(b)(6) pertains only to disparate impact claims.  *See*, *e.g.*, *Fulbright v. Union Pacific Railroad Co.*, No. 3:20-CV-2392-BK, 2022 WL 625082, at *3 (N.D. Tex. Mar. 3, 2022); *EEOC v. BNSF Railway Co.*, NO. C14-1488 MJP, 2016 WL 98510, at *5 (W.D. Wash. Jan. 8, 2016).  Dollar General urges the Court to follow suit in this case.  Other courts have allowed plaintiffs to pursue disparate treatment claims under § 12112(b)(6).  *See*, *e.g.*, *Gonzales v. City of New Braunfels*, *Tex.*, 176 F.3d 834, 839 (5th Cir. 1999) (examining medical screening claim by individual plaintiff as a disparate treatment claim and noting that plaintiff did not plead a disparate impact claim under § 12112(b)(6)); *Toole v. Metal Services, LLC*, 17 F. Supp. 3d 1161 (S.D. Ala. 2014) (applying the *McDonnell Douglas* framework, though noting the plaintiff alleged that the physical examination had a "disparate impact" on the plaintiff).  Neither the Supreme Court nor the Eleventh Circuit Court of Appeals has held explicitly that a plaintiff may pursue only a disparate impact claim under § 12112(b)(6).

Dicta in *Raytheon* undergirds the argument that § 12112(b)(6) pertains only to disparate impact claims.  In *Raytheon*, in discussing the Court of Appeals' erroneous analysis of the substance of Raytheon's rehire policy at stage two of the *McDonell Douglas* framework, the Supreme Court commented:

> [T]he Court of Appeals observed that petitioner's policy "screens out persons with a record of addiction," and further noted that the company had not raised a business necessity defense, factors that pertain to disparate-impact claims but not disparate-treatment claims.

*Raytheon*, 540 U.S. at 54 (citation to Court of Appeals' decision omitted); *see Fulbright*, 2022 WL 625082 at *3 ("The Supreme Court appears to have also positioned section 12112(b)(6) exclusively in the disparate-impact category, although it has not definitively held as much.") (citing *Raytheon*, 540 U.S. at 53).[8]

---

[8] *In Raytheon*, the Supreme Court appears to associate disparate treatment claims with the language of § 12112(b)(3) and disparate impact claims with the language of § 12112(b)(6).  Using the language of these two subsections, the Supreme Court wrote:

> Both disparate-treatment and disparate-impact claims are cognizable under the ADA.  See 42 U.S.C. § 12112(b) (defining "discriminate" to include "utilizing standards, criteria, or methods of administration ... that have the effect of discrimination on the basis of disability" and "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability").

540 U.S. at 53.  By identifying disparate-treatment claims first and using the language of § 12112(b)(3) first in its parenthetical, the Supreme Court seemed to link disparate-treatment claims with § 12112(b)(3) and disparate-impact claims with § 12112(b)(6).

This Court observes that, because it speaks of standards that have the "effect" of discriminating, § 12112(b)(3), rather than § 12112(b)(6), seems to address disparate-impact claims.  In its entirety, § 12112(b)(3) provides that an employer discriminates against a qualified individual on the basis of a disability by:

> (3) utilizing standards, criteria, or methods of administration--
>
> > (A) that *have the effect of discrimination* on the basis of disability; or
> >
> > (B) that perpetuate the discrimination of others who are subject to common administrative control[.]

42 U.S.C. § 12112(b)(3) (emphasis added).  In contrast, § 12112(b)(6) speaks to standards and employment tests that expressly "screen out" individuals on the basis of disability, a direct form of selective hiring.  Respectfully, the Court tends to think that Congress attempted to capture

Importantly, *Raytheon* concerned a facially-neutral hiring policy.  The Supreme Court stated that courts dealing with facially-neutral policies and procedures must evaluate the effect of the policy on a suspect group; the employer's intent is not at issue in those cases.  *Raytheon*, 540 U.S. at 52-53.

In *Raytheon*, the company "had a policy against rehiring employees who were terminated for workplace misconduct."  *Raytheon*, 540 U.S. at 47.  Because Mr. Hernandez's separation summary indicated that he previously had left his job at Raytheon because of employee misconduct, the employee who reviewed Mr. Hernandez's application for rehire declined the application.  The employee who made the hiring decision indicated that she did not know that the misconduct for which Mr. Hernandez lost his job was drug abuse, but the record revealed that Mr. Hernandez submitted with his job application a letter from an Alcoholics Anonymous counselor, suggesting that the employee who declined Mr. Hernandez's application for rehire may have been aware of Mr. Hernandez's record of addiction. *Raytheon*, 540 U.S. at 47.  Still, Raytheon's rehire policy was not targeted at actual or perceived disabilities; the policy embraced all categories of employee misconduct.  The Supreme Court emphasized this point throughout its opinion, describing Raytheon's informal rehire policy as a "neutral company policy" that was

---

disparate-impact claims under § 12112(b)(3) and disparate-treatment screen out claims under § 12112(b)(6).

"lawful on its face." *Raytheon*, 540 U.S. at 50-51. In this context, the Supreme Court indicated that courts should evaluate facially-neutral employment policies as disparate impact claims. *Raytheon*, 540 U.S. at 52-53 (citing *Atonio*, 490 U.S. at 645-46).

The plain language of § 12112(b)(6) does not limit discrimination actions brought under the subsection to actions involving facially-neutral employment policies. As discussed, § 12112(b)(6) prohibits an employer from discriminating against a qualified individual on the basis of disability by:

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b)(6). Qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities may appear in a facially-neutral employment policy, but employers also may adopt policies that expressly and intentionally screen out individuals with disabilities. In the latter category of screen out cases, the employment policy constitutes direct evidence of discriminatory intent. An employer attempting to avoid liability for disparate treatment of employees based on its screening policy may do so by establishing that the screening

standard is "job-related for the position in question" and "consistent with business necessity."  42 U.S.C. § 12112(b)(6).

The Sixth Circuit Court of Appeals discussed direct evidence "screen out" cases in *Monette v. Electronic Data Systems, Corp.*, 90 F.3d 1173 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).  The Court of Appeals explained that "employers often rely on an employee's disability in making employment decisions, a fact rarely present in Title VII race or gender discrimination cases" and that "when an employer admits (or the evidence establishes) that its decision was based upon the employee's disability, direct evidence of discrimination exists."  *Monette*, 90 F.3d at 1180.  In direct evidence cases, courts do not need to use the *McDonnell Douglas* burden-shifting framework for cases that rest on circumstantial evidence of discriminatory intent or the disparate impact analysis attendant to facially-neutral employment policies that have a disproportionate effect on a protected group.  *Monette*, 90 F.3d at 1180.  Instead, when an employer relies partially or entirely on an applicant's disability in making a hiring decision, to prove his ADA claim, an applicant either may establish that he can perform the requirements of the job despite his disability or he may "challenge[] a particular job requirement as unessential."  *Monette*, 90 F.3d at 1182.  In the latter instance, the employer "bears the burden of proving that a particular hiring policy is 'job-related' and 'consistent with business necessity;'"

the job applicant "retains the burden of proving that he or she is qualified to perform the essential functions of the job absent the challenged job requirement." *Monette*, 90 F.3d at 1184; *see also Rohr v. Salt River Project Agricultural Imp. & Power Dist.*, 555 F.3d 850, 862 (9th Cir. 2009) ("Once an employee shows that a qualification standard tends to screen out an individual with a disability, the employer shoulders the burden of proving that the challenged standard is job-related and consistent with business necessity.").

The Court finds the reasoning of *Monette* persuasive. Therefore, the Court rejects Dollar General's contention that § 12112(b)(6) pertains only to disparate impact claims and that a plaintiff may prove a discrimination claim under § 12112(b)(6) only by offering comprehensive statistical evidence. Another feature of the plain language of § 12112(b)(6) bolsters this conclusion. Generally, under employment discrimination statutes, plaintiffs bring disparate impact claims on behalf of groups of applicants or employees who suffer disproportionate harm because of an employer's facially-neutral policy, and plaintiffs establish those claims with statistical evidence. *Raytheon*, 540 U.S. at 52-53; *Hallmark Developers, Inc. v. Fulton County, Georgia*, 466 F.3d 1276, 1286 (11th Cir. 2006) ("Typically, a disparate impact is demonstrated by statistics."). But under the ADA, § 12112(b)(6) expressly authorizes not only class claims but also individual claims based on an employer's screening policy. 42 U.S.C. § 12112(b)(6). In other words,

a disabled individual may assert a claim under § 12112(b)(6) and may prove that his employer's qualification standards, employment tests, or other selection criteria screened him out. *Gonzales*, 176 F.3d at 839 n.26 ("In the ADA context, a plaintiff may satisfy the second prong of his prima facie case by demonstrating an adverse impact on himself rather than on an entire group. 1 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 333–34 (3d ed.1996)."); *Williams v. ABM Parking Services Inc.*, 296 F. Supp. 3d 779, 789 (E.D. Va. 2017) ("[A] disparate impact claim under the ADA differs from a disparate impact claim under other federal statutes, such as Title VII. Under § 12112(b)(6), claims can be brought either by an individual plaintiff or by a class of individuals. . . . [A]n ADA disparate impact claim need not present statistical evidence if he or she can show that a job qualification screens out the plaintiff on the basis of his or her disability.").[9]

---

[9]  In support of its argument that the EEOC must produce statistical evidence to prove its disparate impact claim, Dollar General cites *Smith v. Miami-Dade County*, 621 Fed. Appx. 955 (11th Cir. 2015). In *Smith*, the Eleventh Circuit stated:

> Further, to establish a *prima facie* case of disparate impact, a plaintiff must provide comparative evidence showing that a policy has a disparate impact on the disabled. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir.2008) (holding that a district court correctly rejected a disparate-impact claim because the plaintiff completely failed to present relevant comparative evidence). It is not sufficient to show that a few people are affected by a policy. *See id.* ("[S]imply showing that a few houses are affected by an ordinance does not come close to establishing disparate impact."). The disparity of the evidence provided must be substantial enough to raise an inference of causation. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1314 (11th Cir.1994).
>
> [The plaintiff]'s disparate-impact claim stems from [the defendant]'s no-rehire policy, which prevents former employees with a history of long-term absences from

For an individual to prove a prima facie screen out claim under § 12112(b)(6) of the ADA, a plaintiff "must (i) identify the challenged employment practice or policy, (ii) demonstrate that the practice or policy had an adverse impact on the plaintiff with a disability, and (iii) demonstrate a causal relationship between the identified practice and the [adverse] impact." *Williams*, 296 F. Supp. 3d at 789 (citing generally *Gonzalez*, 176 F.3d 834). "To assert a business necessity defense,

---

> being rehired. [The plaintiff], however, has provided none of the evidence necessary to make out a *prima facie* case. Her argument that she was adversely affected by the no-rehire policy is insufficient and does not show a significant discriminatory effect on disabled individuals as a group. Thus, the district court did not err in granting summary judgment on [the plaintiff]'s disparate-impact claim.

*Smith*, 621 Fed. Appx. at 961-62. The decisions that the Eleventh Circuit cited in this passage are not ADA decisions. In *Schwarz*, the Eleventh Circuit examined a disparate impact claim under the Fair Housing Act. *Schwarz*, 544 F.3d at 1217. In *Armstrong*, the Eleventh Circuit examined a disparate impact claim under Title VII. *Armstrong*, 33 F.3d at 1312, 1314. Unlike the ADA, neither the FHA nor Title VII expressly authorizes an individual to maintain a disparate impact claim. *Smith* involved a facially-neutral employment policy, so it falls in the *Raytheon* category of cases that examine the effect of an employment policy on a group of applicants or employees, but not all disparate impact cases concern facially-neutral employment policies. Because it is an unpublished opinion, the *Smith* decision is persuasive authority, not binding precedent. *U.S. v. Izurieta*, 710 F.3d 1176, 1179 (11th Cir. 2013). Significantly, Ms. Smith was *pro se*, and she offered little authority to save her claim on appeal. Appellant's Reply Brief at 15-21, *Smith*, 621 Fed. Appx. 955 (No. 14-12566). Nothing in the *Smith* record or in the *Smith* decision suggests that Ms. Smith developed arguments like those on which the EEOC relies in this case. For these reasons, Dollar General's reliance on *Smith* is misplaced.

The Court has located one binding decision in which the Eleventh Circuit evaluated an individual plaintiff's ADA screen out claim under § 12112(b)(6). *Allmond v. Akal. Sec., Inc.*, 558 F.3d 1312 (11th Cir. 2009). Because the Eleventh Circuit based its decision in that case on the business necessity affirmative defense to a § 12112(b)(6) claim, the Eleventh Circuit did not consider the statutory nature of a § 12112(b)(6) claim. *Allmond v. Akal. Sec., Inc.*, 558 F.3d at 1316 ("[W]e focus our attention solely on the affirmative business-necessity defense and its application to the hearing-aid ban. We express no view on whether Allmond is disabled under federal law and just assume that he is disabled for the sake of discussion.").

the defendants must show that the allegedly discriminatory qualification requirement is (i) job-related, (ii) consistent with business necessity, and (iii) that performance cannot be accomplished with a reasonable accommodation." *Williams*, 296 F. Supp. 3d at 790 (citing *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 993 (9th Cir. 2007)).

Here, the EEOC alleges, and the evidence, viewed in the light most favorable to the EEOC and Mr. Jackson, demonstrates, that Dollar General required job applicants to undergo a post-offer medical examination, and Dollar General deemed not qualified for employment in Dollar General's Bessemer warehouse applicants whose corrected vision did not measure 20/50 or better in both eyes, whose blood pressure measured 160/100 or higher, and/or whose blood sugar exceeded a certain threshold. (Doc. 1, pp. 7-8, ¶¶ 25(b)-(d) & 25(i); Doc. 104-19, p. 362; Doc. 115-16, pp. 2-5, 8; Doc. 115-26, pp. 7-8; Doc. 115-35, p. 6). The EEOC contends that binocular vision and blood pressure below 160/100 were not job-related requirements for the general warehouse worker position, and the medical qualification standards were not consistent with business necessity. (Doc. 1, pp. 7-8, ¶¶ 25(e)-(g) & 25(j)). On its face, Dollar General's policy that screened out applicants whose corrected vision did not measure 20/50 or better in both eyes and whose blood pressure measured 160/100 or higher is direct evidence of intent to

screen out certain job applicants based on medical qualifications standards or criteria.

Viewed in the light most favorable to the EEOC and Mr. Jackson, the summary judgment evidence establishes a prima facie screen out claim under § 12112(b)(6).  The EEOC and Mr. Jackson have demonstrated that the unsuccessful job applicants who the EEOC represents, whose corrected vision did not measure 20/50 or better in both eyes or whose blood pressure measured 160/100 or higher, either were disabled or Dollar General regarded those applicants as disabled, and Dollar General's screening standards had an adverse impact on those job applicants.[10]

The ADA defines "disability" as (1) "a physical or mental impairment that substantially limits one or more major life activities of [an] individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment."  42 U.S.C. § 12102(1).  "The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."  42 U.S.C. § 12102(4)(A).

Federal Regulations define a physical impairment as:

---

[10] There is not sufficient evidence in the record to establish a screen out claim based on an unstated blood sugar level.  The Court limits its analysis to unsuccessful job applicants with impaired vision or blood pressure that exceeded 160/100.

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine[.]

29 C.F.R. § 1630.2(h).  The ADA provides that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  With respect to the meaning of the phrase "substantially limits," the Eleventh Circuit, in *Mazzeo v. Color Resolutions Int'l, LLC*, noted that Congress has amended the statute to ensure that the phrase is interpreted broadly, and:

the EEOC, pursuant to its statutory authority to issue regulations implementing the definition of "disability" in the ADA, *see id.* at § 12205a, has further explained that the phrase "substantially limits" is to be "construed broadly in terms of extensive coverage" and is "not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  The EEOC's regulations also provide that an "impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting;" the phrase "substantially limits" "shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA;" (with the exception of glasses or contact lenses) the "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures;" and an "impairment that is episodic or in remission is a disability if it would substantially limit a major life activity."  *Id.* at § 1630.2(j)(1)(ii), (iv), (vi)-(vii).

*Mazzeo*, 746 F.3d 1264, 1269 (11th Cir. 2014) (adopting the EEOC's interpretation

of the phrase "substantially limits"). Similarly, the ADA provides:

> (E)(i) The determination of whether an impairment substantially limits
> a major life activity shall be made without regard to the ameliorative
> effects of mitigating measures such as—
>
>> (I) medication, medical supplies, equipment, or appliances, low-
>> vision devices (which do not include ordinary eyeglasses or
>> contact lenses), prosthetics including limbs and devices, hearing
>> aids and cochlear implants or other implantable hearing devices,
>> mobility devices, or oxygen therapy equipment and supplies;
>>
>> (II) use of assistive technology;
>>
>> (III) reasonable accommodations or auxiliary aids or services; or
>>
>> (IV) learned behavioral or adaptive neurological modifications.

42 U.S.C. § 12102(4)(E)(i). "In effect, these provisions require courts to look at a

plaintiff's impairment in a hypothetical state where it remains untreated." *Lloyd v.

Housing Auth. of the City of Montgomery, Ala.*, 857 F. Supp. 2d 1252, 1263 (M.D.

Ala. 2012). Courts must "determine the existence of disabilities on a case-by-case

basis." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999).

Monocular vision – meaning an individual relies on one eye – is a physical

impairment because it is a physiological condition that affects an individual's eyes,

a "special sense organ." 29 C.F.R. § 1630.2(h)(1). Monocular vision also affects a

major life activity, "seeing." 42 U.S.C. § 12102(2)(A). Dollar General argues that

monocular vision does not "substantially limit" Mr. Jackson's nor any EEOC class

member's ability to see.  (Doc. 110, pp. 24-26).[11]  Because those with monocular

vision "may embrace a group whose members vary by the degree of visual acuity in

the weaker eye . . . and the ultimate scope of the restrictions on their visual abilities,"

those with monocular vision are not *per se* disabled.  *Kirkingburg*, 527 U.S. at 566.

> This is not to suggest that monocular individuals have an onerous burden in trying to show that they are disabled.  On the contrary, our brief examination of some of the medical literature leaves us sharing the Government's judgment that people with monocular vision "ordinarily" will meet the [ADA]'s definition of disability . . . and we suppose that defendant companies will often not contest the issue.  We simply hold that the [ADA] requires monocular individuals, like others claiming the [ADA]'s protection, to prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial.

*Kirkingburg*, 527 U.S. at 567 (internal citations omitted).

According to Mr. Jackson, the only member of the plaintiff class with

monocular vision to be deposed, from his right eye, he cannot see anything directly

ahead of him other than light.  (Doc. 105-8, pp. 105-06, tpp. 104-05).[12]  Mr.

---

[11] Dollar General contends that "particularly in cases where an individual has had monocular vision for a long time and becomes accustomed to primarily using one eye, the condition likely does not substantially impact a major life activity."  (Doc. 110, p. 25) (citing *Littlefield v. Nevada, ex. rel. Dep't of Public Safety*, 195 F. Supp. 3d 1147, 1153-54 (D. Nev. 2016)).  But that is not the law in the Eleventh Circuit; rather, the Court must ignore any "ameliorative effects of mitigating measures."  *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d at 1269 (internal quotations omitted); *see also* 42 U.S.C. § 12102(4)(E)(i).

[12] It appears that Mr. Jackson's peripheral vision from his right eye is not affected by his condition. (Doc. 105-8, p. 105, tp. 104).  As noted by Dollar General, Mr. Jackson stated during his deposition that he does not consider himself disabled.  (Doc. 105-8, p. 431, tp. 430).  This admission is not dispositive because a reasonable jury may conclude that, due to his condition, Mr. Jackson is disabled under the ADA.

Jackson's inability to see straight ahead with his right eye supports a reasonable inference that "the extent of the limitation in terms of [his] own experience, as in loss of depth perception and visual field, is substantial," *Kirkingburg*, 527 U.S. at 567; which in turn creates a genuine dispute of material fact as to whether he has an actual disability.[13]

Hypertension – also known as high blood pressure – is a physical impairment because it is a physiological condition that affects an individual's cardiovascular system.  29 C.F.R. § 1630.2(h)(1).  And hypertension affects a major life activity, "working."  42 U.S.C. § 12102(2)(A).  As with monocular vision, Dollar General argues that, on the record before the Court, hypertension does not "substantially limit" the EEOC class members' ability to work.  (Doc. 110, pp. 23-24).  Dollar General mistakenly relies on the fact that two EEOC class members with hypertension – Eric Fielder and Willie Copeland – stated that their ability to work is not substantially limited.  (Doc. 110, p. 24).  Dollar General overlooks the fact that both Mr. Fielder and Mr. Copeland take medication for hypertension.  (Doc. 105-14, p. 62, tp. 61; Doc. 111-14, p. 2, ¶ 7).  As noted, a "determination of whether an impairment substantially limits a major life activity shall be made without regard to

---

[13] Carlos Carey, another EEOC class member who has difficulty seeing from one eye, twice failed Middle Creek's eye exam.  (Doc. 115-8, pp. 3, 4, ¶¶ 8, 9, 11).  Mr. Carey failed his second test after he purchased corrective lens.  (Doc. 115-8, p. 4, ¶ 10).  This evidence supports a reasonable inference that Mr. Carey's vision is substantially limited, which in turn creates a genuine dispute of material fact as to whether he has an actual disability.

the ameliorative effects of mitigating measures such as medication." 42 U.S.C.

§ 12102(4)(E)(i)(I).[14]

While "[n]o pathologic changes occur early in hypertension[,] [s]evere or

prolonged hypertension damages target organs (primarily the cardiovascular system,

brain, and kidneys), increasing risk of [c]oronary artery disease (CAD) and

myocardial infarction, [h]eart failure, [s]troke (particularly hemorrhagic), [r]enal

failure, [and] [d]eath[.]" *Toland v. BellSouth Telecommunications, LLC*, NO. 1:15-

CV-2441-SCJ, 2017 WL 6380641, at *3 (N.D. Ga. Aug. 9, 2017) (internal footnote

omitted)                    (quoting              MERCK                    MANUALS,

https://www.merckmanuals.com/professional/cardiovascular-

disorders/hypertension/overview-of-hypertension (last visited July 25, 2022).[15]

Because Mr. Fielder and Mr. Copeland have hypertension, jurors reasonably may

infer that the men are at risk of suffering the aforementioned maladies in a

---

[14] Dollar General's reliance on *Morgan v. County Comm'n of Lawrence County*, No. 5:14-CV-01823-CLS, 2016 WL 3525357 (N.D. Ala. June 20, 2016), is misplaced. (Doc. 130, p. 6). In *Morgan*, the district court stated: "The Eleventh Circuit also has held that exhaustion and high blood pressure, without more, are not conditions that substantially impair a person's ability to perform major life activities, such as working." *Morgan*, 2016 WL 3525357, at *28. The district court cited to two pre-ADAA Eleventh Circuit cases which relied on the now outdated definition of "substantially limits."

[15] In *Harris v. H & W Contracting*, the Eleventh Circuit took judicial notice in the summary judgment context that "'Graves' disease is a condition that is capable of substantially limiting major life activities if left untreated by medication.'" *Toland v. BellSouth Telecommunications, LLC*, NO. 1:15-CV-2441-SCJ, 2017 WL 6380641, at *3 (N.D. Ga. Aug. 9, 2017) (quoting *Harris v. H & W Contracting Co.*, 102 F.3d 516, 522 (11th Cir. 1996)). The *Toland* court also took judicial notice of the risks associated with hypertension. *Toland*, 2017 WL 6380641, at *3.

"hypothetical state where [their hypertension] remains untreated." *Lloyd*, 857 F. Supp. 2d at 1263.[16]  In turn, this creates a genuine dispute of material fact as to whether Mr. Fielder and Mr. Copeland have an actual disability.[17]

In any event, the evidence, viewed in the light most favorable to the EEOC and Mr. Jackson, indicates that Dollar General regarded Mr. Jackson and the other unsuccessful job applicants as disabled.

---

[16] Mr. Fielder has a family history of high blood pressure, (Doc. 105-14, p. 61, tp. 60), and has taken medication for high blood pressure since he was 19 years old, (Doc. 105-14, p. 62, tp. 61). On the day he failed his physical examination at Middle Creek, Mr. Fielder had been off his medication for about a month because he did not have health insurance.  (Doc. 105-14, pp. 78-79, tpp. 77-78).

Mr. Copeland failed two physical examinations at Middle Creek because of high blood pressure. (Doc. 111-14, pp. 2-3, ¶¶ 7-9).  Mr. Copeland failed his first examination after not taking his medication on the day of the exam (due to side effects) and he failed his second examination after starting a different medication.  (Doc. 111-14, pp. 2-3, ¶¶ 7-9).

[17] The Court's analysis here with respect to Mr. Fielder and Mr. Copeland is similar to the analysis in *Toland*, where the Northern District of Georgia found that the risks associated with hypertension coupled with the fact that the plaintiff has hypertension are "sufficient to create a genuine issue of material fact about whether [plaintiff's] medical condition, in the absence of mitigating measures, would substantially limit [his] major life activities [to include the cardiovascular/circulatory systems]."  *Toland*, 2017 WL 6380641, at *4 (quoting *Harris*, 102 F.3d at 522).  Unlike the plaintiffs here, the plaintiff in *Toland* had had "at least one hospitalization for blood pressure." *Toland*, 2017 WL 6380641, at *4 n.9.  But this difference does not dictate a different outcome because jurors reasonably may infer that Mr. Fielder and Mr. Copeland would be at risk of hospitalization if they were to skip their medication for an extended period.

In its brief in support of its motion for summary judgment, Dollar General also relies on *Toland* but for the opposite proposition—that "*Toland's* assertion that he suffers from hypertension does not establish that this physical impairment substantially limited one or more of his major life activities."  (Doc. 110, p. 23) (quoting *Toland v. BellSouth Telecommunications, Division of AT&T, Inc.*, No. 1:15-cv-02441-SCJ-RGV, 2017 WL 6374873, at *7 (N.D. Ga. May 1, 2017)). Dollar General relies on the magistrate judge's final report and recommendation, rather than the subsequent order from the Northern District of Georgia sustaining the plaintiff's objection on this very point.  *Toland*, 2017 WL 6380641, at *4.

> "[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521–22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) . . . . Thus, "[a]n employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity." *Sutton*, 527 U.S. at 490, 119 S.Ct. 2139.

*D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1228 (11th Cir. 2005) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 490 (1999), *superseded by statute*, U.S. Pub. L. No. 110-325).  Using physical criteria that Dollar General established for warehouse workers, Middle Creek indicated to Dollar General that Mr. Jackson and the other unsuccessful job applicants were not qualified to work as warehouse workers either because of impaired vision or blood pressure that exceeded 160/100.  Using the Middle Creek rating, Dollar General did not offer the applicants a warehouse worker position because Dollar General regarded those applicants' health conditions as limiting their ability to work in the warehouse.  Because Dollar General declined to extend job offers to Mr. Jackson and the other unsuccessful job applicants based on real or perceived physical disabilities, Dollar General's screening policy had a negative impact on Mr. Jackson and the other unsuccessful applicants in violation of § 12112(b)(6).

Disputed questions of fact regarding Dollar General's screen out policy preclude judgment in Dollar General's favor based on the company's job-relatedness

and business necessity defenses.  Job-relatedness and business necessity are "distinct pillars of the affirmative defense." *Allmond*, 558 F.3d at 1317.

> As [the Eleventh Circuit] has explained, "[j]ob[-]relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer in making hiring or promotional decisions." *Hamer*, 872 F.2d at 1533. Business necessity, in contrast, "is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria in hiring or promotion decision making." *Id.*

*Allmond*, 558 F.3d at 1317.

Vision tests – meant to assess one's ability to see – and blood pressure tests – meant to assess the likelihood that one may become suddenly incapacitated – are job-related, satisfying the first prong of the test.  This is especially true when the job requires an individual to operate heavy machinery around other workers, as is the case here.  But Dollar General has not met its burden of showing that the physical criteria it set for its warehouse worker position was necessary.  This "defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2(r)).  Dollar General contends that rating candidates "referred to PMD" individualized

assessments.  (Doc. 130, pp. 14-15).  But the evidence, viewed in the light most favorable to the nonmoving parties, indicates that candidates rated "referred to PMD" were effectively screened out because Dollar General did not follow up with those applicants to explain how they could qualify for a warehouse worker position.[18]

The record is replete with evidence from which jurors reasonably may infer that the EEOC class members could safely perform the essential functions of the job, undercutting Dollar General's argument that screening the applicants out was a business necessity.  Notably, many EEOC class members held similar jobs, both before and after applying to work at Dollar General, without incident, despite the medical conditions that caused them to be screened out from Dollar General's warehouse worker position.  (*See e.g.*, Doc. 115-4, p. 3, ¶ 5; Doc. 115-5, p. 3, ¶¶ 3, 4; Doc. 115-6, p. 3, 4 ¶ 3, 6; Doc. 115-7, p. 4, ¶ 9).  Additionally, an EEOC expert witness, Dr. Robert Swotinsky, posited that "[t]here is not a medical or scientific basis for excluding people from general warehouse work (or other jobs) because of

---

[18] According to the EEOC, the 24 applicants "were not told whether they passed the exam, were not told that they needed medical clearance from their doctor in order to start work, and were not told what medical standard they needed to pass."  (Doc. 121, p. 17; *see* Doc. 115-4, pp. 4-6, ¶ 14 (declaration of EEOC class member Roderiquez Crumpton); Doc. 115-5, p. 4, ¶¶ 10-11 (declaration of EEOC class member John Greene); Doc. 115-12, p. 4, ¶¶ 10-11 (declaration of EEOC class member Percy Tate); Doc. 115-9, pp. 4-5, ¶¶ 11-12 (declaration of EEOC class member Orenthal Jordan)).  Thus, viewing the evidence in the light most favorable to the 24 applicants who the EEOC represents, the EEOC has established that Dollar General screened out this group of 24 applicants through its medical examination requirement for job applicants at the Bessemer warehouse.

high blood pressure." (Doc. 115-1, p. 15).[19]  According to another expert witness, Dr. Dawn DeCarlo, "if you have one good eye, you tend to be able to do pretty much everything that everybody else around you can do." (Doc. 111-4, p. 49, tp. 191). Ultimately, as mentioned above, Dollar General has not met its burden of demonstrating that using its physical qualification standards to screen out candidates was consistent with business necessity.

Thus, the Court denies Dollar General's motion for summary judgment on the EEOC's and Mr. Jackson's ADA "screen out" claim.

### Generic ADA Disparate Treatment Claim

As discussed, in paragraphs 22 through 24 of their respective complaints, the EEOC, on behalf of Mr. Jackson, and Mr. Jackson independently pleaded a generic disparate treatment claim under 42 U.S.C. § 12112(a).[20]  Procedurally, the claim is poorly pleaded. The Eleventh Circuit Court of Appeals "discourage[s] consideration of 'shotgun' pleadings where the plaintiff asserts multiple claims of relief in single counts and 'it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" *Kennedy v. Bell South Telecommunications,*

---

[19] In Doc. 115-1, Dr. Swotinsky provides reasons for these conclusions.

[20] In Paragraph 22, the EEOC alleges violations of 42 U.S.C. § 12112(a) and 42 U.S.C. § 12112(b)(6), but none of the key phrases in § 12112(b)(6) – "screen out," "tend to screen out," "standard," "test," "selection criteria," or "business necessity" – appears in paragraphs 22 through 24. These omissions indicate that neither the EEOC nor Mr. Jackson intended the claim alleged in paragraphs 22 through 24 to be duplicative of the claim alleged in paragraphs 25 and 26, where the language mirrors that of a screen out claim under § 12112(b)(6).

*Inc. (AT & T)*, 546 Fed. Appx. 817, 820 (11th Cir. 2013) (quoting *Anderson v. Dist. Bd. Of Trs. Of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)). A pleading which lumps multiple claims into a single count fails "to give the defendant[] adequate notice of the claims against [it] and the grounds upon which each claim rests." *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015).

While the EEOC and Mr. Jackson "commit[ted] the sin of not separating into a different count each cause of action or claim for relief," *Weiland*, 792 F.3d at 1323, their complaints provided Dollar General with adequate notice that they were bringing a generic disparate treatment claim under § 12112(a). In its brief in support of its motion for summary judgment, Dollar General acknowledged that the EEOC and Mr. Jackson may have pleaded paragraphs 22 through 24 "in an effort to craft a disparate treatment claim" on behalf of Mr. Jackson. (Doc. 110, p. 16 n.15).[21] Dollar General then explained why a disparate treatment claim must fail. (Doc. 110, p. 16 n.15). Accordingly, Dollar General will not be prejudiced by the Court addressing the plaintiffs' § 12112(a) claim on the merits.

Dollar General argues that the plaintiffs' generic disparate treatment claim "fail[s] because there is no evidence of any decisionmaker with unlawful motive:"

---

[21] In its reply brief, Dollar General argues for the first time that the EEOC and Mr. Jackson failed to plead a disparate treatment claim. (Doc. 130, pp. 2-3).

> To the extent Jackson alleges he was treated differently by Dollar General because of his monocular vision, it is undisputed that Dollar General was unaware of Jackson's monocular vision. The only information provided to Dollar General was that Middle Creek had not qualified Jackson because he failed the vision exam and had refused to complete the physical. While Jackson disputes that he refused to complete the remainder of his physical, he cannot dispute what Middle Creek relayed to Dollar General, and this justifies Dollar General's honest belief that Jackson abandoned the process. This forecloses any attempt to impute a discriminatory motive to Dollar General.

(Doc. 110, p. 16 n.15) (internal record citations omitted). But, as discussed above, Dollar General's version of the facts is disputed. Mr. Jackson testified that he wanted to continue his examination, but Middle Creek would not allow him to proceed because his impaired vision could not be corrected.[22] By producing evidence that Dollar General did not hire Mr. Jackson because of his monocular vision, the EEOC and Mr. Jackson have demonstrated that Dollar General acted with discriminatory intent. Moreover, as explained above, the EEOC and Mr. Jackson

---

[22] On the form that Middle Creek faxed to Dollar General, a Middle Creek employee noted that the "[patient] failed vision exam + then refused physical." (Doc. 102-9, p. 11). Mr. Jackson testified that he wanted to finish the exam. (Doc. 105-8, p. 266, tp. 265).

Elizabeth Deslattes, a Middle Creek employee, testified that Mr. Jackson refused to complete his physical examination after he failed his eye examination. (Doc. 104-1, p. 119). According to Mr. Jackson, after he failed his eye examination, Brittney Busbee, another Middle Creek employee, told him that under Dollar General's requirements he was disqualified from consideration for the job. (Doc. 105-8, p. 373, tp. 372). Therefore, viewing the evidence in the light most favorable to Mr. Jackson, even if Mr. Jackson refused to complete his physical examination, the effort would have been futile because he was effectively disqualified by Dollar General's requirement that "[v]ision must be 20/50 or better." (Doc. 104-19, p. 365).

have established a disputed question of material fact as to whether Mr. Jackson was qualified to perform the essential functions of the warehouse worker job.

Thus, the Court denies Dollar General's motion for summary judgment on the EEOC's and Mr. Jackson's generic disparate treatment claim.

## IV.

The Genetic Information Nondiscrimination Act of 2008 prohibits employers from discriminating based on genetic information and acquiring genetic information. 42 U.S.C. § 2000ff-1.  An employee – or an agency, such as the EEOC, acting on behalf of an employee – may bring a GINA claim under subsection (a), "Discrimination based on genetic information;" or subsection (b), "Acquisition of genetic information." 42 U.S.C. § 2000ff-1.  Here, the EEOC brings its GINA claim under subsection (b).  (Doc. 1, p. 9, ¶ 34; *see also* Doc. 41, p. 9, ¶ 35).  Under subsection (b):

> It shall be an unlawful employment practice for an employer to request, require, or purchase genetic information with respect to an employee or a family member of the employee except—
>
> > (1) where an employer inadvertently requests or requires family medical history of the employee or family member of the employee; . . . .

42 U.S.C. § 2000ff-1(b).[23]   Under GINA, "[t]he term 'genetic information' means, with respect to any individual, information about—"

_____

[23] There are six exceptions to subsection (b).  The first exception is quoted above.  The remaining five exceptions are:

> (2) where—

>> (A) health or genetic services are offered by the employer, including such services as part of a wellness program;

>> (B) the employee provides prior, knowing, voluntary, and written authorization;

>> (C) only the employee (or family member if the family member is receiving genetic services) and the licensed health care professional or board certified genetic counselor involved in providing such services receive individually identifiable information concerning the results of such services; and

>> (D) any individually identifiable genetic information provided under subparagraph (C) in connection with the services provided under subparagraph (A) is only available for purposes of such services and shall not be disclosed to the employer except in aggregate terms that do not disclose the identity of specific employees;

> (3) where an employer requests or requires family medical history from the employee to comply with the certification provisions of section 2613 of Title 29 or such requirements under State family and medical leave laws;

> (4) where an employer purchases documents that are commercially and publicly available (including newspapers, magazines, periodicals, and books, but not including medical databases or court records) that include family medical history;

> (5) where the information involved is to be used for genetic monitoring of the biological effects of toxic substances in the workplace, but only if—

>> (A) the employer provides written notice of the genetic monitoring to the employee;

>> (B)(i) the employee provides prior, knowing, voluntary, and written authorization; or

>> (ii) the genetic monitoring is required by Federal or State law;

(i) such individual's genetic tests,

(ii) the genetic tests of family members of such individuals, and

(iii) the manifestation of a disease or disorder in family members of such individual.

42 U.S.C. § 2000ff(4)(A).

Here, Dollar General does not deny that it violated GINA subsection (b). It is undisputed that, from at least December 2013 until August 22, 2014, pursuant to

---

(C) the employee is informed of individual monitoring results;

(D) the monitoring is in compliance with—

(i) any Federal genetic monitoring regulations, including any such regulations that may be promulgated by the Secretary of Labor pursuant to the Occupational Safety and Health Act of 1970 (29 U.S.C. 651 et seq.), the Federal Mine Safety and Health Act of 1977 (30 U.S.C. 801 et seq.), or the Atomic Energy Act of 1954 (42 U.S.C. 2011 et seq.); or

(ii) State genetic monitoring regulations, in the case of a State that is implementing genetic monitoring regulations under the authority of the Occupational Safety and Health Act of 1970 (29 U.S.C. 651 et seq.); and

(E) the employer, excluding any licensed health care professional or board certified genetic counselor that is involved in the genetic monitoring program, receives the results of the monitoring only in aggregate terms that do not disclose the identity of specific individuals; or

(6) where the employer conducts DNA analysis for law enforcement purposes as a forensic laboratory or for purposes of human remains identification, and requests or requires genetic information of such employer's employees, but only to the extent that such genetic information is used for analysis of DNA identification markers for quality control to detect sample contamination.

42 U.S.C. § 2000ff-1(b)(2)-(6).

Dollar General's instructions, Dollar General's agent, Middle Creek Medical Center, asked Dollar General job candidates whether their grandparents, parents, or children had significant medical problems, in violation of 42 U.S.C. § 2000ff-1(b). (*See e.g.*, Doc. 104-19, p. 316).[24]  Instead, Dollar General argues that the EEOC and Mr. Jackson lack standing to bring this GINA claim. (Doc. 126, pp. 5-15).  Specifically, Dollar General argues that, insofar as the EEOC and Mr. Jackson request compensatory and punitive damages, there is no redressability because GINA does allow for compensatory and punitive damages for claims brought under 42 U.S.C. § 2000ff-1(b). (Doc. 126, pp. 10-12).[25]  As far as the Court can tell, this is an issue of first impression.

In its remedies and enforcement section, GINA incorporates the remedial schemes of other statutes.  42 U.S.C. § 2000ff-6.[26]  With respect to the availability of damages, GINA states:

---

[24] As noted above, under GINA subsection (b), "[i]t shall be an unlawful employment practice for an employer to request . . . genetic information with respect to an employee or a family member of the employee . . . ." 42 U.S.C. § 2000ff-1(b).  Dollar General, acting through its agent, Middle Creek Medical Center, is an employer.  42 U.S.C. § 2000e(b); 42 U.S.C. § 2000ff(2)(B)(i).  Dollar General's job applicants are employees.  42 U.S.C. 2000ff(2)(A)(i); 42 U.S.C. § 2000e(f).  And "genetic information" includes "information about—(iii) the manifestation of a disease or disorder in family members of such individual."  42 U.S.C. § 2000ff(4)(A)(iii).  Thus, Dollar General requested genetic information from its employees in violation of GINA.

[25] The EEOC also requests injunctive relief.  (Doc. 1, p. 11).  Dollar General argues that the Court lacks jurisdiction over a claim for injunctive relief because the company voluntarily ceased the alleged unlawful practice more than six years ago.  (Doc. 126, p. 11 n.5).

[26] Subsection (a) applies to "Employees covered by title VII of the Civil Rights Act of 1964." Subsection (b) applies to "Employees covered by Government Employee Rights Act of 1991."

> The powers, remedies, and procedures provided in section 1981a of this title, including the limitations contained in subsection (b)(3) of such section 1981a, shall be powers, remedies, and procedures this chapter provides to the Commission, the Attorney General, or any person, alleging such a practice (not an employment practice specifically excluded from coverage under section 1981a(a)(1) of this title).

42 U.S.C. § 2000ff-6(a)(3).  In turn, 42 U.S.C. § 1981a states, in pertinent part:

> In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 against a respondent who engaged in unlawful discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act, and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

42 U.S.C. § 1981a(a)(1).  According to the Supreme Court, this provision "limits compensatory and punitive damages awards . . . to cases of 'intentional discrimination'—that is, cases that do not rely on the 'disparate impact' theory of discrimination." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999) (citing 42 U.S.C. § 1981a(a)(1)).

Dollar General argues that neither the EEOC nor Mr. Jackson alleges intentional discrimination and that, for purposes of § 1981a(a)(1), the Court should treat the EEOC's and Mr. Jackson's GINA claim like a disparate impact claim.

---

Subsection (c) applies to "Employees covered by Congressional Accountability Act of 1995." Subsection (d) applies to "Employees covered by chapter 5 of Title 3." Subsection (e) applies to "Employees covered by section 717 of the Civil Rights Act of 1964."

(Doc. 126, pp. 8-12).  The EEOC's complaint upends this argument.  While citing 42 U.S.C. § 2000ff-1(b) as the basis for its GINA claim, (Doc.1, p. 9, ¶ 34), the EEOC expressly alleges that "Defendant's request for genetic information was not inadvertent," (Doc. 1, p. 10, ¶ 40), and that the unlawful employment practices that the EEOC describes "were and are intentional," (Doc. 1, p. 11, ¶ 44).  Thus, as with the ADA claims in this case, Dollar General's attempt to characterize the claims as unintentional discriminatory effect claims is not persuasive.  The EEOC expressly alleged intentional conduct to support an award of damages for Dollar General's GINA violation.

District courts appear to have assumed that damages are available for claims brought under 42 U.S.C. § 2000ff-1(b).  For example, in *EEOC v. Grisham Farm Products, Inc.*, the United States District Court for the Western District of Missouri ordered the defendant to pay $10,000 "for the damages suffered that are a direct and proximate result of its violations of the ADA, 42 U.S.C. § 12112(d) and GINA, 42 U.S.C. § 2000ff-1(b)."  *Grisham Farm Products, Inc.*, 191 F. Supp. 3d 994, 998 (W.D. Mo. 2016).[27]  Conversely, no court has held that damages are not available under 42 U.S.C. § 2000ff-1(b).

---

[27] *See also Jackson v. Regal Beloit America, Inc.*, NO. 16-134-DLB-CJS, 2018 WL 3078760, at *17 (E.D. Ky. June 21, 2018) (granting the plaintiff's motion for partial summary judgment on her GINA claim under subsection (b) and holding that "damages must be determined by a jury"); *Lee v. City of Moraine Fire Dep't*, No. 3:13-cv-222, 2015 WL 914440 (S.D. Ohio Mar. 3, 2015); *Lowe v. Atlas Logistics Group Retail Servs. (Atlanta), LLC*, 102 F. Supp. 3d 1360 (N.D. Ga. 2015).

Admittedly, GINA's statutory framework does not neatly map onto 42 U.S.C. § 1981a(a)(1)'s remedial scheme.   As discussed, the Supreme Court separates § 1981a(a)(1) into two types of claims:   "intentional discrimination" claims for which compensatory and punitive damages are available and "the disparate impact theory of discrimination," for which compensatory and punitive damages are not available.   *Kolstad*, 527 U.S. at 534 (internal quotation marks omitted).   GINA separates claims into two somewhat different categories:   "[d]iscrimination based on genetic information" and "[a]cquisition of genetic information."   42 U.S.C. § 2000ff-1.  As Dollar General notes, the first type of claim under each statute – "intentional discrimination" under 42 U.S.C. § 1981a(a)(1) and "discrimination based on genetic information" under 42 U.S.C. § 2000ff-1(a) – align neatly.  Both sections expressly address intentional discrimination.[28]  But the second type of claim

---

[28] GINA subsection (a) states:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee; or

(2) to limit, segregate, or classify the employees of the employer in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of the employee as an employee, because of genetic information with respect to the employee.

42 U.S.C. § 2000ff-1(a).   By its terms, GINA subsection (a) applies only to intentional discrimination.

under each statute – "the disparate impact theory of discrimination" under 42 U.S.C. § 1981a(a)(1) and "acquisition of genetic information" under 42 U.S.C. § 2000ff-1(b) – are less compatible.

Importantly, though a claim under 42 U.S.C. § 2000ff-1(b) may not involve intent to discriminate, a claim under 42 U.S.C. § 2000ff-1(b) does involve the intentional collection of genetic information.  Under 42 U.S.C. § 2000ff-1(b) an employer may not "request, require, or purchase" certain information.  To "request, require, or purchase" necessarily involves intentional conduct, not benign conduct that produces an unlawful result as in a disparate impact claim.  In fact, § 2000ff-1(b)(1) expressly excludes liability for inadvertent requests for family medical history of an employee or family member of the employee.  GINA explicitly deals with unintentional conduct, not by limiting what remedies are available to a plaintiff, but by excusing liability.  Finally, and most importantly, any argument that a 42 U.S.C. § 2000ff-1(b) claim should be treated like a disparate impact is undercut by the language of GINA itself, which states:  "Notwithstanding any other provision of this Act, 'disparate impact', as that term is used in section 2000e-2(k) of this title, on the basis of genetic information does not establish a cause of action under this Act."  42 U.S.C. § 2000ff-7(a).

GINA's legislative history also suggests that a plaintiff may recover compensatory and punitive damages for claims brought under 42 U.S.C. § 2000ff-

1(b).  When the bill originally was introduced in the House, the provision that would

eventually become 42 U.S.C. § 2000ff-1(b) was nearly identical to the final version:

> Acquisition Of Genetic Information.—It shall be an unlawful
> employment practice for an employer to request, require, or purchase
> genetic information with respect to an employee or a family member of
> the employee (or information about a request for the receipt of genetic
> services by such employee or a family member of such employee)
> except— . . . .

H.R. 493, 110th Cong. § 202(b) (2007).  The only difference is the parenthetical,

which was removed from the bill in the House.  H.R. 493, § 202(b) (as engrossed in

the House, Apr. 25, 2007).[29]  Similarly, the remedies and enforcement section in the

original bill is nearly identical to what would eventually become 42 U.S.C. § 2000ff-

6.  H.R. 493, § 207.  The damages subsection incorporated 42 U.S.C. § 1981a's

remedial scheme.  H.R. 493, § 207(a)(3).[30]

The House Committee on Education and Labor recognized that this bill would

allow an array of damages actions.  H.R. REP. NO. 110-28 (2007) (Conf. Rep.).

Burton J. Fishman, on behalf of the Genetic Information Nondiscrimination in

Employment Coalition, testified before the Committee on Education and Labor.

H.R. REP. NO. 110-28, at 67-68.  In his testimony, Mr. Fishman stated that "[w]hen

---

[29] The original bill included five exceptions, including exception (b)(1) covering inadvertent requests or requirements.  H.R. 493, § 202(b)(1)-(5).  Later, a sixth exception was added covering DNA analysis for law enforcement purposes.  H.R. 493, § 202(b)(6).

[30] Later, the Senate added subsection (f): "Prohibition against retaliation."  H.R. 493, § 207(f) (as engrossed in the Senate).

a company intentionally discriminates, remedies should be available," but expressed concern over the fact that this bill "resorts to jury trials with punitive and compensatory damages for any violation, without distinction, while will necessarily invite additional litigation." H.R. REP. NO. 110-28, at 67-68. Those writing for the minority in the committee report quoted Mr. Fishman, sharing his concern. H.R. REP. NO. 110-28, at 67. Yet, the language of the bill was not changed to limit the availability of compensatory and punitive damages. Thus, given the language and legislative history of GINA, coupled with the Supreme Court's interpretation of 42 U.S.C. § 1981a(a)(1), the Court finds that compensatory and punitive damages are available for claims brought under 42 U.S.C. § 2000ff-1(b). In turn, the Court also finds that the EEOC and Mr. Jackson have standing to bring their GINA claims, even if their request for injunctive relief is moot, and the EEOC and Mr. Jackson have alleged intentional conduct to support a damages claim.

Alternatively, Dollar General argues that the EEOC's summary judgment motion on its GINA claim "is premature because it depends upon the EEOC establishing proof of damages," (Doc. 126, p. 15), but the EEOC has moved for partial summary judgment only with respect to a GINA violation, not damages, (Doc. 107, p. 1). The Court does not need to determine damages to determine a GINA violation. Thus, the Court grants the EEOC's motion for partial summary judgment on its GINA claim as to liability. Damages under GINA are for a jury to

decide. *Jackson*, NO. 16-134-DLB-CJS, 2018 WL 3078760, at *17. Additionally, the Court grants summary judgment for Mr. Jackson on his GINA claim pursuant to its power under FED. R. CIV. P. 56(f)(1).

## CONCLUSION

For the reasons discussed above, the EEOC and Mr. Jackson have established as a matter of law that Dollar General violated GINA. The Court denies Dollar General's motion for summary judgment on the EEOC's and Mr. Jackson's 42 U.S.C. §§ 12112(b)(6) and 12112(a) ADA claims. Finally, the Court regards the EEOC's and Mr. Jackson's 42 U.S.C. § 12112(d)(3) ADA claim as a duplicate claim that the Court will dismiss. By separate order, the Court will set the EEOC's and Mr. Jackson's remaining ADA claims and their GINA claim, with respect to damages, for trial.

**DONE** and **ORDERED** this July 26, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

# Exhibit B

FILED
2023 Jan-03  PM 12:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** } } } | |
| **Plaintiff,** } } | |
| **and** } } | |
| **VINCENT JACKSON,** } } | **Case No.: 2:17-cv-01649-MHH** |
| **Plaintiff-Intervenor,** } } | |
| **v.** } } | |
| **DOLGENCORP, LLC,** } } | |
| **Defendant.** } | |

## ORDER

Earlier this year, the Court denied Dollar General's motion for summary judgment on the EEOC's and Mr. Jackson's Americans with Disability Act and Genetic Information Nondiscrimination Act claims.  (Doc. 131).  Pursuant to 28 U.S.C. § 1292(b), Dollar General has asked the Court to certify for interlocutory appeal the order denying the company's summary judgment motion.  (Doc. 134).

Interlocutory review is a "rare exception" to the firm rule that the "great bulk of [] review must be conducted after final judgment."  *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1264 (11th Cir. 2004).  Under § 1292(b), when a district judge

who issues an order "not otherwise appealable . . . shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation," the judge should state so in its order. 28 U.S.C. § 1292(b). Both district and circuit courts have the discretion to certify issues for interlocutory appeal. *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1358 (11th Cir. 2008).

A court should certify an issue for interlocutory appeal only when the issue involves:

> (1) pure questions of law, (2) which are controlling of at least a substantial part of the case, (3) and which are specified by the district court in its order, (4) and about which there are substantial grounds for difference of opinion, (5) and whose resolution may well substantially reduce the amount of litigation necessary on remand.

*McFarlin*, 381 F.3d at 1264. The "and" towards the end of the five-factor test makes the factors conjunctive, so if a factor is not established, a court must deny a request for interlocutory review.

### *The GINA Issue*

Dollar General has asked the Court to certify for interlocutory appeal the following question:

> Is a GINA claim for the "acquisition of genetic information" under 42 U.S.C. § 2000ff-1(b) a claim for "intentional unlawful discrimination" within the meaning of 42 U.S.C. § 1981a for which compensatory and punitive damages are available?

(Doc. 134, p. 1).  The parties dispute whether the question Dollar General presents for interlocutory appeal is a question on which there are substantial grounds for difference of opinion.  (Doc. 134, pp. 6-8; Doc. 142, pp. 5-6).  The Court will assume that the other requirements for certification are met and will focus its analysis on whether substantial grounds for difference of opinion exist.

"Substantial ground for difference of opinion exists when a legal issue is (1) difficult and of first impression, (2) the district courts of the controlling circuit are split as to the issue, or (3) the circuits are split on the issue." *Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assocs., P.C*, 165 F. Supp. 3d 1330, 1335 (N.D. Ga. 2015) (citing *Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 952 F. Supp. 2d 1360, 1362 (N.D. Ga. 2013)).  Only the first factor is relevant here. With respect to the plaintiffs' GINA claim, the Court has stated:  "[a]s far as the Court can tell, this is an issue of first impression," (Doc. 131, p. 39), but that is not enough to establish a basis for an interlocutory appeal; the issue must be one of first impression, and it must be difficult.  *Consumer Fin. Prot. Bureau*, 165 F. Supp. 3d at 1335.  The issue here is novel, but it is not difficult.

Stated plainly, Dollar General asks whether an employer who intentionally obtains an employee's genetic information in violation of 42 U.S.C. § 2000ff-1(b) is liable for compensatory and punitive damages under 42 U.S.C. § 1981(a) which allows such damages for intentional discrimination.  The Court answered yes and

pointed to other district courts that have said the same and to GINA's legislative history. (Doc. 131, pp. 41-45). The Court also noted that "no court has held that damages are not available under 42 U.S.C. § 2000ff-1(b)." (Doc. 131, p. 41). While the Court recognized, and Dollar General emphasizes, that "GINA's statutory framework does not neatly map onto 42 U.S.C. § 1981(a)(1)'s remedial scheme," (Doc. 131, p. 41; Doc. 135, p. 7), the underlying issue is not a particularly difficult one. Section 2000ff-1(b) makes the intentional acquisition of genetic information unlawful. When an employer intentionally requests, requires, or purchases genetic information that it is not otherwise allowed to have or allowed to base its employment decisions on, it intentionally engages in the kind of unlawful intentional conduct 42 U.S.C. § 1981(a)(1) disallows. Admittedly, 42 U.S.C. § 1981(a)(1) uses the word discrimination and 42 U.S.C. § 2000ff-1(b) does not, but the Court found that "given the language and legislative history of GINA" and "the Supreme Court's interpretation of 42 U.S.C. § 1981a(a)(1) . . . compensatory and punitive damages are available for claims brought under 42 U.S.C. § 2000ff-1(b)." (Doc. 131, p. 45).

This damages analysis is based on general and well-settled principles of employment law. Therefore, it is not difficult and does not require interlocutory review. *See Owens v. Metro. Life Ins. Co.*, 2017 WL 106017, *5 (N.D. Ga. Jan. 11, 2017) ("And while this issue is one of first impression, it involves the application of traditional rules of contract interpretation. This is not the difficult issue for which §

4

1292(b) was intended."); *Consumer Fin. Prot. Bureau*, 165 F. Supp. 3d at 1337 ("The application of settled law to this case's somewhat new facts does not present a substantial ground for difference of opinion warranting certification.").  Although no circuit has found that a violation of 42 U.S.C. § 2000ff-1(b) entitles a plaintiff to compensatory and punitive damages, no circuit has rejected such a rule.  *Consumer Fin. Prot. Bureau*, 165 F. Supp. 3d at 1337 (finding that no substantial difference of opinion existed because, "[a]lthough no circuit has specifically applied the meaningful attorney doctrine to the filing of a debt collection complaint, no circuit has rejected such application").  Accordingly, in the absence of a record that demonstrates substantial grounds for difference of opinion beyond Dollar General's disagreement with the Court's analysis, the Court declines to certify Dollar General's first question for interlocutory review.  *Consumer Fin. Prot. Bureau*, 165 F. Supp. 3d at 1339 ("Defendants' disagreement with this Court's Order does not constitute substantial ground for difference of opinion . . . .") (internal quotation marks omitted).

### *The ADA Question*

Dollar General also has asked the Court to certify the following question for interlocutory appeal:

> Is an ADA claim of qualification standards that screen out or tend to screen out individuals with disabilities under 42 U.S.C. § 12112(b)(6) analyzed exclusively as a disparate impact claim or can it be established through a showing of disparate treatment?

(Doc. 134, p. 1).  As with the first question, the certification of Dollar General's second question turns on whether there are substantial grounds for a difference of opinion on the proposed question.  For this question, Dollar General argues, and the Court agrees, that substantial grounds for difference of opinion exists because district courts within this circuit and circuit courts across the country are split on the issue.  (Doc. 146, pp. 5-7).  "[T]o demonstrate the existence of a substantial ground for difference of opinion, the appellant must show that at least two courts interpret the legal principle differently."  *Havana Docks Corp. v. MSC Cruises SA Co.*, 2020 WL 3451681, *3 (S.D. Fla. June 24, 2020) (internal quotations and citation omitted).

At least four district courts in this circuit have analyzed the issue.  This Court found that a party may pursue a disparate treatment claim under § 12112(b)(6). (Doc. 131, pp. 14-19) ("[T]he Court rejects Dollar General's contention that § 12112(b)(6) pertains only to disparate impact claims and that a plaintiff may prove a discrimination claim under § 12112(b)(6) only by offering comprehensive statistical evidence.").  Similarly, in *Toole v. Metal Services, LLC*, the district court allowed the plaintiff to pursue an intentional discrimination claim under § 12112(b)(6) using the *McDonnell Douglas* burden-shifting standard.  17 F. Supp. 3d 1161, 1170 (S.D. Ala. 2014).  In contrast, in *Allmond v. Akal Security, Inc.*, the district court found that "[c]laims brought pursuant to § 12112(b)(6) are treated as disparate impact claims."  2007 WL 2904023, at *6 (M.D. Ga. Sept. 28, 2007), *aff'd*

*on other grounds*, 558 F.3d 1312 (11th Cir. 2009).  District courts in other circuits also differ in their analysis of the issue.  (Doc. 131, pp. 14, 20).

Lack of consensus among the district courts of this circuit creates substantial grounds for differences of opinion on the ADA question presented by Dollar General.  No clear consensus on the issue exists among federal circuit courts either. *Compare Monette v. Electronic Data Systems, Corp.*, 90 F.3d 1173 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012), *and Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 834, 839 (5th Cir. 1999) (examining medical screening claim by individual plaintiff as a disparate treatment claim and noting that plaintiff did not plead a disparate impact claim under § 12112(b)(6)), *with Boersig v. Union Elec. Co.*, 219 F.3d 816, 822 (8th Cir. 2000) (stating that 42 U.S.C. § 12112(b)(6) "invoke[es] a disparate impact theory of ADA liability.").  The Supreme Court's opinion in *Raytheon Company v. Hernandez*, 540 U.S. 44 (2003), also is relevant.  As this Court stated, "[d]icta in *Raytheon* undergirds the argument that § 12112(b)(6) pertains only to disparate impact claims."  (Doc. 131, p. 14).

Given the lack of consensus among the district courts of this circuit and among circuit courts and the dicta in *Raytheon*, substantial grounds for difference of opinion exist.  An interlocutory determination of this issue would not require the Eleventh Circuit Court of Appeals to delve into the factual record in this case, and the ADA

issue impacts a substantial part of this case.  Resolution of the ADA issue in favor of Dollar General likely will substantially reduce the scope of this litigation on remand.

### *Conclusion*

For the reasons discussed above, the Court declines to certify the GINA question for interlocutory appeal.  The Court certifies for interlocutory appellate review the following issue under the ADA:

> Should ADA claims regarding qualification standards that screen out or tend to screen out individuals with disabilities under 42 U.S.C. § 12112(b)(6) be analyzed exclusively as disparate impact claims or may plaintiffs establish screening claims by making an adequate showing of disparate treatment?

**DONE** and **ORDERED** this January 3, 2023.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

# Exhibit C

FILED

Case 2:17-cv-01649-MHH   Document 110   Filed 12/22/20   Page 1 of 46

USCA11 Case: 23-90003   Document: 1-2   Date Filed: 01/13/2023   Page: 99 of 175

2020-Dec-22  AM 12:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| VINCENT JACKSON, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| v. | ) | Civil Action No. 2:17-cv-01649-MHH |
| | ) | |
| DOLGENCORP, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

The Americans with Disabilities Act (the "ADA") has long given employers the right to condition job offers on pre-employment medical examinations assessing a candidate's physical qualification for the job. Plaintiffs in this action bring a misplaced challenge to pre-employment physical examinations lawfully conducted between 2013 and 2017 for General Warehouse Worker ("GWW") candidates at Dollar General's Bessemer distribution center ("Bessemer DC"). Medical personnel at nearby Middle Creek Medical Center conducted those examinations, with each candidate medically evaluated for their ability to perform the physically demanding GWW position while working on and near various types of moving equipment. Citing 42 U.S.C. § 12112(b)(6), Plaintiffs claim in error that these examinations applied unlawful "qualification

standards" because Middle Creek's medical personnel considered a candidate's blood pressure reading, peripheral vision and depth perception, and blood sugar level in their overall assessment.

Plaintiffs' ADA challenge is unfounded for many reasons. First, Plaintiffs cannot establish that any of the twenty-five candidates on whose behalf the case is brought are disabled. Second, they cannot establish that consideration of any candidate's blood pressure, blood sugar, or vision constituted an unlawful "qualification standard" that "screened out or tended to screen out" individuals with disabilities. Even in those situations where the Middle Creek examiner determined there was an issue that might impact a candidate's ability to do the job, candidates were *not* excluded from further consideration. They were instead referred to their personal doctor (or another doctor of the candidate's choice) to address the candidate's particular issue. That referral status also allowed for the candidate to return for reevaluation after taking forgotten medication, obtaining corrective lenses, or simply for a recheck of vital signs. Nearly all of those whom Middle Creek initially gave a "referral" status were ultimately qualified to work as GWWs on their return to Middle Creek. Plaintiffs, however, challenge this medically-focused process and attempt to substitute their medical judgment for that of the Middle Creek medical personnel who, in addition to using their own medical judgment also considered the medical judgment of a candidate's own doctor in making physical qualification assessments.

The ADA claim Plaintiffs seek to bring must also be dismissed because the medical examiner's consideration of such information was job-related and consistent with business necessity. Middle Creek's medical personnel knew the GWW position involved work in a fast-paced industrial setting, with workers expected to work on and near forklifts and other motorized equipment, and often at significant heights. It was therefore particularly important that they assess the candidate's ability to navigate within that environment, including whether the candidate was

at risk of a sudden loss of consciousness while operating or working near moving equipment and whether the candidate could perceive risks using their peripheral vision and depth perception.

Plaintiffs also attempt a separate claim under the Genetic Information Non-Discrimination Act ("GINA") based on allegations that Middle Creek improperly asked candidates about family health history.  This claim is similarly without merit.  First, the question on which Plaintiffs base this claim was on a form that Middle Creek discontinued in August 2014.  Second, GINA does not provide for damages on an "impermissible inquiry" claim.  Accordingly, the harm alleged is not redressable, and this deprives either plaintiff of Article III standing.

## II.   STATEMENT OF FACTS

### A.  Dollar General's Bessemer Distribution Center

Dollar General is a discount retailer of consumable goods with approximately 17,000 retail locations nationwide.[1]   In order to supply its retail locations, Dollar General operates large distribution centers in multiple locations where product is shipped, checked in, unloaded and stored before being sent out to the stores.  DG Dep. Tr. 50:19-52:16; 53:9–69:19; 93:25–96:14. *Id.*  One such distribution center is the Bessemer DC.  DG Dep. Tr. 21:10–17.

The Bessemer DC is a 1.2 million square foot facility with height clearance of approximately 50 feet that contains pallets of merchandise stacked on shelving four stories high.  Orefice Dep. Tr. 92:9–98:25; *see also* Pl's Exs. 78–92; Deslattes Exs. 12A–D; Deslattes Dep. Tr. 440:10–444:6.  The over 600 employees who actually distribute the product within the distribution center are known as "General Warehouse Workers."  Orefice Dep. Tr. 92:9–98:25; DG Dep. Tr. 137:14–144:14.  GWWs fill the stores' orders by retrieving the necessary merchandise—either in full cases or in smaller quantities—and placing the merchandise on rolltainers, a non-motorized

---

[1] https://www.dollargeneral.com/about-us.html.
4834-7710-0501.4

silver rack on wheels that fits onto the pallet truck.  DG Dep. Tr. 93:9–96:14; Pl's Exs. 78–79, 91.  Loaded rolltainers and other merchandise are then loaded on trucks for delivery to Dollar General stores.  *Id.*

Product is then moved throughout the Bessemer DC on various motorized equipment that includes: sweeping vehicles, pallet trucks, tow tractors, and several different types of forklifts (including "MUOPs," or "Man Up Order Pickers").  DG Dep. Tr. 68:18–70:22; Pl's Exs. 78–85, 91–95.  The motorized equipment most frequently operated by GWWs are various types of forklifts and pallet trucks, which have two long prongs used to transport product on and off trucks and around the Bessemer DC.  DG Dep. Tr. 68:18–70:22;  93:9–96:14; Pl's Exs. 78–79, 91.  The three main types of forklifts operated by GWWs are: (1) counterbalanced lift trucks, which are what one would generally think of as a standard forklift; (2) reach-fork lift truck, which are forklifts with the ability to reach over four stories high; and (3) MUOPs, which lift a person standing on a platform up to four stories in the air.  DG Dep. Tr. 96:15–101:7; 104:4–108:8; Pl's Exs. 80–81, 84, 91–92, 95.

The Bessemer DC is a fast-paced work environment and GWWs must constantly be aware of their surroundings both on and off the motorized equipment they use to move product.  Orefice Dep. Tr. 102:21–104:25; DG Dep. Tr. 126:22–127:22; 133:5–134:9; 219:7–16.   No matter where a GWW is located in the DC, the individual will be operating or working near large motorized equipment.  Orefice Dep. Tr. 102:21–104:25; DG Dep. Tr. 126:22–127:22; 133:5–134:9; 219:7–16.

GWWs work across four departments: (1) Repack, which pulls individual product to pack rolltainers based on individual store orders and also puts individual product back onto shelves; (2) Shipping, which transports product between the loading dock and the trucks; (3) Full Case, which

loads or unloads pallets of product from shelves; and (4) Case Pack, which takes cases of merchandise and places it on conveyor belts for travel to the shipping dock. DG Dep. Tr. 53:9–69:19; Orefice Dep. Tr. 92:21–100:20; Young Dep. Tr. 37:2–43:2; Pl's Ex. 8 at 2–5.

Though GWWs generally start out in one department, the expectation is that over time they will become cross-trained and able to perform the duties of any department on any given shift depending on business needs, including operating the various motorized equipment used in that department. DG Dep. Tr. 64:1–78:12; Orefice Dep. Tr. 99:1–100:20; Young Dep. Tr. 37:2–43:2; 75:3–76:11. As detailed in both the GWW Position Description and a Job Analysis created during the initial stage of the pre-employment physical, the GWW position is physically demanding and requires continuous lifting and walking, operating on and around motorized equipment, and working at heights. Pl's Ex. 6 at 2; Pl's Ex. 8 at 2–5.

## B. Pre-Employment Physical

### 1. The Pre-Employment Physical

During the time period at issue,[2] GWW job applicants went through a multi-step selection process that included a written application, job interview, background check, and an offer of employment conditioned on successful completion of a drug screen and a pre-employment physical examination with Middle Creek Medical Center. Young Dep. Tr. 17:18–24:24, 32:13–36:19; Orefice Dep. Tr. 14:24–28:9; DG Dep. Tr. 39:10–47:18. After receiving a conditional offer, the candidate would be referred to Middle Creek for their pre-employment physical. DG Dep. Tr. 45:19–47:18.

After Middle Creek conducted the physical, it faxed a one page "results" form indicating whether in the examiner's judgment the candidate was "qualified," "not qualified," or whether a

---

[2] The relevant period is December 2013 until August 2014 for Plaintiffs' GINA claim and until September 2017 for Plaintiffs' ADA claim.

4834-7710-0501.4

decision was pending.  DG Dep. Tr. 240:7–244:1; MC Dep. Tr. 31:8–32:19; 52:15–20; 56:20–59:17; 229:15–231:16; 264:12–265:10; Young Dep. Tr. 49:2–16; Orefice Dep. Tr. 44:9–47:24; 102:9–20.   Dollar General was not involved with the examinations, but Middle Creek's contemporaneous medical records and the testimony of its personnel reflect the following process:

1. Upon arrival at Middle Creek's facility, the candidate was given paperwork that included a health questionnaire entitled "Physical Encounter."  MC Dep. Tr. 58:13–60:13; 111:6–113:5; *see* Pl's Ex. 5 at 5.[3]

2. A Middle Creek medical assistant next performed "triage," which included taking vital signs such as blood pressure, pulse, height, and weight.  MC Dep. Tr. 34:12–37:6; 61:17–66:12; 76:12–77:2; 111:6–113:5; Busbee Dep. Tr. 42:7–45:7.

3. The medical assistant also performed a vision test and collect urine from the candidate for drug screen and urinalysis, contemporaneously entering her findings in the appropriate forms and Middle Creek's electronic medical records.  MC Dep. Tr. 34:12–37:6; 61:17–66:12; 76:12–77:2; 111:6–113:5; Busbee Dep. Tr. 42:7–45:7; *see* Pl's Ex. 16 at 4–5, 8–9.

4. A nurse practitioner next met with the candidate to review the candidate's health history information, vital signs, and test results, ask any necessary follow up questions, and conduct a physical examination of the candidate.  MC Dep. Tr. 35:19–36:14; 52:15; 260:3–11; Busbee Dep. Tr. 63:9–64:5.  23; 57:10–58:12; 111:6–113:5; Deslattes Dep. Tr. 74:23–76:16; 83:3–85:14.

5. At the conclusion of the examination, the nurse practitioner assessed whether in her medical judgment—and in reliance on the GWW Job Description and Job Analysis—the

---

[3] The questionnaire at one time included a "yes/no" question concerning the candidate's family medical history.  That form was later updated, and by August 22, 2014 the question had been removed and Middle Creek specifically instructed not to ask candidates any questions about family medical history.  Pl's Ex. 17 at 9–15.  Any family medical history obtained by Middle Creek had no effect on the examiner's qualification rating.  MC Dep. Tr. 270:9–13.

4834-7710-0501.4

candidate was physically qualified to perform the GWW position.  MC Dep. Tr. 67:5–68:23; 77:19–79:9; 86:11–88:8; 237:15–240:13; 271:15–274:6; Deslattes Dep. Tr. 40:9–25; 52:19–60:19; 86:16–90:11; 265:9–273:16; 287:1–292:24; 108:12–110:8; 267:12–273:23; *see* Pl's Exs. 6 at 2; 8 at 2–5.  The nurse practitioner then advised the candidate of her assessment, including whether or not additional information was needed before a qualification decision could be made.  MC Dep. Tr. 31:8–32:19; 52:15–20; 56:20–59:17; 229:15–231:16; 264:12–265:10; Deslattes Dep. Tr. 41:14–48:4; 104:20–106:24; 149:19–153:19; 160:11–161:23; 290:16–292:24; 315:1–318:4; 406:4–407:3; Pl's Ex. 5 at 4.

6.  Following the exam, Middle Creek faxed Dollar General a one-page "Pre-Employment Physical Results" form with one of three pre-printed boxes checked: "Qualified," "Not Qualified," or "Referred to PMD."  MC Dep. Tr. 31:8–32:19; 52:15–20; 56:20–59:17; 229:15–231:16; 264:12–265:10; *see* Pl's Ex. 5 at 2.  Dollar General received no other information from the pre-employment physical beyond the final rating indicated on the Results Form.[4]  DG Dep. Tr. 240:7–244:1; MC Dep. Tr. 31:8–32:19; 52:15–20; 56:20–59:17; 229:15–231:16; 264:12–265:10; Young Dep. Tr. 49:2–16; Orefice Dep. Tr. 44:9–47:24; 102:9–20.

The "Refer to PMD" rating was intended to convey that there was some aspect of the candidate's pre-employment physical that required further evaluation and possible treatment by another healthcare provider before a qualification decision could be made.  MC Dep. Tr. 54:6–55:2; 66:4–12; 72:2–73:10; 101:12–102:16; 123:9–127:1; 163:16–165:10; 182:18–186:14; 201:2–20; Deslattes Dep. Tr. 41:14–48:4; 86:16–90:11; 104:20–106:24; 149:19–153:19; 160:11–161:23;

---

[4] Though Middle Creek personnel occasionally wrote explanations on the result form, they were instructed not to do so.  *See e.g.*, Pl's Ex. 6 at 4 ("Dollar General will not receive any medical documents from the medical facility."); Pl's Ex. 17 at 9 ("You should only inform Dollar General (on the form provided) whether a candidate is qualified, not qualified or referred to his or her PMD.").

4834-7710-0501.4

290:16–292:24; 315:1–318:4; 406:4–407:3.  When giving a "Refer to PMD" rating, the nurse practitioner explained to the candidate what the rating meant and what the candidate should do next—including seeing another physician or contacting Dollar General to request an accommodation if necessary.  MC Dep. Tr. 54:6–55:2; 66:4–12; 72:2–73:10; 101:12–102:16; 123:9–127:1; 163:16–165:10; 182:18–186:14; 201:2–20; Deslattes Dep. Tr. 41:14–48:4; 86:16–90:11; 104:20–106:24; 149:19–153:19; 160:11–161:23; 290:16–292:24; 315:1–318:4; 406:4–407:3.  If the nurse practitioner referred the candidate to his or her primary doctor (or another provider), copies of the GWW Position Description and Job Analysis were given to the candidate to take to the candidate's provider.  Deslattes Dep. Tr. 45:17–47:3; 86:16–90:11; *see* Pl's Ex. 5 at 2 (noting under "Referred to PMD" rating that "Copy of Job Analysis was provided to applicant for PMD review").  If the candidate said he or she did not already have an appropriate provider, the nurse practitioner provided referral suggestions.[5]  Deslattes Dep. Tr. 45:17–47:3; 86:16–90:11.  Unless the candidate failed the drug screen or refused to complete the pre-employment physical, it was rare for a candidate to be rated "Not Qualified."  MC Dep. Tr. 163:16–165:10; 195:22–196:23; 201:2–20; Deslattes Dep. Tr. 86:16–90:11; *see also* Medical Record Summary.[6]

### 2. Pre-Employment Physical Criteria

The EEOC contends that Middle Creek's nurse practitioners improperly considered blood pressure, blood sugar, and vision as part of its examination process.  It takes issue in particular with the decision to refer candidates for further evaluation if on the day of the examination the candidate had: (1) a blood pressure reading of 160/100 or higher; (2) corrected visual acuity that

---

[5] Testimony from Middle Creek confirms that referral suggestions included free clinics for candidates who indicated cost might be an issue.  Deslattes Dep. Tr. 45:17–47:3; 213:7–22.

[6] The attached Medical Record Summary is a spreadsheet summarizing relevant information contained in the almost 9,000 pages of medical records that Middle Creek produced in response to a subpoena seeking the medical records of all individuals who underwent the Pre-Employment Physical during the relevant period.  The summary is provided pursuant to Federal Rule of Evidence 1006, which permits the summarizing of voluminous records.

4834-7710-0501.4

was not at least 20/50 in each eye; or (3) an abnormally high blood sugar level reflected in their urinalysis or a blood test.  Compl. at ¶ 25(a)–(d).   Dollar General did not mandate any specific "cut off" numbers for the criteria or direct Middle Creek to use them as a screen to disqualify candidates.[7]  DG Dep. Tr. 219:17–220:7; MC Dep. Tr. 67:5–68:23; 77:19–79:9 Ex. 6; 86:11–88:8; 237:15–240:13; 271:15–274:6; Deslattes Dep. Tr. 40:9–25; 52:19–60:19; 86:16–90:11; 95:15–98:7; 265:9–273:16; 287:1–292:24; Sumner Dep. Tr. 94:8–25; 151:24–156:7; 159:14–164:8. Instead, the final rating was based on the independent medical judgment of the Middle Creek nurse practitioner.  *Id.*

### 3.   Pre-Employment Physical Statistical Results

Provided the candidates had also passed their drug screen, those rated "Qualified" by Middle Creek were contacted about a start date.  Young Dep. Tr. 32:13–36:19;  Orefice Dep. Tr. 44:9–47:24.   Those candidates who were given a "Refer to PMD" rating—most of whom subsequently were rated "Qualified"—were placed in a pending status.  Orefice Dep. Tr. 48:6–49:12.

Middle Creek's records reflect that its personnel conducted 627 pre-employment physicals of GWW candidates during the period at issue.  Medical Record Summary.  Of those, 392 initially received "Qualified" ratings, 33 received "Not Qualified" ratings for various reasons, 189 received a "Refer to PMD" rating.[8]  *Id.*  Of the 33 individuals rated "Not Qualified," the records reflect that

---

[7] Throughout discovery, the EEOC has attempted to present a document produced by Middle Creek and entitled "Dollar General Physical Requirements" as if it is a document that was given by Dollar General to Middle Creek for use during the POETs.  Pl's Ex. 2; *see e.g.*, Orefice Dep. Tr. 105:1–121:4.  The overwhelming and undisputed record, however, including several versions of the document itself, clearly show that this document was created by Middle Creek as a sort of checklist for them to use.  Pl's Ex. 14; Sumner Dep. Tr. 151:24–156:7; Orefice Dep. Tr. 1015:16–121:4; Middle Creek Dep. Tr. 44:23–47:1; 98:23–101:20; 163:3–15; Deslattes Dep. Tr. 90:31–95:14; 100:4–103:3.

[8] The remaining 13 medical records are incomplete and do not contain either a completed rating form or enough information to otherwise determine the rating.  Medical Record Summary.  Many of those candidates, however, have an unchecked form and some indication that the candidate failed or refused the drug screen.  *Id.*  Additionally, several individuals underwent the Pre-Employment Physical twice as part of separate application processes during the relevant period, and each of their Pre-Employment Physicals are counted separately.  *Id.*

26 had failed their drug screen, 3 had refused to complete the pre-employment physical exam, and 3 were later rated "Qualified." *Id.*  Only 1 out of 630 candidates, Lorenzo McConnico, is shown to have received a final rating of "Not Qualified" for any reason other than failing a drug screen or not completing the pre-employment physical.  *Id.*

Among those 189 candidates who were rated "Refer to PMD," the majority (118 candidates) who followed through and returned to Middle Creek for further evaluation, were rated "Qualified."  *Id.*  Most noticeably, out of the 143 candidates rated "Referred to PMD" because of their tested blood pressure, blood sugar, or vision measurements (the specific criteria challenged by Plaintiffs), every one of those who followed the nurse practitioner's instructions and returned for further evaluation—a total of 90 candidates—were later rated "Qualified."[9]

### 4.  Relevance of Criteria to General Warehouse Worker Position

After considering the Bessemer DC environment, the GWW Job Description and Job Analysis, Middle Creek medical providers determined that it was appropriate to consider blood pressure, blood sugar, and vision information in determining whether a candidate could perform the duties of a GWW.  Deslattes Dep. Tr. 267:12–273:23; *see also id.* at 55:25–60:19; 265:9–271:2; 290:16–292:24; 301:7–305:7; 314:2–25; 319:7–322:22; Haimes Dep. Tr. 70:12–79:24; 119:1–120:18; 185:22–200:25; 213:12–218:11; 242:22–245:6.  The medical evidence developed in discovery further indicates that blood pressure of 160/100 or higher, if left untreated or uncorrected, indicates a condition that has the potential to cause sudden incapacitation, and the unpredictable nature of such an event means it could pose a safety hazard not only to the individual

---

[9] Of those 92 out of 145 candidates, Middle Creek's records reflect that 22 candidates had initially been referred to PMD due to their blood pressure readings, 14 because of their blood sugar level, and 56 because of vision.  Id.  Of the remaining 53 candidates referred to PMD for the same criteria, Middle Creek's records reflect that none of them returned for further evaluation despite the opportunity to do so.  *Id.*  That includes 21 of the 25 candidates on whose behalf the EEOC is seeking to assert its ADA claim here.  *Id.*

but to others within the Bessemer DC.  MC Dep. Tr. 76:13–77:2; Deslattes Dep. Tr. 56:10–58:6; 95:15–97:4; 290:16–292:24; *see also* Swotinsky Dep. Tr. 73:25–80:11.[10]  Abnormal blood sugar levels are also indicative of possible conditions that if left untreated can lead to sudden incapacitation as well as sudden loss of vision—again posing a safety hazard in a distribution center environment.  Deslattes Dep. Tr. 58:7–60:19; 301:7–305:7; 314:2–25.[11]

Finally, corrected visual acuity of 20/50 or better in each eye was a relevant consideration given the presence in the Bessemer DC of hundreds of pieces of motorized equipment in operation and the need for depth perception and peripheral vision in that environment.[12]  Orefice Dep. Tr. 102:21–104:25; MC Dep. Tr. 77:19–79:9; 86:11–88:8; Deslattes Dep. Tr. 55:25–56:9; 265:9–271:2; 319:7–322:22; *see also* Haimes Dep. Tr. 70:12–79:24; 119:1–120:18.  Without reasonable peripheral vision and depth perception, GWWs would be limited in their ability to see or react in time to pedestrians or other equipment.  MC Dep. Tr. 77:19–79:9; 86:11–88:8; Deslattes Dep. Tr. 55:25–56:9; 265:9–271:2; 319:7–322:22; *see also* DeCarlo Dep. Tr. 88:20–94:12 (noting legitimate concern for evaluation that someone with one eye would not being able to process information fast enough or work safely in a dangerous job because of lost depth perception).  They would also be limited in their ability to safely line up the prongs of the forklifts without causing damage to the shelves or equipment, or inadvertently knocking a loaded pallet off one of the four-story racks in the Bessemer DC.  MC Dep. Tr. 77:19–79:9; 86:11–88:8; Deslattes Dep. Tr. 55:25–56:9; 265:9–271:2; 319:7–322:22.

---

[10] Notably, A requirement of blood pressure below 160/100 is less stringent than the blood pressure requirement imposed by the Department of Transportation ("DOT") for commercial drivers.  MC Dep. Tr. 98:23–101:20; Deslattes Dep. Tr. 413:19–416:12; 457:10–458:19; *see also* Swotinsky Dep. Tr. 16:18–17:20, 18:2–22:22 (DOT standards for truck drivers are appropriate and common to consider for evaluating fork lift operators); Haimes Dep. Tr. 74:17–79:24 (looking at standards for regulated jobs is relevant and helpful for analogous jobs).

[11] On at least one occasion, a GWW at the Bessemer DC lost consciousness and/or vision while working on a MUOP because she suffered from an unknown and uncontrolled diabetic condition.  Young Dep. Tr. 73:13–74:15.

[12] This vision criteria as also less stringent than the corrected vision requirement imposed by the DOT for commercial drivers.  Haimes Dep. Tr. 74:2–79:24.

### C.  Jackson's Pre-Employment Physical

Jackson went to Middle Creek for his pre-employment physical on June 17, 2014.  Jackson Dep. Tr. 331:7–394:4; Pl's Ex. 16.  Jackson followed the process described above and filled out a Physical Encounter form in which he checked "No" in response to the "family history" question and then had his vital signs and vision checked by a Middle Creek medical assistant.  Jackson Dep. Tr. 331:7–394:4; Pl's Ex. 16.  When the vision test resulted in a finding of 20/200 in his right eye, the medical assistant informed Jackson that he had not met the vision criteria for the pre-employment physical.  Jackson Dep. Tr. 331:7–394:4; Pl's Ex. 16. She then completed her portion of the process and took him to a room to be examined by the nurse practitioner.  Jackson Dep. Tr. 331:7–394:4; Pl's Ex. 16.

Jackson was seen by a Middle Creek nurse practitioner, who discussed with him the poor vision in his right eye.  Jackson Dep. Tr. 331:7–394:4; Pl's Ex. 16.  After reviewing his test results and before performing an exam, the nurse practitioner advised Jackson that his current vision was insufficient to satisfy the pre-employment physical and that he should see a doctor to either have his vision corrected or obtain a further evaluation to determine his ability to do the job.  Jackson Dep. Tr. 331:7–394:4; Pl's Ex. 16.   Jackson says he advised the nurse practitioner that he was born with the vision issue and it was not correctable and that she then completed the exam before he left.[13]  Jackson Dep. Tr. 387:20–392:20; Pl's Ex. 16.  However, according to the nurse practitioner and the contemporaneous medical records, after the conversation concerning his vision, the nurse practitioner requested Jackson finish the exam, but Jackson refused and walked out.   Deslattes Dep. Tr. 117:16–119:7; 137:23–139:7; 149:19–151:14; 155:4–156:1; 160:11–161:23; 324:21–326:21; Pl's Ex. 16 at 5 ("Pt refused physical"), at 6 ("refused physical exam"),

---

[13] Jackson testified that notwithstanding his vision in his right eye, he does not consider himself disabled.  Jackson Depo. at 430.

4834-7710-0501.4

at 8 ("Pt sts he knows there is no correction, and he declined a physical exam"), at 10 ("Pt . . . refused physical").  It is undisputed that within an hour of Jackson leaving Middle Creek, Middle Creek faxed a "Not Qualified" Results Form to Dollar General with a note that he had refused to finish the physical.  Pl's Ex. 16 at 10.

### III.   LEGAL ARGUMENT

The Plaintiffs assert two causes of action with respect to Dollar General's pre-employment physical: (1) an ADA challenge that prior to September 2017, the Middle Creek examinations "applied unlawful qualification standards that screened out or had the effect of screening out individuals with disabilities" and (2) a GINA "unlawful inquiry" claim that prior to August 2014 Middle Creek made improper requests for family medical history.  Compl. at ¶¶ 21–45.[14]

The ADA claim is brought on behalf of Jackson and twenty-four additional candidates (the "ADA Aggrieved Parties") who allegedly were denied employment because they received a rating on the exam of either "Referred to PMD" or "Not Qualified" based on their blood pressure, blood sugar, or visual acuity measurements.  EEOC's Second Amended Response to Interrogatories ¶ 12. The GINA claim is bought on behalf of Jackson and approximately 500 additional candidates (the "GINA Aggrieved Parties") who allegedly were harmed by being asked to answer a single question on a form concerning their family medical history and possibly being asked the same question orally by a Middle Creek medical assistant during their pre-employment physical.  EEOC's Second Amended Response to Interrogatories ¶ 13.

For the reasons addressed below, Dollar General should be granted summary judgment on both claims and the Court should dismiss this case with prejudice.

---

[14] Jackson's Intervenor-Complaint is substantively identical to the EEOC's Complaint and asserts the same claims.  Compl. at ¶¶ 21–45; Intervenor Compl. at ¶¶ 21–45.  Moreover, Jackson is an aggrieved party for both the EEOC's ADA and GINA claim.  Accordingly, Jackson's individual claims fail for the same reasons the EEOC's claims on behalf of the ADA and GINA Aggrieved Parties fail.

**A.  Dollar General is Entitled to Summary Judgment on Plaintiffs' ADA Claim.**

Although pled as two separate counts, Plaintiffs assert a single ADA claim alleging  that Dollar General's pre-employment physical was an unlawful employee entrance exam under 42 U.S.C. § 12112(d)(3) because it used "qualification standards or selection criteria that screen out or tend[ed] to screen out an individual with a disability or a class of individuals with disabilities," in violation of 42 U.S.C. § 12112(b)(6).  *See* Complaint at ¶ 25.a.  Claims premised on qualification standards or selection criteria that violate § 12112(b)(6) are properly analyzed as disparate impact claims, not disparate treatment claims, because they turn on the <u>effect</u> of a qualification standard or selection criteria and whether it "screens out individuals with disabilities," *see* § 12112(b)(6), not the *intent* for which the standard or criteria was adopted.

Plaintiffs' ADA claim is fatally flawed as a matter of undisputed fact and controlling law. A comprehensive analysis of all the pre-employment physicals Middle Creek performed demonstrates that the criteria considered during the pre-employment physicals did not "screen out or tend to screen out" individuals with disabilities.  Those criteria accordingly did not violate § 12112(b)(6).  Additionally, because the criteria used during pre-employment physicals were permissible as job-related and consistent with business necessity, the pre-employment physicals themselves did not violate § 12112(d)(3).

*1.  Plaintiffs' ADA claim must be analyzed as a disparate impact claim.*

Dollar General's pre-employment physical is an "employee entrance exam" expressly authorized under 42 U.S.C. § 12112(d)(3) ("A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination.").  An employee entrance exam is lawful if it meets three requirements:

(1)     all entering employees are subjected to such an examination regardless of disability;

(2)     information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record …; and

(3)     the results of such examination are used only in accordance with this subchapter.

42 U.S.C. § 12112(d)(3).  There is no allegation that the pre-employment physicals did not meet the first two requirements.  Compl. at ¶¶ 21–32; 42 U.S.C. § 12112(d)(3)(A)–(B).  Plaintiffs' only contention is that the pre-employment physical was unlawful under the third element for such an exam because its "results . . . [were not] used in accordance with" either § 12112(a) or § 12112(b)(6)—the subsections of the ADA cited in Count 1.  § 12112(d)(3)(C); *see* Compl. at ¶¶ 21–32.

Section 12112(a) is the general provision of the ADA disability stating that an employer shall not "discriminate against a qualified individual on the basis of a disability."  Section 12112(b) provides a list of seven employment practices that constitute discrimination "against a qualified individual on the basis of a disability."  The only one of those seven practices the EEOC alleges Dollar General violated is § 12112(b)(6)'s prohibition of "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities" as a type of discrimination within the meaning of § 12112(a).  *See*  42 U.S.C. § 12112.

As recognized by numerous Courts in this circuit, "[c]laims brought pursuant to § 12112(b)(6) are [more properly] treated as disparate impact claims."  *Allmond v. Akal Sec., Inc.*, 2007 U.S. Dist. LEXIS 72713, *16–17 (M.D. Ga. Sep. 28, 2007) (collecting cases); *see Raytheon v. Hernandez*, 540 U.S. 44, 53 (2003) (explaining the ADA permits disparate treatment claims by

quoting § 12112(b)(3) and disparate impact claims by quoting § 12112(b)(6)); *see also Monaco v. City of Jacksonville*, 51 F. Supp. 3d 1251, 1268 (M.D. Fla. 2014) ("Because Plaintiffs are proceeding solely under a theory of disparate treatment . . . Plaintiffs' argument that the City's practice violates 42 U.S.C. § 12112(b)(6) as a selection criteria that excludes or tends to exclude a class of individuals with disabilities, is unavailing in that it relies on a theory of disparate impact discrimination.").

Plaintiffs' Complaint and discovery responses, confirm that their ADA claim is indeed brought as a disparate impact claim.[15]  *See* Compl. at ¶¶ 21–26; EEOC Second Amended Responses to First Set of Interrogatories at ¶ 10 (alleging Dollar General intentionally used the pre-employment physical, not that it intentionally discriminated against the disabled).  The EEOC does not plead any factual basis for an intentional discrimination claim under § 12112(a) and appears to reference that subsection for the proposition that the ADA general prohibits discrimination against a qualified individual with a disability, including the specific type of discrimination alleged by the EEOC—application of an improper qualification standard.  *See* Compl. at ¶¶ 21–26.  Plaintiffs' ADA claim is premised solely on the allegation that the pre-

---

[15] The EEOC and Jackson each devote a section of their respective Complaints to Jackson individually, with both relying on 42 U.S.C. § 12112(b)(6) as the statutory basis for an alleged violation of 42 U.S.C. 12112(a).  See Complaint at ¶¶ 21-24; Intervenor-Complaint at ¶¶ 21-24.  If they have done so in an effort to craft a disparate treatment claim on his behalf, any such claim would fail because there is no evidence of any decisionmaker with unlawful motive.  If they contend it was the nurse practitioner who rated him, that allegation is foreclosed by Jackson's admission that his pre-employment physical involved application of the vision criteria consistent with its application to others, including the recommendation that Jackson consult his own doctor (or a specialist) for further evaluation.  Jackson Dep. at 387:21-388:8.  The nurse practitioner accordingly did not treat him differently from the manner in which the EEOC alleges others were treated.  To the extent Jackson alleges he was treated differently by Dollar General because of his monocular vision, it is undisputed that Dollar General was unaware of Jackson's monocular vision.  DG Dep. Tr. 240:7–244:1; MC Dep. Tr. 31:8–32:19; 52:15–20; 56:20–59:17; 229:15–231:16; 264:12–265:10.  The only information provided to Dollar General was that Middle Creek had not qualified Jackson because he failed the vision exam and had refused to complete the physical.  Pl's Ex. 16 at 10.  While Jackson disputes that he refused to complete the remainder of his physical, he cannot dispute what Middle Creek relayed to Dollar General, and this justifies Dollar General's honest belief that Jackson abandoned the process.  This forecloses any attempt to impute a discriminatory motive to Dollar General.
4834-7710-0501.4

employment physical used qualification standards that "screen out or tend to screen out" individuals with a disability in violation of § 12112(b)(6). *See* Compl. at ¶ 25a.

Accordingly, to survive summary judgment, Plaintiffs must present sufficient evidence to establish a *prima facie* case for disparate impact under § 12112(b)(6). It has failed to do so.

> ### 2. *Plaintiffs cannot establish a prima facie case of disparate impact discrimination.*

Disparate impact claims under § 12112(b)(6) are those claims which "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Raytheon*, 540 U.S. at 52–53. In the ADA context, the group that is adversely affected must be qualified individuals with a disability. *See Haynes v. City of Montgomery*, 2008 U.S. Dist. LEXIS 19435, *10 (M.D. Ala. Mar. 12, 2008) ("The ADA also protects against employment practices that have a disparate impact on *persons with disabilities*. *See, e.g.*, 42 U.S.C. § 12112(b)(6)." (emphasis added)).

Unlike disparate treatment claims where the fundamental issue is the intent of a particular decision-maker, disparate impact claims do not require evidence of discriminatory intent. *Raytheon*, 540 U.S. at 53. Instead, a qualified individual with a disability asserting the claim must present two kinds of evidence to establish a prima facie case. First, the plaintiff must point to the specific employment practice that allegedly has a disparate impact. *Spivey v. Beverly Enters., Inc.*, 196 F.3d 1309, 1314 (11th Cir. 1999). Second, the plaintiff must demonstrate causation by offering statistical evidence sufficient to show that the challenged practice has resulted in prohibited discrimination. *See id.*; *Hallmark Developers v. Fulton Cnty.*, 466 F.3d 1276, 1286 (11th Cir. 2006). "While no single test controls in measuring disparate impact, the plaintiff must produce some evidence about the population that a policy applies to, some numbers

4834-7710-0501.4

or proportional statistics, in order to survive a motion for summary judgment." *Kintz v. UPS*, 766 F. Supp. 2d 1245, 1254 (M.D. Ala. 2011) (internal quotation omitted); *see Corbin v. Town of Palm Beach*, 2014 U.S. Dist. LEXIS 28093, *5 (S.D. Fla. Mar. 4, 2014) ("Besides pointing to a specific employment practice that allegedly has a disparate impact, a plaintiff must also demonstrate causation by offering statistical evidence to show that the challenged practice has resulted in prohibited discrimination.").

With respect to the vision, blood pressure, and blood sugar criteria Plaintiffs challenge, Plaintiffs cannot carry their prima facie burden when it comes to statistical evidence. The undisputed medical records related to pre-employment physicals during the relevant period belie any allegation of a disparate impact disfavoring the disabled and refute any causal connection Plaintiffs may attempt to draw between the challenged criteria and the failure of the ADA Aggrieved Parties to successfully complete the pre-employment physical. Moreover, the EEOC has failed to present evidence that a single one of the ADA Aggrieved Parties is a qualified individual with a disability who it may rely upon to establish disparate impact.

### a. The statistics of the pre-employment physicals disprove any disparate impact in violation of the ADA.

The EEOC claims that over an approximately 4-year period, twenty-five individuals were impermissibly screened out because of their abnormal vision, blood pressure, or blood sugar measurements. Compl. at ¶¶ 21–32. Accepting for the sake of argument that each those conditions is a disability (or a proxy for one)—which is untrue as explained below—any claim of disparate impact under § 12112(b)(6) nevertheless fails because the statistics of the pre-employment physical results show that the criteria did not cause any disparate impact on those individuals.

Based on the entirety of the records provided by Middle Creek for candidates during the relevant period, out of the 627 candidates who underwent a pre-employment physical at that time,

4834-7710-0501.4

only one single candidate, McConnico, received a "Not Qualified" rating for anything other than refusing to finish the exam or failing the drug screen. Medical Record Summary. Therefore, even if McConnico's rating was based on his medical condition—which is not established in the record and Dollar General disputes—the pre-employment physical exam resulted in less than .16% of all candidates being screened out because of their medical test measurements. *Id.* This tiny percentage cannot as a matter of law be enough to establish the pre-employment physical had a disparate impact on such individuals. *See Smith v. Miami-Dade Cty.*, 621 F. App'x 955, 961–62 (11th Cir. 2015) ("It is not sufficient to show that a few people are affected by a policy. The disparity of the evidence provided must be substantial enough to raise an inference of causation.").

To the extent the EEOC attempts to challenge the notations in Middle Creek's medical records that ADA Aggrieved Parties Jackson and Carlos Carey were rated "Not Qualified" after they refused to finish their pre-employment physicals, even crediting such challenges, three individuals (McConnico, Jackson, and Carey) would still only constitute .48% of the 627 candidates who took the pre-employment physical and only 2% of the 149 individuals who were rated "Referred to PMD" or "Not Qualified" under the exact same criteria that the EEOC claims was unlawful. Medical Record Summary. Again, such small numbers of even potentially adversely effected candidates are insufficient to show disparate impact. *See Smith*, 621 F. App'x at 961–62; *see also Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir. 2008) ("[S]imply showing that a few houses are affected by an ordinance does not come close to establishing disparate impact.").

Further, those who were rated "Referred to PMD" for blood pressure, blood sugar or vision, were just as successful in ultimately being rated "Qualified" as every other candidate rated "Referred to PMD." Medical Record Summary. Over half of the candidates who received a

"Referred to PMD" rating (118 out of 189, or 62%) subsequently received a "Qualified Rating." *Id.* This fact does not change when the universe is narrowed to only those who received a "Referred to PMD" for the exact criteria now being challenged. On the contrary, the percentage stays nearly the same as out of the 143 individuals who were rated "Referred to PMD" because of blood pressure, blood sugar, or vision, 90 of them (about 63%) were subsequently rated "Qualified." *Id.* Therefore, there is no factual basis to claim that the three challenged criteria impacted a candidate's chance of ultimately being rated "Qualified" any differently from all the other criteria considered.

Finally, the medical records show that the "Referred to PMD" rating did not screen out any candidates.[16] Among the 53 candidates who were rated "Referred to PMD" because of blood pressure, blood sugar, or vision and were not ultimately rated "Qualified"—from whom the EEOC draws the vast majority of its ADA Aggrieved Parties—all but 4 of them failed to return to Middle Creek after their referral, and the 4 who did return all failed to visit a doctor before doing so. *Id.* The common factor shared among the ADA Aggrieved Parties was their failure to follow instructions and complete the pre-employment physical, not their respective test measurements. *Id.* Indeed, among those who rated "Referred to PMD" because of blood pressure, blood sugar, or vision measurements and either saw a primary care doctor, took medication, or obtained corrective lenses before returning, <u>every one of them was rated "Qualified"</u>—even those with monocular vision. *See e.g.*, *id.* (TR6, DW7, JS6).

The data of the pre-employment physical results thus show that the exam worked exactly as intended: it identified measurement levels that could be indicative of potential problems if left uncorrected or uncontrolled, and once the candidate either corrected or controlled the issue or

---

[16] Indeed, numerous candidates with actual disabilities—like cancer, heart diseases, and multiple sclerosis—were rated "Qualified," and are notably not ADA Aggrieved Parties. *See, e.g.*, Medical Record Summary (AB4, CD2, FF, TL).

4834-7710-0501.4

obtained a doctor's note clearing him to work, he was rated "Qualified." *Id.* The EEOC's ADA Aggrieved Parties represent—at most—three outliers from the established practice, and a collection of other candidates who failed to follow instructions and complete the pre-employment physical process. *Id.* Accordingly, the actual statistical results of the pre-employment physical disprove any claim of disparate impact towards individuals with a disability and Plaintiffs' ADA claim must fail.

b. None of the ADA Aggrieved Parties have a proven disability.

Notwithstanding the lack of any statistical evidence that the criteria Middle Creek used during pre-employment physicals screened out any individuals with any condition, none of the individuals identified by the EEOC as ADA Aggrieved Parties are appropriate parties on whose behalf to bring such a challenge in the first place. Only a "qualified individual with a disability" is entitled to bring an ADA claim under §§ 12112(d)(3) and (b)(6), and the undisputed facts confirm that none of the twenty-five ADA Aggrieved Parties meet that statutory definition.

An essential element for a *prima facie* case of disparate impact under § 12112(b)(6) is that those allegedly being discriminated against are qualified individuals with a disability. *Howard v. Norfolk S. Corp.*, 2020 U.S. Dist. LEXIS 170436, *40 (N.D. Ala. Sep. 17, 2020) ("Under the ADA, an employer cannot: 'discriminate against a qualified individual on the basis of disability by using qualification standards . . . that screen out or tend to screen out *an individual with a disability*.' 42 U.S.C. § 12112(b)(6)." (emphasis added)) (quoting *Pollard v. Drummond Co.*, 2015 U.S. Dist. LEXIS 120279, *6 (N.D. Ala. Sept. 10, 2015)); *see Wetherbee v. S. Co.*, 754 F.3d 901, 904–05 (11th Cir. 2014) ("We . . . join the Seventh and Tenth Circuits in holding that an individual seeking relief under § 12112(d)(3)(C) must demonstrate that he is a qualified individual with a disability.").

"The ADA defines the term 'disability' as (1) a physical or mental impairment that 'substantially limits one or more' of an individual's 'major life activities,' (2) a 'record of such an

impairment,' or (3) 'being regarded as having such an impairment' as described in subsection (1)." *Lewis v. City of Union City*, 934 F.3d 1169, 1179 (11th Cir. 2019) (quoting 42 U.S.C. § 12102(1)). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). Accordingly, to survive summary judgment, the EEOC must prove that <u>each of the ADA Aggrieved Parties</u> are limited in a major life activity and thus qualified individuals with a disability in order to survive summary judgment. *See Lewis*, 934 F.3d at 1179 (explaining it is the plaintiff's burden to "produce sufficient evidence to permit a jury to find that she: . . . is disabled."). It has failed to do so for any of them.

Out of the twenty-five ADA Aggrieved Parties, nine demonstrated visual acuity of less than 20/50 in both eyes, fifteen had blood pressure results equal to or greater than 160/100, and five had exam results indicating elevated blood sugar.[17]  None of these conditions, however, qualifies *per se* as a disability, and Plaintiffs have not presented any evidence that a single one of them was in fact disabled at the time of their pre-employment physical.  To the contrary, all the evidence produced in discovery on the issue uniformly demonstrates that these individual were not disabled.  Accordingly, the ADA claim asserted on behalf of the ADA Aggrieved Parties fails.

i.   High Blood Sugar

First, a high blood sugar test result on a given day is not a diagnosis of a chronic condition, let alone a diagnosis of substantially limiting impairment.  *See* Swotinsky Dep. Tr. 331:14–332:25 (EEOC putative expert explaining that a one-time blood sugar reading could be high for reasons like recently eating sugar that have nothing to do with any underlying condition); *see also Wagner*

---

[17] Four individuals fit into two of these categories.
4834-7710-0501.4

*v. Colvin*, 2013 U.S. Dist. LEXIS 182823, *28 (M.D. Fla. Dec. 11, 2013) (finding in the context of an appeal from denial of SSA disability benefits that occasional low blood sugar shown by a lab test rather than frequent abnormal levels shown by a blood sugar log did not show the plaintiff was precluded from gainful employment).  The record is devoid of any evidence that any of the five ADA Aggrieved Parties who were rated "Referred to PMD" because of their blood sugar levels were even aware that they had abnormal blood sugar levels at the time of the pre-employment physical, let alone that it had any effect whatsoever on their daily life.  Indeed, the one individual in that group that has been deposed testified that he did not know he had high blood sugar when he underwent the pre-employment physical, did not consider himself disabled by his blood sugar level, and was not limited by it in any way.  Snead Dep. Tr. 76:19–80:9.  Thus, because Plaintiffs have failed to make any showing that these individuals have a disability, the ADA claim brought on their behalf should be dismissed.

ii.    High Blood Pressure

Similarly, having a blood pressure reading of 160/100 or higher on a given day and during a particular examination does not establish chronic hypertension, let alone hypertension that is substantially limiting enough to constitute a disability.  *See Jones v. McDonald*, 2018 U.S. Dist. LEXIS 99217, *26–28 (S.D. Fla. June 12, 2018) (finding that merely having high blood pressure without any evidence it substantially limited a major life activity does not constitute a disability); *Toland v. BellSouth Telecomms.*, 2017 U.S. Dist. LEXIS 211527, *17 (N.D. Ga. May 1, 2017) ("Toland's assertion that he suffers from hypertension does not establish that this physical impairment substantially limited one or more of his major life activities.") (internal quotations omitted); *Lloyd v. Housing Auth. of the City of Montgomery, Ala.*, 857 F. Supp. 2d 1252, 1263–64 (M.D. Ala. 2012) (finding that the plaintiff failed to produce sufficient evidence from which a reasonable juror could conclude that his high blood pressure substantially affected a major life

activity); *see also Morgan v. Cty. Comm'n of Lawrence Cty.*, 2016 U.S. Dist. LEXIS 80281, *28 (N.D. Ala. June 20, 2016) (observing that "[t]he Eleventh Circuit . . . has held that exhaustion and high blood pressure, without more, are not conditions that substantially impair a person's ability to perform major life activities, such as working") (citing *Swain v. Hillsborough Cty. Sch. Bd.*, 146 F.3d 855, 856 n.1 858 (11th Cir. 1998)).

As with elevated blood sugar, the record is devoid of any evidence that any of the fifteen ADA Aggrieved Parties who were rated "Referred to PMD" because of their blood pressure levels were substantially limited in any way by their blood pressure.  Again, the only individual deposed on the issue affirmatively denied considering himself disabled or being limited in any major life activity by his blood pressure.   Fielder Dep. Tr. 105:25–107:16.   Likewise, the only other testimony (in the form of a declaration) from an ADA Aggrieved Party whose blood pressure was high at his pre-employment physical also indicates that he did not consider the condition to have any substantial impact on his life or ability to work.  S*ee* Copeland Decl. at ¶ 12 ("I was really surprised that the reason I did not get the Dollar General job was because of my blood pressure.  I had previously worked much more physically strenuous jobs such as a tree cuter for Asplundh for over eight years.  I believe I could have done the job easily.").  Because the EEOC has failed to make any showing that the ADA Aggrieved Parties who were rated "Referred to PMD" because of their blood pressure readings are substantially limited in any way, the ADA claim brought on their behalf must fail.

### iii.    Limited Peripheral Vision and Depth Perception

Finally, lacking visual acuity of 20/50 or better in each eye—and the resulting limitations on peripheral vision and depth perception—is also not inherently a disability, and simply having poor vision in one eye does not make one disabled under the ADA.  *See Dick v. CRC Ins. Servs.*, 2009 U.S. Dist. Lexis 147564, *17–18 (N.D. Ala. Dec. 14, 2009) (plaintiff is not disabled despite

"not hav[ing] strong depth perception, and [somewhat limited] peripheral vision" due to issues with her right eye because it "does not prevent her from doing anything in normal daily life"). Even being "monocular," broadly defined to mean poor vision in one eye that results in limited peripheral vision and depth perception, is not enough alone to show an individual is disabled without also showing the vision substantial impairs a major life activity. *See Perry v. Kappos*, 489 F. App'x 637, 638 (4th Cir. 2012) (plaintiff with "no vision in his left eye and reduced vision in his right eye" was not disabled under the RA because he could drive so long as the route was well-lit); *Wilson v. Dollar Gen. Corp.*, 122 F. Supp. 3d 460, 466–68 (W.D. Va. 2015) (plaintiff's monocular vision was not a disability under the ADA inability to blink or completely close her right eye hindered her depth perception at times, the Court found that her overall quality of life and work performance were unaffected); *Knutson v. Schwan's Home Serv., Inc.*, 870 F. Supp. 2d 685 (D. Minn. 2012) (vision of "anywhere from 20/150 to 20/80 vision in his left eye" that could not be corrected was not a disability because there was no evidence he was substantially limited); *cf. Dyke v. O'Neal Steel, Inc.*, 327 F.3d 628, 632 (7th Cir. 2003) (holding pre-ADAAA that plaintiff's monocular vision, which "prevented him only from driving at night, working on roofs, holding his head straight when looking left to right, and participating in various recreational activities," was not substantially limiting).

Indeed, particularly in cases where an individual has had monocular vision for a long time and become accustomed to primarily using one eye, the condition likely does not substantially impair a major life activity. *See Littlefield v. Nev. ex rel. Dep't of Pub. Safety*, 195 F. Supp. 3d 1147, 1153–1154 (D. Nev. July 15, 2016) ("Mr. Littlefield has not met his burden in establishing a prima facie case that he is disabled within the meaning of the ADA. On the contrary, the evidence shows that Mr. Littlefield, having been monocular from the age of six months, has been and is able

to function as an unimpaired individual in the use of his eyesight in daily life."); *see also* DeCarlo Dep. Tr. 252:2–256:15 (EEOC's putative expert explaining that "most patients with monocular vision can do everything you and I can do," especially after they have had the condition "for a long period of time").

The EEOC has again failed to present evidence that a single one of the ADA Aggrieved Parties with monocular vision was substantially limited in any major life activity. The only ADA Aggrieved Party who has testified about the impact of his monocular vision had on his life activities was Vincent Jackson, and he affirmatively denied being disabled.[18] Jackson Dep. Tr. 429:18–430:23; 436:2–437:20. Moreover, the EEOC's own putative expert testified that having monocular vision does not make one disabled or substantially impair them once they have adjusted to it. DeCarlo Dep. Tr. 251:7–260:13. Accordingly, because the EEOC has not shown that any of the ADA Aggrieved Parties with limited depth perception and peripheral vision are substantially impaired by that condition, the ADA claim on behalf of those individuals must fail.

        iv.    The EEOC cannot salvage the ADA Aggrieved Parties' status as disabled by claiming they were regarded as such.

A disparate impact theory under the ADA provides redress where a facially neutral policy nevertheless adversely impacts individuals with actual disabilities and not those who might claim they were "regarded as" disabled. Nevertheless, to the extent the EEOC attempts to salvage its claim by asserting that the ADA Aggrieved Parties were "regarded as" disabled, the undisputed facts foreclose the EEOC actually establishing that any of the ADA Aggrieved Parties were regarded by Dollar General as disabled.

---

[18] Jackson's admissions that his monocular vision does not limit him in any way forecloses any argument he may make that he is a qualified individual with a disability and dictates judgment in Dollar General's favor on the ADA claim he brings individually as an intervening plaintiff and the EEOC brings on his behalf.

4834-7710-0501.4

First, Dollar General was never informed of a candidate's actual condition, so it could not have regarded any of them as disabled based on that condition.  Second, Dollar General did not dictate cut-off testing levels to Middle Creek that would result in a "Not Qualified" rating.  It at all times relied on Middle Creek to exercise its medical judgment in ascertaining which candidates were qualified to work as GWWs.  And finally, the "Referred to PMD" rating does not indicate that Middle Creek or Dollar General regarded anyone as impaired; rather it indicated only that there was a potential issue that warranted further medical evaluation.

In "regarded as" cases, a plaintiff must show that the employer knew that the employee had an actual impairment or perceived the employee to have an impairment at the time of the adverse employment action.  *EEOC v. STME, LLC*, 938 F.3d 1305, 1316 (11th Cir. 2019).  Here, Dollar General could not have regarded any ADA Aggrieved Party in question as disabled Dollar General had no information, medical or otherwise, to suggest the candidate had a disability; the only information available to Dollar General was that the candidate had not yet been rated "Qualified."  DG Dep. Tr. 240:7–244:1; MC Dep. Tr. 31:8–32:19; 52:15–20; 56:20–57:8; 59:10– 17; 229:15–231:16; 264:12–265:10; Young Dep. Tr. 49:2–16; Orefice Dep. Tr. 44:9–47:24; 102:9–20; *see Toland*, 2017 U.S. Dist. Lexis 211527 at *20 ("Even assuming that Toland's assertion that BellSouth received his August 7, 2013, blood pressure readings from Concentra is correct, this 'only demonstrate[s] an awareness of [Toland's] physical condition,' but it 'do[es] not demonstrate that [BellSouth] regarded him as having a physical *impairment*." (quoting *Cooper v. CLP Corp.*, 2015 U.S. Dist. LEXIS 171105, *6 (N.D. Ala. Dec. 23, 2015), *aff'd*, 679 Fed. Appx. 851 (11th Cir. 2017) (per curiam))).[19]

---

[19] Similarly, the EEOC cannot rely on any record of impairment to satisfy disability element, because the relevant record for establishing a substantially limiting impairment is the "record relied on by [the] employer," and again, all Dollar General knew was a candidate's rating.  *Hall v. Masterlock Co.*, 1999 U.S. Dist. LEXIS 13119, *23 (M.D. Ala. Aug. 12, 1999) (quoting 29 C.F.R. pt 1630, App. 1630.2(k)); *see Butler v. Pers. Bd.*, 2008 U.S. Dist. LEXIS 125090, 4834-7710-0501.4

Merely receiving notification that an individual had received a rating of "Referred to PMD" or "Not Qualified," does not show knowledge of any actual impairment that would support a "regarded as" arguments, especially in light of the undisputed facts that numerous individuals with such ratings were later rated "Qualified." Medical Records Summary; *see Hutcherson v. Int'l Marine & Indus. Applications, LLC*, 2016 U.S. Dist. Lexis 51749 (S.D. Ala. Apr. 11, 2016) (knowledge that the plaintiff wore glasses was not enough to infer that the company perceived the plaintiff as disabled or impaired); *Cooper*, 2015 U.S. Dist. LEXIS 171105 at *17 (not regarded as disabled where plaintiff "only demonstrate an awareness of [his] physical condition" not "that [the employer] regarded him as having a physical *impairment*"); *see also Rubink v. Roadway Express, Inc.*, 2002 U.S. App. Lexis 9920, *3–4 (8th Cir. May 20, 2002) (plaintiff was not regarded as disabled because the employer had merely regarded him as not being able to meet DOT regulations).

Moreover, the undisputed record shows that the criteria used in the pre-employment physical were not rigid cutoffs at which an individual would be disqualified. MC Dep. Tr. 43:1–44:22; 98:23–104:9; 105:18–106:2; 140:18–141:7; 211:15–212:10; *see also* Medical Record Summary. Instead, they were merely test levels that indicated the possibility of conditions and therefore warranted further evaluation through a referral. MC Dep. Tr. 54:6–55:2; 66:4–12; 72:2–73:10; 101:12–102:16; 123:9–127:1; 163:16–165:10; 182:18–186:14; 201:2–20; Deslattes Dep. Tr. 41:14–48:4; 86:16–90:11; 104:20–106:24; 149:19–153:19; 160:11–161:23; 290:16–292:24; 315:1–318:4; 406:4–407:3; *see also* Medical Record Summary. In fact, there is no record of any

---

*21 (N.D. Ala. May 27, 2008) ("[I]n order to establish an ADA claim based on a record of disability, a plaintiff must show that at some point in the past, the employer relied upon a record which either classified or misclassified that individual as having a physical or mental impairment that substantially limits a major life activity." (internal quotations omitted)). The only record Dollar General had was the one-page result form. DG Dep. Tr. 240:7–244:1; MC Dep. Tr. 31:8–32:19; 52:15–20; 56:20–57:8; 59:10–17; 229:15–231:16; 264:12–265:10; Young Dep. Tr. 49:2–16; Orefice Dep. Tr. 44:9–47:24; 102:9–20.

specific number used for a "Refer to PMD" rating with respect to blood sugar <u>at all</u>.  MC Dep. Tr. 103:18–104:9.  Therefore, simply receiving a "Refer to PMD" rating, even if based on a specific test level, does not indicate Dollar General or Middle Creek regarded someone with those levels as disabled.  *See Toland*, 2017 U.S. Dist. Lexis 211527 at *20; *see also Rubink*, 2002 U.S. App. Lexis 9920 at *3–4.  As a matter of undisputed fact, it did not.

Accordingly, because all Dollar General ever knew were the ADA Aggrieved Parties' ratings and the criteria challenged resulted in a determination of further evaluation needed rather than a finding of impairment, Dollar General could not have regarded any of the ADA Aggrieved Parties as disabled.

### B. The ADA claim also fails because the challenged criteria is job-related and consistent with business necessity.

In addition to the previously discussed deficiencies, Plaintiffs' ADA claim fails because under § 12112(b)(6), the criteria considered by Middle Creek during pre-employment physicals were permissible as "job-related for the position in question and . . . consistent with business necessity."  42 U.S.C. § 12112(b)(6); *Allmond v. Akal Sec. Inc.*, 558 F.3d 1312, 1316–17 (11th Cir. 2009) ("To benefit from the affirmative defense, an employer must prove that the pertinent qualification standard is job-related and consistent with business necessity.").

The Eleventh Circuit has explained both prongs of the relevant analysis:  "job-relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer" as a basis for an employment decision, while "[b]usiness necessity, in context, is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria" for such a decision.  *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311 (11th Cir. 2013).  "Although [an employer's] burden is generally quite high, it is significantly

lowered when, like here, 'the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great . . . .'" *Allmond*, 558 F.3d at 1316–17 (quoting *Hamer v. City of Atlanta*, 872 F.2d 1521, 1535 (11th Cir. 1989)).

In analyzing whether consideration of particular physical conditions is job-related and consistent with business necessity, "[t]he test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business." *Hamer v. City of Atlanta*, 872 F.2d 1521, 1533 (11th Cir. 1989) (quoting *Nash v. Consol. City of Jacksonville*, 837 F.2d 1534, 1539 (11th Cir. 1988).  An analysis of cases from within the 11th Circuit confirms that an employer can establish that the evaluation of a specific physical condition is job-related and consistent with business necessity where the condition increases a health or safety risk for the individual or those around him based on "reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence."  *See Horton v. Hillshire Brands Co.*, 2018 U.S. LEXIS 60265, *28 (N.D. Ala. Apr. 10, 2018) (analyzing issue of job-related and consistent with business necessity in conjunction with a "direct threat" defense); *accord. Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 84–87 (2002) (Congress included harm-to-others as an example of legitimate qualifications that are job-related and consistent with business necessity).

For example, in *Horton v. Hillshire Brands Co.*, this Court granted summary judgment to an employer who suspended a forklift operator after multiple blood pressure checks failed to provide a reading of 159/99 or below based on the opinion of its medical staff that he could not safely perform the job given the risk of "potentially serious dangers, including stroke-like symptoms, heart attacks, and muscle weakness that cannot be predicted with certainty and can strike even asymptomatic individuals without warning."  2018 U.S. Dist. Lexis 60265 at *28–33.

4834-7710-0501.4

30

Similarly, in *Lowber v. W.L. Halsey Grocery Co.*, the Court granted the employer summary judgment after finding that the employer's termination of a warehouse sanitation worker whose vision was legally blind in one eye did not violate the ADA because a medical examiner had determined that the worker's poor eyesight meant he was "unable to practice safety awareness" while at work, constituting a threat to himself and others.  2013 U.S. Dist. Lexis 109440, *4–6, 12–14 (N.D. Ala. Aug. 5, 2013).

In *Nix v. Home Depot USA, Inc.*, the Court similarly granted the employer summary judgment after finding that a qualification standard requiring forklift operators to have a sufficient level of hearing that was developed in consultation with an associate at the Georgia Resource Center for the Deaf was job-related and consistent with business necessity because otherwise the employees could not perform their job safely.  2003 U.S. Dist. LEXIS 19178 *18–20 (N.D. Ga. Oct. 16, 2003).

The undisputed record shows that Dollar General also satisfies its burden because the challenged criteria were based on reasonable medical judgment that candidates who did not satisfy those criteria could present a safety risk to themselves or their coworkers.  Again, the three criteria challenged by the EEOC are: (1) corrected visual acuity of 20/50 or better in each eye, (2) blood pressure less than 160/100, and (3) non-concerning blood sugar levels.  Compl. at ¶¶ 21–32.  Operating or working around forklifts and other motorized industrial equipment is an essential job duty of the GWWs at the Bessemer DC.  DG Dep. Tr. 53:9–69:19; Orefice Dep. Tr. 92:21–100:20; Young Dep. Tr. 37:2–43:2; Pl's Ex. 6 at 2; Pl's Ex. 8 at 2–5.  And as a matter of undisputed fact, consideration of each challenged criteria is job-related and consistent with business necessity because they are supported by reasonable medical judgments analyzing reasonable safety requirements for operating and working around industrial motorized equipment like forklifts.

Deslattes Dep. Tr. 55:25–60:19; 265:9–271:2; 290:16–292:24; 301:7–305:7; 314:2–25; 319:7–322:22; Haimes Dep. Tr. 70:12–79:24; 119:1–120:18; 185:22–200:25; 213:12–218:11; 242:22–245:6.

Indeed, it is undisputed that limited visual acuity—particularly a lack of the depth perception and peripheral vision provided by two functioning eyes—impacts an individual's ability to successfully and safely line up the prongs of a forklift with the slots of a pallet. All of the medical professionals, including Middle Creek's nurse practitioner (who holds a doctorate degree and is a certified DOT examiner) and all of the designated medical experts agree on this point. Deslattes Dep. Tr. 18:10–27:21; 55:25–56:9; 265:9–273:23; 319:7–322:22; DeCarlo Dep. Tr. 88:20–94:12; Haimes Dep. Tr. 70:12–79:24; 119:1–120:18; 197:5–200:4. It is indisputable that the need for depth perception is even more acute in the context of operating a forklift used to place or retrieve pallets on shelves up to four stories high. Deslattes Dep. Tr. 321:4–321:22; 335:18–336:9; 441:18–25; DeCarlo Dep. Tr. 88:20–94:12; 233:5–234:24; Haimes Dep. Tr. 70:12–79:24; 119:1–120:18; 197:5–200:4. And it is undisputable that limited visual acuity impacts an individual's ability to navigate motorized machinery around the busy Bessemer DC without an unacceptable risk of hitting a pedestrian, another vehicle, or a shelf. Orefice Dep. Tr. 102:21–104:25; MC Dep. Tr. 77:19–79:9; 86:11–88:8; Deslattes Dep. Tr. 55:25–56:9; 265:9–271:2; 319:7–322:22; Haimes Dep. Tr. 70:12–79:24; 119:1–120:18; *see also* DeCarlo Dep. Tr. 88:20–94:12 (noting legitimate concern for evaluation that someone with one eye would not being able to process information fast enough or work safely in a dangerous job because of lost depth perception). Lower visual acuity and loss of peripheral vision also presents a risk to those working and traveling around motorized equipment while in operation as they may not see an approaching vehicle. Haimes Dep. Tr. 70:12–79:24; 119:1–120:18; *see Lowber*, 2013 U.S. Dist. Lexis 109440

at *12–14 (warehouse sanitation worker's monocular vision made him a direct threat to himself and others in the warehouse because he was "unable to practice safety awareness").

It is also undisputed that high blood pressure increases the likelihood that a person who is either operating motorized equipment or working in proximity to such equipment can suddenly become incapacitated or lose his or her sight or cognitive function, causing an accident.  MC Dep. Tr. 76:13–77:2; Deslattes Dep. Tr. 56:10–58:6; 95:15–97:4; 290:16–292:24; Swotinsky Dep. Tr. 73:25–80:11; Haimes Dep. Tr. 41:19–45:10; 57:14–58:11.  It is similarly undisputed that abnormal blood sugar levels indicate an increased likelihood of blood sugar drops or spikes that also can result in sudden incapacitation or loss of sight or cognitive function that might similarly result in an accident.  Deslattes Dep. Tr. 58:7–60:19; 301:7–305:7; 314:2–25; Haimes Dep. Tr. 156:25–159:24; *see also* Young Dep. Tr. 73:13–74:15 (recalling an incident where a GWW at the Bessemer DC lost consciousness or vision while working on a MUOP because of blood sugar).

It is because of the potential medical reactions and subsequent harms that may result to the candidates with these conditions or those working around them that Middle Creek's medical providers—who Dollar General hired for their independent medical judgment—determined that such criteria were appropriate for assessing when determining whether a candidate was qualified to perform the GWW position.  Deslattes Dep. Tr. 55:25–60:19; 265:9–271:2; 290:16–292:24; 301:7–305:7; 314:2–25; 319:7–322:22.  Moreover, it is not just the opinion of Middle Creek's medical providers that these were relevant criteria for evaluating someone operating motorized equipment, but the DOT has expressed the same opinion through its regulations concerning the exact same criteria to be evaluated for commercial drivers, an analogous position to an industrial equipment operator.[20]  MC Dep. Tr. 98:23–101:20; Deslattes Dep. Tr. 413:19–416:12; 457:10–

---

[20] Notably, the DOT standards are more stringent than those used by Middle Creek.  *See* Deslattes Dep. Tr. 345:9–347:24.

4834-7710-0501.4

458:19; Haimes Dep. Tr. 74:2–79:24; *see* Swotinsky Dep. Tr. 16:18–17:20, 18:2–22:22 (DOT standards for truck drivers are appropriate and common to consider for evaluating fork lift operators); Haimes Dep. Tr. 74:17–79:24 (looking at standards for regulated jobs is relevant and helpful for analogous jobs); *see also Vaughn v. FedEx Freight, Inc.*, 421 F. Supp. 3d 1302, 1306 (N.D. Ala. 2019) (recognizing that the DOT commercial trucker certification regulations "are based on expert review of 'the available scientific literature,' are recommendations to help medical examiners determine a driver's medical fitness for duty, and are 'considered best practice for commercial motor vehicle operators and carriers'"). The Alabama State government likewise expressly considers the same criteria when determining whether an individual is qualified to obtain a standard driver's license. *See* Ala. Admin. Code §§ 760-X-20-.03 ("Whenever the department learns that a person applying for, renewing, or holding an operator's license has a progressive, recurring or debilitating medical condition which may affect safe driving, the department may require the person to provide the department with medical information about the person's medical condition."); 760-X-20-.06(2)(a), .07(2)(a) (hypertension); 760-X-20-.08(2)(a)–(b) (hypoglycemia and hyperglycemia); 760-X-20-.14(2)(a)–(b) (visual acuity and field of vision).

Accordingly, the criteria used in the pre-employment physical for the Bessemer DC's GWWs, which are based upon the reasonable medical opinion of Middle Creek and are the same criteria used by the DOT and the State of Alabama to determine if someone can safely operate a vehicle, were job-related and consistent with business necessity. As a result, even if it could otherwise make a *prima facie* case, Plaintiffs' ADA claim should be dismissed. *See Adkison v. Willis*, 214 F. Supp. 3d 1190, 1198 (N.D. Ala. 2016) (J. Haikala) (placing an officer on leave pending a medical evaluation "where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job-related and

4834-7710-0501.4

consistent with business necessity") (quoting *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999)); *see also Horton*, 2018 U.S. Dist. Lexis 60265 at *28–33; *Lowber*, 2013 U.S. Dist. Lexis 109440 at *12–14; *Nix*, 2003 U.S. Dist. LEXIS 19178 at *20.

### C. The EEOC does not have Article III standing to bring its GINA claim because none of the GINA Aggrieved Parties suffered a redressable injury.

Before the EEOC can ask the Court to consider the merits of its GINA claim brought on behalf of each of the nearly 500 alleged GINA Aggrieved Parties, it must first establish it has standing to do so. There are two types of standing: "statutory standing" which requires a party asserting a claim to be a party authorized by statute to bring that claim, and constitutional or "Article III" standing, which requires that the claim present a case or controversy the Court can address. *See Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006). GINA confers statutory standing on the EEOC to bring claims on behalf of alleged aggrieved parties similar to its statutory standing to bring Title VII claims on behalf of alleged aggrieved parties. 42 U.S.C. § 2000ff-6(a)(1). However, while the EEOC has statutory standing to assert GINA claims on behalf of the GINA Aggrieved Parties, it lacks Article III standing.

For a party to have [Article III] standing to bring a lawsuit, it must have:

(1) suffered an injury in fact,

(2) that is fairly traceable to the challenged conduct of the defendant, and

(3) that is likely to be redressed by a favorable judicial decision.

*Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, *13–14 (11th Cir. 2020) (quoting *Spokeo Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). "In plainer language, the plaintiff needs to show that the defendant harmed him, and that a court decision can either eliminate the harm or compensate for it." *Id.* at *14.

For a private individual, the first standing element, an "injury in fact," requires more than a mere technical violation of a statute where, like GINA, the statute does not provide damages for a technical violation. *Id.* at *3–4 ("[A] party does not have standing to sue when it pleads only the bare violation of a statute.").[21]   The EEOC, however, does not simply "stand in the shoes" of the individual claimants on whose behalf it brings claims. *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297–98 (2002).   Instead, its statutory enforcement authority provides it standing to bring a suit to vindicate the rights of the government, including seeking an injunction to stop even bare technical violations—like those alleged here. *See Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010) ("A violation of [a] statute inherently constitutes an injury to the United States.); *see also Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (stating that the government suffers an "injury to its sovereignty arising from violation of its laws").

However, while the EEOC's enforcement authority allows it to satisfy the "injury in fact" requirement with a bare technical violation, the EEOC still must establish some form of relief is available to exhibit Article III standing. *See EEOC v. Celadon Trucking Servs.*, 2015 U.S. Dist. LEXIS 84639, *33 (S.D. Ind. June 30, 2015) ("The EEOC has therefore stated a sufficient prima facie case at the liability stage so long as the availability of some form of relief—whether an injunction or money damages—renders the violation redressable."); *EEOC v. Tex. Dep't of Agric.*, 2012 U.S. Dist. LEXIS 95204, *16 (W.D. Tex. July 10, 2012) ("In order to get a prospective injunction pursuant to Section 17, the EEOC must allege that the employer has employees covered by the law, that it is in violation of the law with respect to these employees, and that without an injunction the violations are likely to continue."); *EEOC v. Sears, Roebuck & Co.*, 883 F. Supp.

---

[21] To the extent Jackson seeks to bring a GINA claim as a private party, his claim alleges a bare technical violation of the statute.  He  accordingly also lacks standing because he fails to satisfy the injury in fact element in addition to the issue of redressability.  *See Spokeo Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, *13–14 (11th Cir. 2020).

211, 214 (N.D. Ill. 1995) (finding "the EEOC lacks standing" where it has failed to identify an individual who has actually been harmed); *cf. EEOC v. GLC Rest., Inc.*, 2006 U.S. Dist. LEXIS 78270, *8 (D. Ariz. Oct. 26, 2006) ("The EEOC is correct that it has broader standing than a private class representative, but its standing is not unlimited.").

The EEOC has failed to establish any form of relief is available to give it standing.  As explained below, Plaintiffs' GINA claim is based upon an alleged impermissible inquiry under 42 U.S.C. § 2000ff-1(b), but the only damages it has sought are emotional and punitive damages, which GINA does not permit for such claims.  Accordingly, the EEOC does not have a redressable injury, and thus, does not have standing.

       1.  *Plaintiffs' GINA claim is one for impermissible inquiry.*

Plaintiffs' GINA claim alleges violations of GINA's prohibitions on requesting family medical history found at 42 U.S.C. § 2000ff-1(b).  Compl. at ¶¶ 34–45.  The only remedies sought by the EEOC to redress these alleged improper requests under 42 U.S.C. § 2000ff-1(b) are compensatory and punitive damages.  *See* Compl. at Prayer for Relief ¶¶ A–H.  Importantly, however, the EEOC does <u>not</u> also allege violations of GINA's separate anti-discrimination provision found at 42 U.S.C. § 2000ff-1(a).  *See* Compl. at ¶¶ 34–45; *see also* DG Dep. Tr. 240:15–243:9 (EEOC counsel stating that any question about whether Dollar General considered genetic information "is one of those that could have been eliminated;" "I'm not saying we're making that claim").  Accordingly, the EEOC only has standing to bring its GINA claim if the damages it is seeking to redress for the alleged improper requests under 42 U.S.C. § 2000ff-1(b) are permitted for such a claim under the statute.  They are not.

       2.  *Emotional and punitive damages are unavailable for an impermissible inquiry claim under the GINA.*

"In deciding what remedies, if any, are available under any statute, we begin our analysis, as we must, with the language of the statute itself." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1190 (11th Cir. 2007). GINA states that "[t]he powers, remedies, and procedures provided in [42 U.S.C. § 1981a of Title VII] . . . shall be [the] powers, remedies, and procedures [GINA] provides." 42 USCS § 2000ff-6(a)(3); *see also Rusthoven v. Victor Sch. Dist., #7*, 2014 U.S. Dist. LEXIS 162025, *5–6 (D. Mont. Sep. 30, 2014) ("GINA provides an employee with the same civil remedies available under Title VII of the Civil Rights Act of 1964."). Therefore, the determination of what remedies are available under GINA depends on determining what remedies are available under Title VII.

Critically, 42 U.S.C. § 1981a distinguishes between the remedies available for "intentional discrimination" and the remedies available for other unlawful employment practices that do not fall within the definition of "intentional discrimination":

> In an action brought by a complaining party . . . against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) . . . and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

42 U.S.C. § 1981a(a)(1). In the context of Title VII—from which GINA borrows its remedies—a violation like disparate impact that does not amount to intentional discrimination does not provide for compensatory or punitive damages. *See Rivers v. Walt Disney World Co.*, 2008 U.S. Dist. LEXIS 9789, *1 (M.D. Fla. Feb. 11, 2008) ("ADA plaintiffs, like Title VII plaintiffs, have no right to compensatory or punitive damages, or a jury trial, in a disparate impact case."); *EEOC v. Outback Steak House of Fla., Inc.*, 576 F. Supp. 2d 1202, 1205 (D. Colo. 2008) ("[The EEOC] ha[s] already agreed that compensatory and punitive damages cannot be recovered for the disparate

impact claim" (internal quotations omitted)).  Instead, the only relief available to a Title VII plaintiff proving a Title VII violation that did not involve intentional discrimination is the equitable and injunctive relief provided under 42 U.S.C. § 2000e5(g).  *See Terry v. City of San Diego*, 2012 U.S. Dist. LEXIS 7661, *12 (S.D. Cal. Jan. 24, 2012) ("[B]ecause Plaintiff prevails on her Title VII disparate impact claim, she is entitled to the remedies available under 42 U.S.C. § 2000e-5(g)").

Similarly to Title VII, the GINA statute also has two distinct practices that it holds to be unlawful, with one section prohibiting intentional discrimination (42 U.S.C. § 2000ff-1(a)) and a separate section prohibiting an employer's acquisition of genetic information (42 U.S.C. § 2000ff-1(b)).[22]  Accordingly, in incorporating the Title VII remedies in 42 U.S.C. § 1981a, which provides different remedies for different types of claims, GINA likewise incorporates Title VII's distinction between the different types of damages available for the different types of claims: compensatory and punitive damages for proven claims of intentional discrimination (in addition to equitable or injunctive relief), but only equitable or injunctive relief for unlawful employment practices other than intentional discrimination.  *Accord. Sheely*, 505 F.3d at 1190–96 (noting in the context of the Rehabilitation Act's adoption of the remedies available under Title VI the distinction between

---

[22] **(a)    Discrimination based on genetic information**

It shall be an unlawful employment practice for an employer—
**(1)**  to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee; or
**(2)** to limit, segregate, or classify the employees of the employer in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of the employee as an employee, because of genetic information with respect to the employee.
42 U.S.C. § 2000ff-1(a).

**(b) Acquisition of genetic information**

It shall be an unlawful employment practice for an employer to request, require, or purchase genetic information with respect to an employee or a family member of the employee….
42 U.S.C. § 2000ff-1(b).

4834-7710-0501.4

intentional and unintentional violations in determining whether compensatory and punitive damages are provided).

This distinction not only follows from the structure and language of the statutes, but it makes logical sense considering that intentional discrimination based on genetic information is likely to result in concrete (and other economic) harm whereas merely being asked genetic information on its own does not. *Compare* 42 U.S.C. §§ 2000ff-1(a) and (b) (treating discrimination and acquisition of genetic information as separate employment actions) *with* 42 U.S.C. § 12112(d) (pursuant to which an impermissible medical examination or inquiry under the ADA is defined as a type of disability discrimination). Therefore, applying both reason and the plain language of GINA to its incorporation of the remedies under 42 U.S.C. § 1981a(a)(1) yields the result that while compensatory and punitive damages are available for intentional discrimination violations of 42 U.S.C. §§ 2000ff-1(a), they are not available for impermissible acquisition violations of 42 U.S.C. §§ 2000ff-1(b). Compensatory and punitive damages are thus unavailable to the EEOC on its 42 U.S.C. §§ 2000ff-1(b) claim.

### 3. A prospective injunction to obey the law is not an available form of relief.

In its Complaint, the EEOC only prays for injunctive relief for its ADA claim and not its GINA claim. Compl. at Prayer for Relief ¶¶ A–B ("Grant a permanent injunction enjoining Defendant from . . . any [] employment practice *which discriminates on the basis of disability*." "Order Defendant to institute and carry out polices, practices, and program which provide equal employment opportunities *for qualified individuals with disabilities*.") (emphasis added). Consequently, it cannot base its GINA standing on any request for injunctive relief. Even if it had sought such relief, however, that too is unavailable.

An enforcement agency's request for a prospective injunction satisfies the redressability requirement for Article III standing only if "the agency shows a real threat of future harm,"

otherwise "there is in fact no lawful purpose to be served by a preventive injunction." *SEC v. Gentile*, 939 F.3d 549, 556 (3d Cir. 2019); *see Tex. Dep't of Agric.*, 2012 U.S. Dist. LEXIS 95204 at *16 ("In order to get a prospective injunction pursuant to Section 17, the EEOC must allege . . . that without an injunction the violations are likely to continue.").  The EEOC has not, and cannot, make such a showing.

It is undisputed that the alleged GINA violations ceased more six years ago and three years prior to this lawsuit even being filed.  *See* Compl. at ¶ 41; Pl's Ex. 18.  Moreover, the corrective instructions issued and reissued by Dollar General to prevent the allegedly offending questions from ever being asked again and the passage of time without such questions recurring shows that there is no real threat of any future violation of GINA.  *See Capability Grp., Inc. v. Am. Express Travel Related Servs. Co.*, 706 F. Supp. 2d 146, 160 (D. Mass. 2010) ("The record does not reveal to me another basis on which to enjoin AMEX from the use or dissemination of course materials it has already stopped using.  An injunction, five years later, appears to be moot because there is no meaningful prospective relief that can be identified."); *FTC v. U.S. Oil & Gas Corp.*, 1987 U.S. Dist. LEXIS 16137, *52 (S.D. Fla. July 10, 1987) (finding a cognizable danger of recurrence of ceased conduct sufficient for an injunction only because of the "egregious nature" of past violations, the fact that the conduct continued until after the Commission filed its complaint, and the ease with which the violations could be transferred to new areas); *see also FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) (motion for preliminary injunction denied; defendant's violations had completely ceased over two years before suit filed).

Indeed, Plaintiffs' decision not to even seek an injunction further indicates that when it filed the lawsuit, it did not believe there was any likelihood the conduct would be renewed.  *See* Compl. Prayer for Relief.  Moreover, such a prospective injunction to obey the law without any

showing of likely future violation is by its very nature inherently suspect as to its validity and constitutionality. *See SEC v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012) ("We have repeatedly questioned the enforceability of obey-the-law injunctions not only in the context of securities cases but other cases as well.") (collecting cases). Accordingly, even if the EEOC had requested a generalized injunction or some other declaratory relief, such a request could not confer standing upon the EEOC. *See Thomas v. Buckner*, 2011 U.S. Dist. LEXIS 103260, *1213 (M.D. Ala. Sep. 13, 2011) ("To the extent that Plaintiffs seek generalized injunctive or declaratory relief based on hypothetical future violations, Plaintiffs lack standing.").

In sum, none of the relief the EEOC seeks or could seek on behalf of the GINA Aggrieved Parties is available. The EEOC accordingly cannot establish that its GINA claim is redressable, and the lack of redressability deprives it of Article III standing for the claim. *See Muransky*, 979 F.3d at *3, 13–14.

### D. Plaintiffs' GINA claim fails because the challenged actions were mere inadvertent requests.

As previously explained, Plaintiffs' GINA claim is not premised upon any adverse employment action Dollar General took against the GINA Aggrieved Parties "because of [their] genetic information." 42 U.S.C. § 2000ff-1(a)(1), (2); *see* DG Dep. Tr. 240:7–243:9. Instead, the claims arise from § 2000ff-1(b), which makes it an "unlawful employment practice for an employer to request, require, or purchase genetic information with respect to an employee or a family member of the employee." Specifically, the EEOC contends there were two unlawful requests for genetic information: (1) a yes or no question on the Physical Encounter form asking "Have your grandparents, parents, or children had significant medical problems?" and (2) follow up questioning conducted by a Middle Creek medical assistant concerning family medical history. Compl. at ¶¶ 36–37. Requests for family medical history do not violate § 2000ff-1(b) "where *an*

*employer inadvertently requests or requires family medical history* of the employee or family member of the employee." 42 U.S.C. § 2000ff-1(b)(1) (emphasis added). The requests for family medical history challenged here were inadvertent, and therefore not a violation of GINA.

The statute does not define what constitutes an "inadvertent" request. The regulations provide that the acquisition of genetic information as part of a lawful request for medical information "will not generally be considered inadvertent" unless the covered entity directs the individual or the health care provider not to provide genetic information, but such explicit direction is not required. 29 C.F.R. § 1635.8(b)(1)(i)(A). Instead, the regulations provide that even where an employer failed to provide this direction, that failure "will not prevent it from establishing that a particular receipt of genetic information was inadvertent" "if its request for medical information was not 'likely to result in a covered entity obtaining genetic information.'" 29 C.F.R. § 1635.8(b)(1)(i)(C).

Here, it is undisputed that any information regarding family medical history received by Middle Creek was never intended to be considered nor shared with Dollar General. It was the inadvertent result of an extraneous question on an initial version of a form and the ubiquity of such questions in medical exams. MC Dep. Tr. 141:9–145:7; 159:7–161:11; 242:13–244:7; 266:21–270:8; 270:14–271:14; Deslattes Dep. Tr. 48:5–52:12; *see also* Swontinsky Dep. Tr. 171:9–175:20 (EEOC's putative expert noting his forms for post-offer pre-employment tests might include family medical history). Any request for genetic information contained in the yes or no question on the Physical Encounter form or any oral questioning by Middle Creek occurred during the pre-employment physical was unintended as Dollar General did not seek or ever receive such information. DG Dep. Tr. 243:3–244:1; MC Dep. Tr. 270:14–21. Indeed, as Middle Creek and its employees repeatedly testified, family medical questions were asked not because such

information had any effect on the rating an individual received but because they were standard practice for their urgent care patients and therefore simply part of their normal routine.  Deslattes Dep. Tr. 80:17–83:2; 147:12–148:24; MC Dep. Tr. 141:9–145:7; 242:13–244:7; 266:21–270:8; Busbee Dep. Tr. 128:13–130:4.

Moreover, Middle Creek's records show that in a significant number of cases, where the candidate checked "no" and the medical record notes "Family History Unremarkable," no family medical information was ever obtained at all.  Medical Record Summary; *see* Busbee Dep. Tr. 55:21–56:22; 59:23–60:6; 220:18–22:21; 240:14–242:2.  It is also undisputed that not only did Dollar General not receive any family medical history information, it would not have ever even learned that the information was requested because it repeatedly and specifically directed Middle Creek not to provide it with any medical records, including any family medical history information incidentally obtained during the pre-employment physical.  *See* Pl's Ex. 6 at 4 ("Dollar General will not receive any medical documents from the medical facility."); Pl's Ex. 14 at 3–4 ("Fax ONLY FINAL PAGE (qualified or not) to Nick at the number on the top of the sheet"); MC Dep. Tr. 264:12–265:10 (specifically instructed not to provide any information but the checked box answer on the result form).  Accordingly, the two challenged actions amounted to inadvertent— and immaterial—requests that are not the sort of actions GINA was created to curtail, nor do they support a cause of action under the statute.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Dollar General respectfully requests that the Court grant the Motion and enter judgment in favor its as to each claim in this case.

Respectfully submitted,

/s/ Stanley E. Graham
Stanley E. Graham, Esq.

4834-7710-0501.4

44

John E. B. Gerth, Esq.
Frederick L. Conrad III, Esq.
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
stan.graham@wallerlaw.com
jeb.gerth@wallerlaw.com
trip.conrad@wallerlaw.com

*Attorneys for Defendant Dolgencorp, LLC*

4834-7710-0501.4

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2020, the foregoing Memorandum of Law in Support of Motion for Summary Judgment was served *via* the court's electronic filing system on the following counsel of record:

**Marsha L. Rucker, Esq.**
**Gerald L. Miller, Esq.**
**Gina Pearson, Esq.**
**Russell P. Parker, Esq.**
**Kurt S. Fischer, Esq.**
Equal Employment Opportunity Commission
1130 22nd Street South
Suite 2000
Birmingham, AL 35205
marsha.rucker@eeoc.gov
gerald.miller@eeoc.gov
gina.pearson@eeoc.gov
kurt.fischer@eeoc.gov
russ.parker@eeoc.gov

**David W. Scott, Esq.**
D.W. Scott Law LLC
P.O. Box 11734
Birmingham, AL 35202
david@dwscottlaw.com

**Byron R. Perkins, Esq.**
Perkins Law
The Civic Center Medical Forum Bldg.
950 22nd Street N., Suite 550
Birmingham, AL 35203
bperkins@perkins-law.com

/s/ Stanley E. Graham

4834-7710-0501.4

# Exhibit D



FILED

2017 Sep-25  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

Page: 146 of 175        Date Filed: 01/13/2023        Document: 1-2        USCA11 Case: 23-90003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | **CIVIL ACTION NO.** |
| v. | ) ) | |
| DOLGENCORP, LLC, | ) ) | **COMPLAINT** |
| | ) | **JURY TRIAL REQUESTED** |
| Defendant. | ) ) | |

### NATURE OF THE ACTION

This is an action under Title I of the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101 et seq., ("ADA"), Title II of the Genetic Information Non-Discrimination Act of 2008, 42 U.S.C. 2000ff et seq., ("GINA") and Title I of the Civil Rights Act of 1991, 42 U.S.C. §1981a,  to correct unlawful employment practices on the basis of disability and genetic information, and to provide appropriate relief to Vincent Jackson ("Jackson") and two classes of aggrieved individuals adversely affected by such practices.

As alleged with greater particularity in Paragraphs 21-23, 25, 27-31, and 33-42 below, Dolgencorp, LLC ("Defendant" or "Dollar General") discriminated against Jackson, a qualified individual with a disability, and a class of qualified individuals with disabilities, when it failed to hire Jackson and the class (ADA class) for general warehouse positions because of disability, perceived disability and/or record of disability. Defendant further discriminated against Jackson and the class when it used post-offer medical examinations to screen out individuals with disabilities by means of exclusionary criteria that were neither job-related nor consistent with

Page: 147 of 175     Date Filed: 01/13/2023     Document: 1-2     USCA11 Case: 23-90003

business necessity. In addition, Defendant unlawfully sought genetic information about Jackson and a class of applicants (GINA class) for employment by requiring them to provide, as part of the post-offer medical examination, family medical history.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.   This action is authorized and instituted pursuant to Section 107(a) of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12117(a), and Section 207(a) of the Genetic Information Non-Discrimination Act of 2008, 42 U.S.C. § 2000ff-6(a), both of which incorporate by reference Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.§ 2000e-5(f)(1) and (3), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      The employment practices alleged to be unlawful were and are now being committed within the jurisdiction of the United States District Court for the Northern District of Alabama, Southern Division.

## PARTIES

3.      Plaintiff, the Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation and enforcement of Title I of the ADA and Title II of the GINA, and is expressly authorized to bring this action by Section 107(a) of the ADA, 42 U.S.C. § 12117(a), and by Section 207(a) of the GINA, 42 U.S.C. § 2000ff-6(a), both of which incorporate by reference Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1).

4.      At all relevant times, Defendant has continuously been doing business in the State of Alabama and the City of Bessemer, and has continuously had at least 15 employees.

USCA11 Case: 23-90003    Document: 1-2    Date Filed: 01/13/2023    Page: 148 of 175

5.     At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce under Sections 101(5) and 101(7) of the ADA, 42 U.S.C.§§ 12111(5), (7), and under Section 201(2)(B)(i) of the GINA, 42 U.S.C.§ 2000ff(2)(B)(i), which incorporate by reference Section 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h).

6.     At all relevant times, Defendant Employer has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

## ADMINISTRATIVE PROCEDURES

7.     More than thirty days prior to the institution of this lawsuit, Jackson filed a charge with the Commission alleging violations of the ADA and GINA by Defendant.

8.     On May 9, 2017, the Commission issued to Defendant a Letter of Determination finding reasonable cause to believe that the ADA and GINA were violated as to Jackson and a class of individuals and inviting Defendant to join with the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

9.     On August 10, 2017, the Commission issued to Defendant a Notice of Failure of Conciliation advising Defendant that the Commission was unable to secure from Defendant a conciliation agreement acceptable to the Commission.

10.     All conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF FACTS

11.     Since at least December of 2013, Defendant has hired general warehouse workers for its Bessemer, Alabama facility using a two-step process. Defendant first reviewed applications, interviewed applicants, and extended conditional offers to those applicants it

USCA11 Case: 23-90003     Document: 1-2     Date Filed: 01/13/2023     Page: 149 of 175

wished to hire. Next, Defendant scheduled those conditional offerees to undergo an extensive, and often, highly invasive, post-offer medical examination. Defendant hired only those applicants who received a rating of "Qualified" as a result of the medical exam.

12.     In 2011, Defendant contracted with Middle Creek Medical Center ("Middle Creek"), a third-party health services provider, to conduct the post-offer medical examinations.

13.     At all times relevant to this action, Middle Creek acted as an agent of Defendant in the conduct of the post-offer medical examinations.

14.     Defendant set the format and content of the exams. Specifically, Defendant provided Middle Creek with instructions on conducting the exams and Defendant provided Middle Creek with specific forms to use in collecting and recording the results of the examinations. The forms provided to Middle Creek contained Defendant's business logo. The forms and instructions were sent to Middle Creek by Defendant when it retained Middle Creek.

15.     Defendant's post-offer examination included the taking of vital signs, the completion of a drug test, a vision test, a medical and health history questionnaire, a review of current medications, and a physical examination, including, in some instances, genital examination of job applicants.

16.     The examinations were conducted by Middle Creek medical assistants and certified registered nurse practitioners. During the examinations, Middle Creek medical personnel recorded their observations in exam notes.

17.     At the conclusion of the examination, Middle Creek rated the conditional hire as "Qualified," "Not Qualified," or "Referred to PMD" (referred to primary medical doctor) based on the results of the examination.

USCA11 Case: 23-90003     Document: 1-2     Date Filed: 01/13/2023     Page: 150 of 175

18.     Middle Creek rated a conditional hire as "Referred to PMD" when it did not have enough information to fail or clear the applicant on the spot.

19.     Upon completion of the examination, Middle Creek faxed Defendant a one page result sheet indicating, with respect to the candidate, only whether that candidate had rated Qualified, Not Qualified or Referred to PMD.

20.     Defendant did not hire a candidate unless he or she passed the post-offer medical examination with a rating of "Qualified."

## STATEMENT OF CLAIMS

### COUNT 1
### (Discrimination on the Basis of Disability)

21.     Plaintiff realleges and incorporates by reference Paragraphs 1-20 herein.

22.     Since at least December of 2013, Defendant has engaged in unlawful employment practices involving its Bessemer, Alabama facility in violation of Title I of the ADA, 42 U.S.C. §§ 12112(a) and 12112(b)(6). These unlawful employment practices include discriminating against Vincent Jackson on the basis of disability.

a.     Vincent Jackson is a qualified individual with a disability under the ADA, 42 U.S.C. §§ 12102 and 12111(8). Jackson has an impairment, monocular vision, that substantially limits a major life activity. In the alternative, Defendant regarded Jackson as having a disability by subjecting him to an adverse employment action when it failed to hire him for a general warehouse position because of an actual or perceived impairment, monocular vision.

b.     On or about June 7, 2014, Jackson applied for a general warehouse position with Defendant in Bessemer, Alabama.

USCA11 Case: 23-90003     Document: 1-2     Date Filed: 01/13/2023     Page: 151 of 175

c.      After an interview by the Warehouse Supervisor, Defendant extended Jackson an offer of employment, contingent upon successful completion of a post-offer medical examination.

d.      On June 17, 2014, Jackson underwent a post-offer medical examination at Middle Creek.

e.      At the beginning of the examination, Jackson informed Middle Creek that he could not see out of his right eye and that this condition was not correctable. Jackson informed Middle Creek that his monocular vision had not prevented him from working similar jobs in the past.

f.      Middle Creek responded that Dollar General's standard required candidates to have 20/50 vision or better in both eyes in order to pass the eye exam. Middle Creek informed Jackson that his monocular vision disqualified him from the job.

g.      Jackson asked to continue the exam.

h.      A certified registered nurse practitioner from Middle Creek then entered the exam room and began to conduct the physical portion of the exam. When that nurse practitioner learned of Jackson's monocular vision, she suggested he see an eye specialist to confirm his eye condition was not correctable.

i.      Jackson replied that he was certain his condition was not correctable.

j.      At the conclusion of the examination, Middle Creek rated Jackson "Not Qualified," noting that he had "failed the vision exam" and "refused the physical examination."

k.      Middle Creek faxed this result to Defendant.

l.      Defendant did not hire Jackson.

m.    Exam notes for other patients with vision difficulties indicate that Defendant instructed Middle Creek that it was not necessary to finish the medical examination if the patient failed the vision test and that such candidates were "Not Qualified."

23.    Defendant's refusal to hire Jackson and/or rescission of his offer on the basis of his monocular vision constituted discrimination on the basis of disability.

24.    The effect of the practices detailed in Paragraphs 21-23 has been to deprive Jackson of equal employment opportunities and otherwise adversely affect his status as an applicant for employment because of disability.

25.    Since at least December 2013, Defendant has engaged in unlawful employment practices involving its Bessemer, Alabama facility in violation of Title I of the ADA, 42 U.S.C. §§ 12112(a) and 12112(b)(6). These unlawful employment practices include discriminating against Jackson and a class of job applicants on the basis of disability.

a.    On information and belief, Defendant, in the administration of its post offer medical examination, uses qualification standards or selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities.

b.    Defendant informed Middle Creek that candidates whose (corrected) vision did not measure 20/50 or better in both eyes were "Not Qualified."

c.    Defendant informed Middle Creek that candidates whose blood pressure measured 160/100 or higher were "Not Qualified."

d.    On information and belief, Defendant informed Middle Creek that individuals with blood sugar over a certain threshold and assorted other impairments were "Not Qualified."

USCA11 Case: 23-90003   Document: 1-2   Date Filed: 01/13/2023   Page: 153 of 175

e.      Binocular vision is not an essential function of the general warehouse worker position.

f.      Blood pressure that measures less than 160/100 is not an essential function of the general warehouse worker position.

g.      None of the other criteria or standards which Defendant deemed disqualifying constitute essential functions of the general warehouse worker position.

h.      On their face, Defendant's qualification standards and selection criteria operate as blanket policies that go beyond the essential job functions, that are not mandated by law, and that screen out qualified individuals with disabilities on the basis of disability.

i.      Because Defendant would not hire anyone who did not rate "Qualified" and because those with certain impairments, including blood pressure over 160/100 and monocular vision, could not rate "Qualified" under Defendant's qualification standards, these individuals were not eligible for hire.

j.      Defendant's qualification standards or selection criteria were not job related or consistent with business necessity.

k.      Defendant through the operation of these qualification standards and selection criteria discriminated against Jackson and a class of qualified individuals with disabilities who were screened out on the basis of disability.

26.     The effect of the practices detailed in Paragraph 25 has been to deprive a class of qualified individuals with disabilities of equal employment opportunities and otherwise adversely affect their status as applicants for employment because of disability.

## COUNT 2
### (Unlawful Medical Examination)

27.     Plaintiff realleges and incorporates by reference Paragraphs 1-26 herein.

28.     Since at least December 2013, Defendant has engaged in unlawful employment practices involving its Bessemer, Alabama facility in violation of Title I of the ADA, 42 U.S.C. 12112(d)(3). These unlawful employment practices include discriminating against Jackson and a class of job applicants on the basis of disability by subjecting them to unlawful post-offer medical examinations.

29.     Since at least December 2013 Defendant has used the results of its post-offer medical examinations to screen out qualified individuals with disabilities using criteria that are neither job-related nor consistent with business necessity.

30.     Defendant has further used the results of its post-offer medical examinations to require individuals with certain impairments to obtain, sometimes costly, additional medical examinations at their own expense, after the examinations revealed these impairments or a record of such impairments, in a manner that is not job related nor consistent with business necessity.

31.     Defendant thereby used the results of its post-offer medical examinations in a discriminatory manner.

32.     The effect of the practices detailed in Paragraphs 27-31 above has been to deprive a class of qualified individuals with disabilities of equal employment opportunities and otherwise affect their status as applicants because of disabilities.

## COUNT 3
### (Violation of the GINA)

33.     Plaintiff realleges and incorporates by reference Paragraphs 1-32 herein.

34.     Since at least 2011, Defendant has engaged in unlawful employment practices at its Bessemer, Alabama facility in violation of Title II of GINA, 42 U.S.C. 2000ff-1(b)(1).

USCA11 Case: 23-90003   Document: 1-2   Date Filed: 01/13/2023   Page: 154 of 175

USCA11 Case: 23-90003    Document: 1-2    Date Filed: 01/13/2023    Page: 155 of 175

35.     Since at least 2011 Defendant has requested and required applicants for employment to undergo a post-offer medical examination conducted for Defendant by Middle Creek.

36.     From 2011 through August 21, 2014 Defendant requested and required conditional hires to complete a health and medical questionnaire for Middle Creek, which included a section requesting applicants indicate whether their grandparents, parents or children have suffered from significant medical problems.

37.     From 2011 through August 21, 2014, Defendant's agent, Middle Creek, conducted additional detailed inquiries into the family medical history of applicants during the in person medical examinations, which included soliciting information regarding cancer history, heart history, and blood pressure history.

38.     On June 17, 2014, Jackson went to Middle Creek and was requested and required to complete Defendant's health and medical questionnaire form which requested family medical history.

39.     On June 17, 2014, Jackson went to Middle Creek and was subjected to additional detailed questioning regarding his family medical history during the in-person portion of the post-offer examination.

40.     Defendant's request for genetic information was not inadvertent.

41.     On or about August 22, 2014, Defendant provided Middle Creek with a new health and medical questionnaire that removed the question soliciting family medical history. Defendant instructed Middle Creek not to request family medical history.

USCA11 Case: 23-90003    Document: 1-2    Date Filed: 01/13/2023    Page: 156 of 175

42.    From 2011 through August 21, 2014, Defendant required every conditional hire who underwent a post-offer medical examination at Middle Creek to disclose family medical history through the health and medical questionnaire and through in person inquiries.

43.    The effect of the practices complained of in Paragraphs 33-42 above has been to deprive Jackson and a class of applicants of equal employment opportunities and otherwise adversely affect their status as applicants because of their genetic information.

44.    The unlawful employment practices complained of in Paragraphs 21-23, 25, 27-31, 33-42 above were and are intentional.

45.    The unlawful employment practices complained of in Paragraphs 21-23, 25, 27-31, 33-42 above were and are done with malice or with reckless indifference to the federally protected rights of Jackson, the ADA class and the GINA class.

## **PRAYER FOR RELIEF**

Wherefore, the Commission respectfully requests that this Court:

A.    Grant a permanent injunction enjoining Defendant, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from failing to provide equal employment opportunities to applicants for employment and employees with disabilities and to accommodate applicants' and employees' disabilities, and any other employment practice which discriminates on the basis of disability.

B.    Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified individuals with disabilities and which eradicate the effects of its past and present unlawful employment practices.

C.    Order Defendant to make whole Jackson and the ADA class, by providing appropriate back pay and front pay with prejudgment interest, in amounts to be determined at

USCA11 Case: 23-90003   Document: 1-2   Date Filed: 01/13/2023   Page: 157 of 175

trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

      D.      Order Defendant to make whole Jackson, the ADA class and the GINA class by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in Paragraphs 21-23, 25, 27-31, 33-42 above, including past and future out-of-pocket losses, in amounts to be determined at trial.

      E.      Order Defendant to make whole Jackson, the ADA class and the GINA class by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in Paragraphs 21-23, 25, 27-31, 33-42 above, including emotional pain, suffering, humiliation, embarrassment, inconvenience, and loss of enjoyment of life, in amounts to be determined at trial.

      F.      Order Defendant to pay Jackson, the ADA class, and the GINA class, punitive damages for its malicious and reckless conduct, as described in Paragraphs 21-23, 25, 27-31, 33-42 above, in amounts to be determined at trial.

      G.      Grant such further relief as the Court deems necessary and proper in the public interest.

      H.      Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its Complaint.

Respectfully submitted,

**JAMES L. LEE**
Deputy General Counsel

**MARSHA L. RUCKER**
Regional Attorney
PA Bar No. 90041

**EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION**
1130 22nd Street South
Suite 2000
Birmingham, AL 35205
(205)212-2046
marsha.rucker@eeoc.gov

# Exhibit E

FILED
2022 Aug-25  PM 06:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| VINCENT JACKSON, | ) ) ) |
| Plaintiff-Intervenor, | ) ) |
| v. | ) **Civil Action No. 2:17-cv-01649-MHH** |
| DOLGENCORP, LLC, | ) ) |
| Defendant. | ) ) |

---

### DEFENDANT'S MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL

---

Pursuant to 28 U.S.C. § 1292(b), Defendant Dolgencorp, LLC ("Dollar General") moves for certification of interlocutory appeal of the Court's July 26, 2022 Memorandum Opinion (Doc. 131) on following two questions:

1. Is a GINA claim for the "acquisition of genetic information" under 42 U.S.C. § 2000ff-1(b) a claim for "intentional unlawful discrimination" within the meaning of 42 U.S.C. § 1981a for which compensatory and punitive damages are available?

2. Is an ADA claim of qualification standards that screen out or tend to screen out individuals with disabilities under 42 U.S.C. § 12112(b)(6) analyzed exclusively as a disparate impact claim or can it be established through a showing of disparate treatment?

As explained in the accompanying memorandum, these two questions are controlling questions of law that do not require any assessment of disputed facts in the record; are questions over which there is substantial ground for difference of opinion; and resolution of these questions

will materially advance termination of the litigation.  Accordingly, they are appropriate for certification to the Eleventh Circuit.

For these reasons, Dollar General respectfully requests that the Court certify the Court's July 26, 2022 Memorandum Opinion for interlocutory appeal on the above questions.

Respectfully submitted,

/s/ Stanley E. Graham
Stanley E. Graham, Esq.
John E. B. Gerth, Esq.
Frederick L. Conrad III, Esq.
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
stan.graham@wallerlaw.com
jeb.gerth@wallerlaw.com
trip.conrad@wallerlaw.com

*Attorneys for Defendant Dolgencorp, LLC*

4880-7138-1548.1

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2022, the foregoing Motion for Certification of Interlocutory Appeal was served *via* the court's electronic filing system on the following counsel of record:

**Marsha L. Rucker, Esq.**
**Gerald L. Miller, Esq.**
**Gina Pearson, Esq.**
**Russell P. Parker, Esq.**
**Kurt S. Fischer, Esq.**
Equal Employment Opportunity Commission
1130 22nd Street South
Suite 2000
Birmingham, AL 35205
marsha.rucker@eeoc.gov
gerald.miller@eeoc.gov
gina.pearson@eeoc.gov
kurt.fischer@eeoc.gov
russ.parker@eeoc.gov

**David W. Scott, Esq.**
D.W. Scott Law LLC
P.O. Box 11734
Birmingham, AL 35202
david@dwscottlaw.com

**Byron R. Perkins, Esq.**
Perkins Law
The Civic Center Medical Forum Bldg.
950 22nd Street N., Suite 550
Birmingham, AL 35203
bperkins@perkins-law.com


/s/ Stanley E. Graham

# Exhibit F

Case 2:17-cv-01649-MHH   Document 135   Filed 08/25/22   Page 1 of 12

USCA11 Case: 23-90003   Document: 1-2   Date Filed: 01/13/2023   Page: 164 of 175

FILED
2025 Aug-25  PM 06:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) | |
| Plaintiff, | ) | |
| and | ) | |
| VINCENT JACKSON, | ) | |
| Plaintiff-Intervenor, | ) | |
| v. | ) | Civil Action No. 2:17-cv-01649-MHH |
| DOLGENCORP, LLC, | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL

## I.   INTRODUCTION

This case presents unusual and unsettled legal theories under the Genetic Information Nondiscrimination Act ("GINA") and the Americans with Disabilities Act ("ADA").  The EEOC seeks to recover compensatory and punitive damages under these statutes on behalf of more than 500 people, but _not_ on claims of intentional discrimination for either genetic information or disability.  Its GINA claim rests instead on a section of the statute aimed at the "acquisition" of genetic information, while its ADA claim is asserted under a provision addressing the alleged impact of employment qualification standards on disabled individuals.

Until this Court's recent summary judgment order, no other court had analyzed whether the law allows for the recovery of compensatory and punitive damages on a GINA acquisition claim.  Dollar General maintains that the plain language of the governing statute extends the right

to such damages only for claims of intentional discrimination based on genetic information—claims that are not asserted here.  The Court's recent Memorandum Opinion, however, found both liability and a right to seek damages on the EEOC's conceptually distinct GINA acquisition claim.  Whether there is such a right to damages on a GINA acquisition claim is a pure question of law and a matter of first impression.  Dollar General submits that this question should be certified for an immediate appeal under 28 U.S.C. § 1292(b).

The EEOC's ADA qualifications standards claim also presents a pure question of law that Dollar General submits warrants immediate review by the Eleventh Circuit.  There is substantial legal authority in this Circuit and elsewhere that an ADA challenge to qualification standards is analyzed as a disparate impact claim that requires statistical evidence and cannot be established as a disparate treatment claim of intentional discrimination.  The Court's Memorandum Opinion ruled otherwise, despite the weight of this authority to the contrary.

An interlocutory appeal of a district court's order is appropriate when the questions presented are: (1) controlling questions of law that do not require any assessment of disputed facts in the record, (2) questions over which there is substantial ground for a difference of opinion, and (3) questions whose resolution through an immediate appeal will materially advance termination of the litigation.  All of those elements are present in the following two questions addressed in the Court's July 26, 2022 Memorandum Opinion (Doc. 131):

1. Is a GINA claim for the "acquisition of genetic information" under 42 U.S.C. § 2000ff-1(b) a claim for "intentional unlawful discrimination" within the meaning of 42 U.S.C. § 1981a for which compensatory and punitive damages are available?

2. Is an ADA claim of qualification standards that screen out or tend to screen out individuals with disabilities under 42 U.S.C. § 12112(b)(6) analyzed exclusively as a disparate impact claim or can it be established through a showing of disparate treatment?

These two questions do not require consideration of any disputed facts.  They are pure questions of law, the answers to which are potentially dispositive of those claims.

The Court's Memorandum Opinion also effectively recognizes that both questions are ones over which there are substantial grounds for differences of opinion.  As the Court noted, the first question concerning what relief is available for an acquisition of genetic information claim under 42 U.S.C. § 2000ff-1(b) is a difficult question of law that is "an issue of first impression." (Memorandum Order, Doc. 131, p. 39).  The question turns on the complex and novel issue of how to apply Title VII's remedial scheme to GINA claims when "GINA's statutory framework does not neatly map onto" that remedial scheme.  (*Id.* at 42).

The ADA qualification standards claim likewise presents substantial grounds for a difference of opinion.  This difference of opinion is evident from the split of authority noted in the Court's Memorandum Opinion, including Supreme Court and Eleventh Circuit authority tacitly acknowledging that ADA qualification standards claims are to be analyzed as disparate impact claims requiring statistical proof—a type of proof that is indisputably absent here.  (Memorandum Order, Doc. 131, p. 14, 20–21).

An immediate appeal is further warranted because the answer to either or both of the questions presented would materially advance the termination of this litigation by avoiding the need for further damages discovery, additional dispositive motions practice, a trial, and an inevitable appeal on the same pure questions of law for which immediate review is now sought. This case is in an unusual posture that is even more suitable for immediate appeal following dispositive motion briefing because the parties—at the Court's direction—delayed taking damages discovery precisely because such discovery could be mooted by summary judgment in Dollar General's favor on these legal questions.  *See* (Transcript of 10/6/20 Hearing, Doc. 98 at 3–6, 14–

20 ("The Court: I wonder if there might be some efficiency in delaying the discovery about damages until after the Court receives . . . the parties' briefing on [a summary judgment] motion."; "I have requested this dispositive motion earlier than anticipated because I'm trying to see if there's an opportunity to narrow the issues in the case. . . .")). Now that the Court has ruled on those initial summary judgment motions, the parties will need to take substantial discovery concerning the alleged damages of over 500 individuals, prepare a second round of dispositive motions on the absence of any damages proof, and (because the Court has already found liability on the GINA claim) try at least some claims before a jury. (*Id.* at 22–24 ("[I]f the EEOC survives these early dispositive motions [] there will be a discovery period on damages and [] Dollar General [may have] the opportunity for a post damages discovery dispositive motion. . . ." (emphasis added)). As the Court already recognized in ordering early summary judgment briefing, however, some or all of these issues may be mooted if the legal questions are raised now before the Eleventh Circuit, materially advancing the termination of this litigation.

## II.   <u>ARGUMENT</u>

If a district court determines that an order "[1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation," an immediate appeal to the circuit court can be certified. 28 U.S.C. § 1292(b); *see McFarlin v. Conseco Servs.*, 381 F.3d 1251, 1257–59 (11th Cir. 2004). "The legal question must be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law. And the answer to that question must substantially reduce the amount of litigation left in the case." *McFarlin*, 381 F.3d at 1259. These elements are satisfied for each of the two questions presented here.

1. **Both questions presented are controlling questions of law that do not require study of the factual record.**

"Controlling questions of law are abstract legal issues that the appellate court 'can decide quickly and cleanly without having to study the record.'" *Johns Manville v. Tva*, 2006 U.S. Dist. LEXIS 111761, *3 (N.D. Ala. July 31, 2006) (quoting *McFarlin*, 381 F.3d at 1258). "They are those questions that involve the meaning of statutes, constitutional provisions, regulations, or common law doctrines and not those that involve 'the application of settled law to fact.'" *Id.* (quoting *McFarlin*, 381 F.3d at 1258). Both questions presented satisfy this element.

The first purely legal question concerns whether GINA's adoption of Title VII's remedial scheme includes that statute's distinction between the remedies available for unlawful employment practices generally and the remedies available for the specific subset of unlawful employment practices that constitute "unlawful intentional discrimination." Prior to 1991, Title VII claimants could not recover damages for any type of claim and could only obtain equitable remedies. The Civil Rights Act of 1991, however, carved out one specific exception. That amendment provided a limited right to recover compensatory and punitive damages under Title VII, but only for a claim of "unlawful intentional discrimination." 42 U.S.C. § 1981a(a)(1).

GINA prohibits two types of employment practices. It creates one cause of action for "discrimination based on genetic information" and a separate cause of action for the "acquisition of genetic information," even if the genetic information is never used in a discriminatory manner. The question presented is whether a standalone GINA "acquisition" claim that does not involve discriminatory intent is nonetheless a claim of "unlawful intentional discrimination" for which § 1981a would allow the recovery of damages. Whether a claim affords a particular type of relief is the type of question that the Eleventh Circuit has recognized is appropriate for interlocutory review. *See, e.g.*, *Tucker v. Fearn*, 333 F.3d 1216, 1218 (11th Cir. 2003) (granting § 1292(b)

4878-9097-2207.4

5

review of whether a nondependent parent may recover loss of society damages for the wrongful death of a minor child under maritime law); *Love v. Delta Air Lines*, 310 F.3d 1347, 1351 (11th Cir. 2002) (granting § 1292(b) review of what remedies, if any, are available to private litigants under the Air Carrier Access Act of 1986); *cf. Solutia Inc. v. McWane, Inc.*, 2008 U.S. Dist. LEXIS 126003, *11 (N.D. Ala. June 25, 2008) (finding that whether a party "can seek to recover [] cleanup costs pursuant to § 107 of CERCLA [] is a 'controlling question of law'").

The second question presented is whether an ADA "qualification standards" claim under § 12112(b)(6) is a disparate impact claim that cannot also be treated as a claim of intentional disability discrimination. This too is a controlling question of law because it concerns the standard applicable to a specific claim under the ADA and does not depend on any review of the factual record. *See Love*, 310 F.3d at 1351 (granting § 1292(b) review of whether the Air Carrier Access Act of 1986 implies a private right of action); *United States v. AseraCare Inc.*, 2014 U.S. Dist. LEXIS 191640, *6 (N.D. Ala. Dec. 19, 2014) (finding that what type of proof is required to establish an element of a claim is "a pure question of law, which the Eleventh Circuit can decide quickly and cleanly without having to study the record") (quotations omitted).

## 2. The answers to both questions are ones for which there are substantial grounds for a difference of opinion.

"Questions of law as to which there is substantial ground for difference of opinion are those in which the Eleventh Circuit is not in 'complete and unequivocal' agreement with the district court." *Id.* (quoting *McFarlin*, 381 F.3d at 1258). "Substantial ground for difference of opinion exists when a legal issue is (1) difficult and of first impression, (2) the district courts of the controlling circuit are split as to the issue, or (3) the circuits are split on the issue." *Ala. Aircraft Indus. V. Boeing Co.*, 2019 U.S. Dist. LEXIS 242335, *18–19 (N.D. Ala. Mar. 18, 2019). Both questions presented here are ones for which substantial grounds for a difference of opinion exist.

4878-9097-2207.4

6

The question of what remedies are available for an "acquisition" claim does not appear to have been analyzed by any court prior to this Court's Memorandum Opinion.  It is "an issue of first impression" involving the difficult overlaying of one statute's remedial scheme onto claims asserted under another statute where the structures of the two statutes do not "neatly" align.  *See* (Memorandum Order, Doc. 131, p. 39–42); *Ala. Aircraft Indus.*, 2019 U.S. Dist. LEXIS 242335 at *18–19 ("Substantial ground for difference of opinion exists when a legal issue is (1) difficult and of first impression . . . .").  The Court has already acknowledged the challenging nature of reconciling Title VII's remedial scheme with GINA's statutory framework.  *See* (Memorandum Order, Doc. 131, p. 42 ("Admittedly, GINA's statutory framework does not neatly map onto 42 U.S.C. § 1981a(a)(1)'s remedial scheme.")).  The dearth of judicial authority analyzing a GINA acquisition claim through the lens of § 1981a is also underscored by the Court's multi-page analysis on the issue, including its citing testimony from a lobbying group in the GINA legislative history in order to infer that compensatory and punitive damages were an intended remedy.  *See* (Memorandum Order, Doc. 131, p. 42–45) (quoting H.R. REP. NO. 110-28, at 67–68).

In contrast, the history of the applicable Title VII remedial scheme supports a construction opposite to the one adopted by the Court.  As previously noted, "[b]efore the enactment of the 1991 Act, Title VII afforded only 'equitable' remedies."  *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 252 (1994).  Then "Congress amended Title VII in 1991 to permit victims of intentional discrimination to recover compensatory [] and punitive damages. . . ."  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 72 (2006) (emphasis added).  That amendment recognized only "unlawful intentional discrimination," and not any other types of prohibited conduct, as the type of conduct for which compensatory and punitive damages could be recovered.  *See* 42 U.S.C. § 1981a(a)(1); *see also John Does, 1, 2, 3 & 4 v. Covington Cty. Sch. Bd.*, 969 F. Supp. 1264, 1279

(M.D. Ala. 1997) ("A Title VII plaintiff may recover compensatory and punitive damages <u>only if</u> he or she demonstrates intentional discrimination.") (emphasis added). This history shows that the default interpretation for any statute governed by § 1981a(a)(1) is that compensatory and punitive damages remain unavailable for all prohibited practices other than "unlawful intentional discrimination." Accordingly, while the relief available for a claim of "discrimination based on genetic information" under 42 U.S.C. § 2000ff-1<u>(a)</u> may include such damages, the separate and distinct claim of "acquisition of genetic information" created by 42 U.S.C. § 2000ff-1<u>(b)</u> does not allow for them. Substantial ground for a difference of opinion thus exists on this novel question. *See Solutia Inc.*, 2008 U.S. Dist. LEXIS 126003 at *11 (finding a substantial ground for difference of opinion in statutory interpretation where neither the Supreme Court nor the Eleventh circuit has answered the question).

The separate question of whether an ADA "qualifications standards" claim must be brought exclusively under a disparate impact theory is also one for which substantial ground for a difference of opinion exists. This substantial ground is demonstrated by the split of authority on the issue among district courts both in the Eleventh Circuit and across the country. *Compare Allmond v. Akal Sec., Inc.*, 2007 U.S. Dist. LEXIS 72713, *16–17 (M.D. Ga. Sep. 28, 2007) ("Claims brought pursuant to § 12112(b)(6) are treated as disparate impact claims.") *and Fulbright v. Union Pac. R.R. Co.*, 2022 U.S. Dist. LEXIS 37383, *9 (N.D. Tex. Mar. 2, 2022) ("Plaintiff may not bring his section 12112(b)(6) screening-related claim under a disparate-treatment theory of discrimination and is limited to doing so only under a theory of disparate impact.") *with* (Memorandum Order, Doc. 131, p. 19) ("[T]he Court rejects Dollar General's contention that § 12112(b)(6) pertains only to disparate impact claims and that a plaintiff may prove a discrimination claim under § 12112(b)(6) only by offering comprehensive statistical evidence.");

*see also Ala. Aircraft Indus.*, 2019 U.S. Dist. LEXIS 242335 at *18–19 ("Substantial ground for difference of opinion exists when . . . the district courts of the controlling circuit are split as to the issue . . . .").

Supreme Court and Eleventh Circuit case law further demonstrate the substantial ground for a difference of opinion by supporting Dollar General's position that § 12112(b)(6) claims must be analyzed as disparate impact claims requiring statistical evidence. *See Raytheon v. Hernandez*, 540 U.S. 44, 53 (2003) (explaining the ADA permits disparate treatment claims by quoting § 12112(b)(3) and disparate impact claims by quoting § 12112(b)(6)); *Smith v. Miami-Dade Cty.*, 621 F. App'x 955, 961–62 (affirming grant of summary judgment to defendant on a § 12112(b)(6) claim because the plaintiff failed to provide statistical evidence and such evidence is required for a disparate impact claim); *see also* (Memorandum Order, Doc. 131, p. 14) ("Dicta in *Raytheon* undergirds the argument that § 12112(b)(6) pertains only to disparate impact claims.").

### 3.   Immediate appeal on one or both of the questions will materially advance termination of the litigation.

"[T]hat resolution of the question may materially advance the ultimate termination of the litigation—means that the appellate court's immediately addressing the controlling question of law 'would serve to avoid a trial or otherwise substantially shorten the litigation.'" *Johns Manville*, 2006 U.S. Dist. LEXIS 111761 at *3–4 (quoting *McFarlin*, 381 F.3d at 1259). "[The] particular question should yield an 'answer . . . [that would] substantially reduce the amount of litigation left in the case.'" *Ala. Aircraft Indus.*, 2019 U.S. Dist. LEXIS 242335 at *19 (quoting *McFarlin*, 381 F.3d at 1259) (emphasis added). Resolution of one or both of the questions in Dollar General's favor on appeal would materially advance the ultimate termination of the litigation.

The resolution of either question in Dollar General's favor would result in the dismissal of a substantial portion of this lawsuit and remove the claims of potentially hundreds of "aggrieved

4878-9097-2207.4

parties" for whom damages discovery and additional summary judgment briefing would otherwise still be necessary before trial. An appeal to the Eleventh Circuit on these very questions would also occur eventually regardless of the outcome of this discovery, motion practice, and trial because the Court has already found in favor of the EEOC on liability for the GINA claim. Immediate appeal at this juncture would not only remove the immediate need for extensive damages discovery, motion practice, and trial in a case involving approximately 500 "aggrieved parties"—whose damages would all need to be individually proven—but it would not add any time to the resolution of this case because an appeal on these pure legal questions would still come after trial even if it were not permitted now.

The unique procedural posture of this case makes the two presented questions particularly appropriate for immediate appeal. The summary judgment motions addressed in the Court's July 26, 2022 Memorandum Opinion were filed at the direction of the Court ahead of the previously set January 29, 2021 dispositive motion deadline, (Doc. 90), and in response to Dollar General's motion for additional time to conduct damages discovery. (Doc. 95). The Court ordered the filing of those motions to potentially avoid individualized damages discovery for 500 "aggrieved parties" claiming emotional distress and to address an ongoing dispute over the scope of damages discovery. The Court then relayed that, should the ADA or the GINA claims survive summary judgment, the Court would order an appropriate period of time to conduct damages discovery. (Transcript of 10/6/20 Hearing, Doc. 98 at 23). The Court's recent summary judgment ruling allowing those claims to proceed means that additional time will now be needed to conduct that damages discovery and prepare a second round of briefing before any trial is held.

Certifying the two questions presented for immediate appeal, however, could potentially avoid or dramatically reduce this discovery, motion practice, and trial. If the Eleventh Circuit were

to hold that a GINA "acquisition" claim is not a claim of "unlawful intentional discrimination" for which § 1981a permits compensatory and punitive damages, the need for extensive damages discovery on those claims would be mooted because the claims would necessarily fail for lack of Article III standing.   Similarly, if the Eleventh Circuit were to hold that an ADA § 12112(b)(6) claim must be analyzed as a disparate impact claim (as it has previously strongly suggested), the Court would not need to resolve the discovery dispute over the individualized damages sought by 23 ADA "aggrieved parties."   A trial on liability would also be unnecessary on those claims because the EEOC has presented no statistical proof as required to support such claims. Accordingly, certification of these two questions for immediate appeal is appropriate because "resolution of the question[s] may reduce the amount of litigation [and] could save the court and the parties from needlessly expending resources."  *See Blumenfeld v. Regions Bank*, 2018 U.S. Dist. LEXIS 243540, *4 (N.D. Ala. Oct. 29, 2018).

## VI.   CONCLUSION

For the foregoing reasons, Dollar General requests that the Court certify its summary judgment order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) on the two questions identified.

Respectfully submitted,

/s/ Stanley E. Graham
Stanley E. Graham, Esq.
John E. B. Gerth, Esq.
Frederick L. Conrad III, Esq.
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
stan.graham@wallerlaw.com
jeb.gerth@wallerlaw.com
trip.conrad@wallerlaw.com

*Attorneys for Defendant Dolgencorp, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2022, the foregoing Memorandum in Support of Motion for Certification of Interlocutory Appeal was served *via* the court's electronic filing system on the following counsel of record:

**Marsha L. Rucker, Esq.**
**Gerald L. Miller, Esq.**
**Gina Pearson, Esq.**
**Russell P. Parker, Esq.**
**Kurt S. Fischer, Esq.**
Equal Employment Opportunity Commission
1130 22nd Street South
Suite 2000
Birmingham, AL 35205
marsha.rucker@eeoc.gov
gerald.miller@eeoc.gov
gina.pearson@eeoc.gov
kurt.fischer@eeoc.gov
russ.parker@eeoc.gov

**David W. Scott, Esq.**
D.W. Scott Law LLC
P.O. Box 11734
Birmingham, AL 35202
david@dwscottlaw.com

**Byron R. Perkins, Esq.**
Perkins Law
The Civic Center Medical Forum Bldg.
950 22nd Street N., Suite 550
Birmingham, AL 35203
bperkins@perkins-law.com

/s/ Stanley E. Graham